WILLIAM N MURPHY H764407
PO. BOX - 7500 CD-120
CRESCENT CITY CAL
95532-7500

U.S. Northern Dist. of Ca.
U.S. Courthouse
450 Golden Gate Ave.
San Francisco, Ca. 94102-3483

RECEIVED

APR 2 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

PELICAN BAY STATE PRISON
5905 Lake Earl Dr
Crescent City CA 95532



UNITED STATES POSTAGE

$ 02.670

02 1M
0004217666    APR 21 2008
MAILED FROM ZIP CODE 9553

55 0

1    **COMPLAINT BY A PRISONER UNDER THE CIVIL RIGHTS ACT, 42 U.S.C §§ 1983**

2    Name   MURPHY              WILLIAM          C

3         (Last)                    (First)              (Initial)

4    Prisoner Number   # H - 76407

5    Institutional Address  P.O. BOX- 7500 C2/120

6                           CRESCENT CITY CAL 95532-7500

7                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
8
         WILLIAM MURPHY
9    (Enter the full name of plaintiff in this action.)      )
                                                             )
10                  vs.                                      ) Case No.
                                                             ) (To be provided by the Clerk of Court)
11   TILTON                                                  )
                                                             ) **COMPLAINT UNDER THE**
12   WOODFORD                                                ) **CIVIL RIGHTS ACT,**
                                                             ) **Title 42 U.S.C § 1983**
13   PLILER                                                  )
                                                             )      E-filing
14   HOREL et al... (SEE ATTACHED PAGES)                     )
     (Enter the full name of the defendant(s) in this action)
15                                                           )

CV  08  2224  (PR)

16   *[All questions on this complaint form must be answered in order for your action to proceed..]*

17   I.    Exhaustion of Administrative Remedies.

18         [**Note:** You must exhaust your administrative remedies before your claim can go

19         forward. The court will dismiss any unexhausted claims.]

20         A.    Place of present confinement PELICAN BAY STATE PRISON SECURITY HOUSING UNIT (PHU)

21         B.    Is there a grievance procedure in this institution?

22               YES (X)     NO ( )

23         C.    Did you present the facts in your complaint for review through the grievance

24               procedure?

25               YES (X)     NO ( )

26         D.    If your answer is YES, list the appeal number and the date and result of the

27               appeal at each level of review. If you did not pursue a certain level of appeal,

28               explain why.

COMPLAINT                          - 1 -

1    1. Informal appeal _____

2    "SEE ATTACHED EXHIBITS AND CAUSES OF ACTIONS HERE TO"

3    _____

4    2. First formal level_____

5    "SEE ATTACHED EXHIBITS AND CAUSES OF ACTIONS HERETO"

6    _____

7    3. Second formal level_____

8    "SEE ATTACHED EXHIBITS AND CAUSES OF ACTIONS HERETO"

9    _____

10   4. Third formal level _____

11   "SEE ATTACHED EXHIBITS AND CAUSES OF ACTIONS HERETO"

12   _____

13   E.    Is the last level to which you appealed the highest level of appeal available to

14        you?

15             YES (X)    NO ( )

16   F.    If you did not present your claim for review through the grievance procedure,

17   explain why._____

18   _____

19   _____

20   II.   Parties.

21   A.    Write your name and your present address. Do the same for additional plaintiffs,

22        if any.

23   WILLIAM MURPHY *H-76407

24   P.O. BOX - 7500 C₃/120 - CRESCENT, CITY, CAL - 95532- 7500

25            ( SEE PAGE - 3 )

26   B.    Write the full name of each defendant, his or her official position, and his or her

27        place of employment.

28            ( SEE PAGE - 3 )

     COMPLAINT                              - 2 -

## I.
## JURISDICTION

THIS ACTION IS BROUGHT PURSUANT TO 42 U.S.C. 1983 TO REDRESS THE DEPRIVATION UNDER THE COLOR OF STATE LAW OF RIGHTS SECURED BY THE UNITED STATES CONSTITUTION. THIS COURT HAS JURISDICTION OF ALL CLAIMS UNDER 28 U.S.C. §§ 1331 1343. THIS COURT ALSO HAS JURISDICTION OVER THE CODE OF SILENCE INJUNCTION UNDER MADRID v. GOMEZ 389 F. SUPP. 1146 (N.D CAL 1995). THE COURT FURTHER HAS PENDENT JURISDICTION OVER THE STATE CLAIMS PURSUANT TO 28 U.S.C. 1367. PLAINTIFF SEEKS DECLARATORY RELIEF PURSUANT TO 28 U.S.C § 2201 2202. THE UNLAWFUL ACTS PRACTICES ALLEGED OCCURED PRIMARILY WITHIN THIS JUDICIAL DISTRICT AND THE MAJO-RITY OF DEFENDANTS RESIDE WITHIN THIS DISTRICT 28 U.S.C 1391(b) PLAINTIFF RESPECTFULLY REQUEST A JURY TRIAL ON THESE ALLEGATIONS.

## II.
## PARTIES

1. PLAINTIFF IS WILLIAM MURPHY AND IS AND WAS AT ALL TIMES MENTIONED HERE IN A PRISONER OF THE STATE OF CALIFORNIA IN THE CUSTODY OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS (CDC). PLAINTIFF IS CURRENTLY AT PELICAN BAY STATE PRISON (PBSP) AND IS HOUSED WITHIN THE SECURITY HOUSING UNIT (SHU)

2. DEFENDANT TILTON IS THE DIRECTOR OF THE CDC. HE IS LEGALLY RESPONSIBLE FOR THE OVERALL OPERATION OF THE DEPARTMENT AND EACH INSTITUTION UNDER ITS JURISDICTION, INCLUDING PBSP.

3. DEFENDANT WOODFORD IS THE FORMER DIRECTOR OF THE CDC. DURING HER TENOR, SHE WAS LEGALLY RESPONSIBLE FOR THE OVERALL OPERATIONS OF THE DEPARTMENT AND EACH INSTITUTION UNDER ITS JURISDICTION - INCLUDING PBSP.

4. DEFENDANT PLILER IS AN ASSOCIATE DIRECTOR AND MEMBER OF THE DEPARTMENTAL REVIEW BOARD (DRB) FOR THE CDC-ASSIGNED TO THE CDC OFFICE IN SACRAMENTO, SHE IS LEGALLY RESPON-SIBLE FOR ASSISTING THE DIRECTOR OF CDC WITH THE OPERATION OF CDC.

5. DEFENDANT HOREL IS THE WARDEN AT PBSP. HE IS LEGALLY RESPONSIBLE FOR THE OPERATION OF PBSP AND FOR THE WELFARE OF THAT PRISON.

6. DEFENDANT M. CASTELLAW IS THE ASSOCIATE WARDEN AT PBSP AT ALL RELEVANT TIMES MENTIONED HERE IN, WAS THE CHAIR PERSON OF THE CLASSIFICATION COMMITTEE, AND HE IS ALSO LEGALLY RESPONSIBLE FOR ASSISTING THE WARDEN AT PBSP WITH THE OPERATION OF PBSP.

7. DEFENDANT BRADBURY IS THE ASSOCIATE WARDEN AT PBSP AT ALL RELEVANT TIMES MENTIONED HERE IN, HE IS LEGALLY RESPONSIBLE FOR ASSISTING THE WARDEN AT PBSP WITH THE OPERATION OF PBSP.

8. DEFENDANT CASTRO IS A CORRECTIONAL OFFICER AND MEMBER OF THE DRB FOR CDC. AT ALL RELEVANT TIMES MENTIONED HERE IN, HE HELD THE RANK OF SUPERVISORY OFFICIAL FOR IGI WITH CDC AND SPECIAL AGENT ASSIGNED TO THE CDC OFFICE AT SACRAMENTO.

9. DEFENDANT M. RUFF IS A CORRECTIONAL OFFICER FOR CDC. AT ALL RELEVANT TIMES MENTIONED HERE IN HELD THE RANK OF OFFICE CHIEF OF SECURITY (OCS) ASSIGNED TO THE CDC OFFICE AT SACRAMENTO.

10. DEFENDANT EVERETT W. FISHER IS A CORRECTIONAL OFFICER FOR CDC. AT ALL RELEVANT

TIMES MENTIONED HEREIN HELD THE RANK OF CCS ASSIGNED TO THE CDC OFFICE AT SACRAMENTO

11. DEFENDANT D. SPEER IS A CORRECTIONAL OFFICER FOR CDC. AT ALL RELEVANT TIMES MENTIONED HERE IN HELD THE RANK OF CCS ASSIGNED FOR CDC. OFFICE. AT SACRAMENTO

12. DEFENDANT N. GRANNIS IS A CORRECTIONAL OFFICER FOR THE CDC. AT ALL RELEVANT TIMES MENTIONED HERE IN HELD THE RANK OF CHIEF OF INMATE APPEALS, ASSIGNED TO THE CDC. OFFICE AT SACRAMENTO,

13. DEFENDANT A.A. READ IS A CORRECTIONAL OFFICER FOR THE CDC. AT ALL RELEVANT TIMES MENTIONED HERE IN HELD THE RANK OF "APPEALS REVIEWER" ASSIGNED TO THE CDC OFFICE AT SACRAMENTO — WHO IS LEGALLY RESPONSIBLE FOR ASSISTING THE CHIEF OF INMATE APPEALS IN REVIEWING GRANTING/DENYING INMATE APPEALS WITHIN THE CDC.

14. DEFENDANT D. MOUNT IS A CORRECTIONAL OFFICER FOR THE CDC AT ALL RELEVANT TIMES MENTIONED HERE IN HELD THE RANK OF INSTITUTIONAL GANG INVESTIGATOR (IGI) ASSIGNED TO PBSP.

15 DEFENDANT K. OSBORNE IS A CORRECTIONAL OFFICER FOR THE CDC. AT ALL RELEVANT TIMES MENTIONED HERE IN HELD THE RANK OF LIEUTENANT OF THE IGI ASSIGNED TO PBSP.

16. DEFENDANT V. SILVA IS A CORRECTIONAL OFFICER FOR THE CDC. AT ALL RELEVANT TIMES MENTIONED HEREIN HELD THE RANK OF FACILITY CAPTAIN, AND MEMBER OF THE CLASSIFICATION COMMITTEE ASSIGNED TO PBSP,

17 DEFENDANT K. NEALY IS A CORRECTIONAL OFFICER FOR THE CDC. AT ALL RELEVANT TIMES MENTIONED HEREIN HELD THE RANK OF CORRECTIONAL COUNSELOR TWO AND MEMBER OF THE CLASSIFICATION COMMITTEE ASSIGNED TO PBSP.

18. DEFENDANT RIANDA IS A CORRECTIONAL OFFICER FOR THE CDC. AT ALL RELEVANT TIMES MENTIONED HEREIN HELD THE RANK OF CHIEF CLASSIFICATION SERVICE REPRESENTATIVE AND DRB MEMBER ASSIGNED TO THE CDC. OFFICE IN SACRAMENTO,

19. DEFENDANT J. ISCIA IS A CORRECTIONAL OFFICER FOR THE CDC. AT ALL RELEVANT TIMES MENTIONED HERE IN HELD THE RANK OF CLASSIFICATIONS SERVICE REPRESENTATIVE, LEGALLY RESPONSIBLE FOR REVIEWING AND APPROVING ICC DECISIONS WHO IS ASSIGNED TO PBSP.

20. DEFENDANT C. WILBER IS A CORRECTIONAL OFFICER FOR CDC AT ALL RELEVANT TIMES MENTIONED HERE IN HELD THE RANK OF APPEALS COORDINATOR ASSIGNED TO PBSP AND IS LEGALLY RESPONSIBLE FOR PROCESSING INMATES APPEALS AT PBSP.

21. EACH DEFENDANT IS SUED INDIVIDUALLY AND IN HIS/HER OFFICIAL CAPACITY. DEFENDANTS, AT ALL TIMES MENTIONED HEREIN, ACTED UNDER THE COLOR OF CALIFORNIA LAW.

III.

## FACTS PERTAINING TO PLAINTIFFS REVALIDATION

1. FOLLOWING CDC NOTICE OF CHANGES TO DIRECTORS RULES NO.# 99/08, ISSUED AUG. 19, 1999 PRISONERS ALLEGED TO BE PRISON GANG MEMBERS/ASSOCIATES, MAY BE RELEASED FROM THE SHU IF THEY HAVE BEEN DESIGNED INACTIVE, I.E., 'NO INVOLVEMENT IN GANG ACTIVITY' FOR A PERIOD OF SIX YEARS (CAL. CODE REGS. TIT. 15 ("CCR") 3341. (C)(5)).

2. "GANG ACTIVITY" IS DEFINED AS "INMATES... SHALL NOT KNOWINGLY PROMOTE, FURTHER OF ASSIST ANY GANG... [WITH] PLANNING, ORGANIZING, THREATENING, FINANCING, SOLICITING, OR COMMITTING UNLAWFUL ACTS OR ACTS OF MISCONDUCT PURSUANT TO SECTION 3315." SEE CCR 3000, 3023; AND SEE CASTILLO V. ALEMEIDA. NO. C-94-2847 MJJ (N.D.CAL. 2005)(CONCENT, STIPULATION).

3. PLAINTIFF DENIES HE IS A PRISON GANG ASSOCIATE, ACTIVE OR OTHERWISE - PLAINTIFF ALSO DENIES HAVING COMMITTED ANY GANG ACTIVITY WITHIN THE MEANING OF CCR 3000, 3023, 3315.

4. ON 6-27-06 DEFENDANT D. MOUNT OF THE INSTITUTIONAL GANG INVESTIGATOR (IGI) INITIATED AN INVESTIGATION RELATIVE TO PLAINTIFFS CURRENT GANG STATUS- AND ELIGIBILITY FOR SHU RELEASE GIVEN THAT THE LAST SOURCE ITEM USED TO RETAIN PLAINTIFF WAS WELL OVER SIX YEARS OLD.

5. DURING D. MOUNT ET AL... INVESTIGATION, IGI REVIEWED PLAINTIFFS C-FILE, THEY CONTACTED THE SPECIAL SERVICE UNIT (SSU) THE LAW ENFORCEMENT INVESTIGATIVE UNIT (LEIU), AND IT WAS ESTABLISHED THAT THERE WAS NO EVIDENCE THAT PLAINTIFF WAS "CURRENTLY ACTIVE" TO SUPPORT HIS RETENTION (SEE EXH "A"-26       )

6. DEFENDANT D. MOUNT SEARCHED PLAINTIFFS PERSONAL PROPERTY AND CONFISCATED PLAINTIFFS PERSONAL ADDRESS BOOK. AFTER REVIEWING THE ADDRESS BOOK D. MOUNT ALLEGED THAT HE FOUND TWO ADDRESSES IN PLAINTIFFS PROPERTY, WHICH HE BELIEVES WERE "MAIL DROPS", IN WHICH PLAINTIFF "COULD" CONTACT VALIDATED INDIVIDUALS. (SEE EX: "B"-P.46        )

7. THERE WAS NO FINDING NOR EVIDENCE THAT POSSESSION OF THESE TWO ADDRESSES, CONSTITUTED GANG ACTIVITY AS DEFINED IN CCR 3000, 3023, 3378(C)(i)(2), NOR WAS THERE ANY EVIDENCE NOR FINDING THAT PLAINTIFF HAS EVER COMMUNICATED WITH THESE INDIVIDUALS [LUCA WAS PLAINTIFFS CELL MATE OVER SIX YEARS AGO] BY CONTRAST AN INVESTIGATION CONDUCTED BY DEFENDANT HOREL AND CORRECTIONAL COUNSELOR II D. HAWKES DETERMINED:

"A REVIEW OF MURPHY'S CENTRAL FILE REFLECTS THAT THERE IS NO INFORMATION AVAILIBLE TO INDICATE THAT HE HAS COMMUNICATED WITH EME AFFILIATES THROUGH EITHER OF THESE ADDRESSES, OFFICER D. MOUNT WAS INTERVIEWED FOR THIS APPEAL RESPONCE. HE INDICATED THAT DURING THE SEARCH HE DID NOT FIND ANY CORRESPONDENCE BETWEEN MURPHY AND PERSONS ASSOCIATED WITH THE TWO ADDRESSES... THE EVIDENCE OF MURPHY'S ACTUAL PARTICI- PATION IN COMMUNICATING WITH AFFILIATES OR RESIDENTS LINKED TO THE ADDRESSES IS LACKING." (SEE EXH- A-PG. 30) (EMPHASIS ADDED)

8. DEFENDANT D. MOUNT DESIGNATED THIS ITEM CONFIDENTIAL (SEE EX B P.46). DEFENDANTS D. MOUNT AND K. OSBORNE THEN REFERED IT TO THE OFFICE CHIEF OF SECURITY (OCS) WITH THE RECOMMENDATION, THAT PLAINTIFF BE RE-VALIDATED AND RETAINED IN THE SHU FOR A MINIMAL OF SIX MORE YEARS (SEE EXH "A"-P. 27 )

9. ON 8-31-06 PLAINTIFF WAS ISSUED A 128-B2 INDICATING THAT DEFENDANTS, M. RUFF, EVERETT, W. FISHER, AND D. SPEER OF THE OCS, REVALIDATED PLAINTIFF AS AN ACTIVE ASSOCIATE OF THE MEXICAN MAFIA (EME) BASED ON THE ALLEGED ADDRESS --THESE DEFENDANTS IMPOSED A SIX YEAR MINIMUM -- TO REASSESS PLAINTIFFS GANG STATUS AND SHU RELEASE. (SEE EXH "A" PG 2B )

10. PLAINTIFF ASSERTS THAT THE ITEM IS NOT RELIABLE NOR PROPERLY DESIGNATED CONFIDENTIAL. DEFENDANTS FOUND IT RELIABLE, AND CONFIDENTIAL, UNDER "SECTION - F" OF THE 1030 WHICH IS A CATCH

ALL CLAUSE (SEE EX B P.46) HOWEVER THIS CATCH ALL CLAUSE IS NOT PART OF THE REQUIRED RELIABILITY, AND CONFIDENTIAL CRITERIA OUT LINED IN CCR 3321 ET .SEQ...

11. PLAINTIFF ASSERTS THAT THE USE OF THIS "CATCH ALL" CLAUSE, IS UNDERGROUND AND UNENFORCIBLE, BECAUSE IT VIOLATES PLAINTIFFS LIBERTY INTEREST IN FIRST HAVING THE REGULATION LEGALLY PROMULGATED IN COMPLIANCE WITH THE ADMINISTRATIVE PROCEDURAL ACT (APA) PRIOR TO ITS ENFORCEMENT SEE CAL. PEN. CODE 5058 : CAL GOV .CODES § 11340 .5 : 11342(g).

12. PLAINTIFF DOES NOT KNOW INMATES ESTRADA AND MENDOZA, HE HAS NO IDIA WHO THEY ARE; BECAUSE D. MOUNT ET. AL... INAPPROPRIATELY DESIGNATED THIS ITEM CONFIDENTIAL. THEY DEPRIVED PLAINTIFF OF HIS RIGHTS TO A NOTICE OF WHAT ADDRESSES THEY REFERED TO, THUS DEPRIVING PLAINTIFF OF HIS RIGHTS TO PREPARE AND PRESENT A DEFENSE.

13. PLAINTIFF ASSERTS THAT D. MOUNT AND K. OSBORNE VIOLATED PLAINTIFFS LIBERTY INTEREST BECAUSE THEY FAILED TO PROVIDE AN ARTICULABLE   BASIS[1] AS TO WHY THE TWO ADDRESSES (ALLEGED TO HAVE BEEN FOUND IN PLAINTIFFS PHONE BOOK) IS INDICATIVE OF "GANG ACTIVITY" [CCR .3378 (C)(6)(B)(C)! 3378(C)(8)(G)] PRIOR TO SUBMITTING AND USING THEM.[2]

14. PLAINTIFF ASSERTS THAT THE ITEM IS NOT CORROBORATED, AND CANNOT BE USED CCR 3321 GIVEN THAT DEFENDANTS HOREL, HAWKES, AND D. MOUNT CONCLUDED THAT THEIR IS NO EVIDENCE TO CORROBORATE THAT PLAINTIFF HAS EVER ASSOCIATED WITH THE ALLEGED AFFILIATES, OR RESIDENCE OF THE MAIL DROPS. (SEE EX "A"- P's 29-30)

15. PLAINTIFF ASSERTS THAT NO WHERE IN HIS ADDRESS BOOK WILL A COURT OR JURY FIND, ANY EVIDENCE OF GANG ACTIVITY (SEE FOOT NOTES) NOR THE NAMES OF ANY OF THE VALIDATED ASSOCIATES, NOR THAT PLAINTIFF KNEW HE POSSESSED PERSONAL DIRECT "MAIL DROPS" TO MENDOZA AND ESTRADA FOR THE PURPOSE OF THIRD PARTY [UNAUTHORIZED] CORRESPONDENCE AS DESCRIBED BY D. MOUNT.

16. PLAINTIFF ASSERTS THAT D. MOUNT, AND K. OSBORNE'S ALLEGATIONS ARE FALLACIOUS, UNFOUNDED, AND SPECULATIVE & SOLELY BASED ON THEORY AND HYPOTHESIS, THEIR ALLEGATIONS OF A DIRECT LINK ARE CONJECTURED AND DO NOT CONSTITUTE SOME EVIDENCE OF "GANG ACTIVITY" CCR .3000, 3023 3378(C)(1)(2)

17. AS TO INMATE LUCA, PLAINTIFF ASSERTS THAT HE AND LUCA WERE CELL MATES OVER SIX YEARS PRIOR TO CONFISCATING THE ADDRESS BOOK, PLAINTIFF AND LUCA HAVE KNOWN EACH OTHER SINCE THEY WERE KIDS, PRIOR TO THEIR INCARSERATION. THEY ARE WELL AQUAINTED WITH EACH OTHERS FAMILIES, THE ONLY ADDRESS OF ANYONE INCARSERATED WERE TO HIS FAMILY, WHO PLAINTIFF SHARES A PERSONAL RELATIONSHIP WITH AND WHO ARE NOT GANG AFFILIATED. ADDITIONALLY PLAINTIFF HAS NOT WRITTEN TO THE LUCA FAMILY SINCE HE AND LUCA STOPPED BEING CELLMATES SIX YEARS PRIOR TO FINDING THE ADDRESS BOOK- NOR HAS PLAINTIFF ENGAGED IN ANY GANG ACTIVITY WITH RESPECT TO THESE OR ANY ADDRESSES, DEFENDANTS CONCEED THIS (SEE EX "A"- P's 29-30)

18. PLAINTIFF IS INFORMED AND BASED ON INFORMATION, BELIEVES THAT IF THE ADDRESS FOUND ARE KNOWN MAIL DROPS. THEN ALL INCOMING AND OUT GOING MAIL TO OR FROM THE ALLEGED MAIL DROPS ARE CLOSELY SCRUTINIZED AND DOCUMENTED ON A CDC FORM TO SUBSTANTIATE THAT GANG ACTIVITY DID OCCURE - SUCH IS NOT THE CASE HERE.

---

1. AND TO DISCLOSE TO PLAINTIFF
2. SEE PARA 2 SUPRA FOR GANG ACTIVITY DEFINITION

FACTS PERTAINING TO DEFENDANTS INVESTIGATIONS AND FAILURE TO CORRECT UNLAWFUL VALIDATION

19. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS IN THIS COMPLAINT.

20. AFTER PLAINTIFF WAS REVALIDATED, HE PUT DEFENDANTS HOREL ET AL... ON NOTICE OF THE CONSTITUTIONAL VIOLATIONS BY FILING AN ADMINISTRATIVE APPEAL (SEE EX-"A"-p's 23-24-25)

21. D. HAWKES CONDUCTED A THOROUGH INVESTIGATION ON BEHALF OF DEFENDANT HOREL- DEFENDANT HOREL ACKNOWLEGED THAT THERE IS NO CORROBORATION TO THE CONFIDENTIAL INFORMATION. HE STATED THAT THERE WAS NO INFORMATION AVAILABLE TO INDICATE THAT HE (PLAINTIFF) HAS COMMUNICATED WITH EME AFFILIATES THROUGH EITHER OF THESE ADDRESSES. OFFICER D. MOUNT WAS INTERVIEWED FOR THIS APPEAL RESPONSE - HE INDICATED THAT DURING THE SEARCH, HE DID NOT FIND ANY CORRESPONDENCE BETWEEN MURPHY AND PERSONS ASSOCIATED WITH THE TWO ADDRESSES... THE EVIDENCE OF [PLAINTIFFS] ACTUAL PARTICIPATION IN COMMUNICATING WITH THE AFFILIATES OR RESIDENTS LINKED TO THE ADDRESSES IS LACKING (SEE EX'A' P"29-30). AND ALTHOUGH DEFENDANT HOREL DISSAGREED WITH THE VALIDATION (IBID) HE REFUSED TO OVER TURN IT AND OR RELEASE PLAINTIFF BASED ON HIS ALLEGED LACK OF AUTHORITY -GIVING THAT THE [OCS] ALREADY ISSUED ITS DECISION (IBID)

22. ON 11-26-06 PLAINTIFF PUT DEFENDANTS "A.A.READ" AND "N.GRANNIS" ON NOTICE OF THE CONSTITU-TIONAL VIOLATION, -IE, LACK OF CORROBORATION, LACK OF EVIDENCE OR ARTICULABLE BASES ESTABLISHING THE ITEM IS CURRENT GANG ACTIVITY CCR 3000, 3023, 3378(c)(1)(2) - AND THE FAILURE TO PROVIDE SUFFICIENT NOTICE TO PREPARE A DEFENSE CCR 3378(c)(6)(B)(c), 3378(c)(8)(G)(SEE EX'A'-P's 31-32-33) WHICH IS INCORPORATED AND RE-ALLEGED AS FULLY SET-FORTH HERETO.)

23. PLAINTIFF USED DEFENDANT HORELS FINDINGS TO SUBSTANTIATE HIS CLAIMS, THAT THE VIOLATION SHOULD BE REVERSED AND THAT PLAINTIFFS STATUS SHOULD BE CHANGED TO INACTIVE SO THAT HE MAY QUALIFY FOR SHU RELEASE.

24. DISPITE THE NOTICE OF CONSTITUTIONAL VIOLATIONS, DEFENDANTS READ AND GRANIS, VIOLATED DUE PROCESS BY FAILING TO CORRECT THE CONSTITUTIONAL VIOLATIONS TO WHICH THEY KNEW ABOUT WHEN THEY REFUSED TO OVERTURN THE VALIDATION AND TO CHANGE PLAINTIFF STATUS TO INACTIVE. THEIR FAILURE TO ACT CONTRIBUTED TO THE CONSTITUTIONAL VIOLATIONS AS ALLEGED HERETO.

· FACTS PERTAINING TO CONTINUED SEGREGATION AND ROTE AND PERFUNCTORY COMMITTEE HEARINGS WHICH VIOLATE DUE PROCESS ET.SEQ...

25. PLAINTIFF INCORPORATES AND RE-ALLEGES ALL PREVIOUS PARAGRAPHS IN THIS COMPLAINT.

26. ON 1-4-08 CC1 PUGET PROVIDED PLAINTIFF A 114 LOCK UP ORDER INDICATING THAT HE WOULD CONTINUE TO BE SEGREGATED UNTIL HE GOES TO HIS ANNUAL INSTITUTIONAL CLASSIFICATION COMMITTEE (ICC) (SEE EX-"B" P.38)

27. PLAINTIFF EXERCISED HIS RIGHTS TO DUE PROCESS PURSUANT TO WOLFF V. MCDONNELL 418 US.539, 563-70 (1974): TOUSSAINT V. MCCARTHY 801 F.2d 1080 ___ (9TH CIR 1986) CERT.DENIED 481 U.S 1069(1987) BY PROVIDING THE COUNSELOR, HIS VIEWS AND DOCUMENTARY EVIDENCE TO BE CONSIDERED BY THE ICC PRIOR TO MAKING ANY DECISION (SEE EX-P's 41-42-43). WHICH IS REALLEGED AND INCORPORATED AS FULLY SET FORTH IN THIS COMPLAINT.)

28. ON 1-9-08 PLAINTIFF APPEARED BEFORE DEFENDANTS M.CASTELLAW, V.SILVA, AND K.NEALY, AND REITERATED HIS VIEWS, PRESENTED EVIDENCE THAT WARDEN HOREL PREVIOUSLY FOUND THE RETAINING ITEM QUESTIONABLE AND UNCORROBORATED. THESE DEFENDANTS READ PLAINTIFFS VIEWS

7

AND DOCUMENTARY EVIDENCE.

29. PLAINTIFF POINTED OUT THAT HE SHOULD BE ELIGIBLE FOR INACTIVE STATUS - AND OR SHU RELEASE, BECAUSE PRIOR TO FINDING THE TWO ADDRESSES, IGI AND LE IU FOUND THAT THERE IS NO EVIDENCE OF CURRENT GANG ACTIVITY AND AS FOR THE ITEM SUBSEQUENTLY USED FOR REVALIDATION/SEGREGATION IGI HAS ADMITTED IT IS NOT CORROBORATED. (SEE EX "B" PG.45) THE WARDEN AND CCII HAVE QUESTIONED THE ITEM, FINDING THERES NO CORROBORATION NOR INFORMATION THAT PLAINTIFF HAS ACTUALLY AFFILIATED WITH EME AFFILIATES OR THE ADDRESSES (IBID) THEY FURTHER QUESTIONED AND FOUND THE ITEM IS UNSUBSTANTIATED "THE EVIDENCE OF MURPHY'S ACTUAL PARTICIPATION IN COMMUNICATING WITH GANG AFFILIATES OR RESIDENTS LINKED TO THE ADDRESSES IS LACKING" (IBID).

30. PLAINTIFF POINTED OUT THAT THE ONLY REASON THE WARDEN AND CCII DID NOT GRANT PLAINTIFF ADMINISTRATIVE APPEAL CHALLENGING THE VALIDATION WAS BECAUSE THEY LACKED "AUTHORITY" (SEE EX. B - PG. 45) HOWEVER, PLAINTIFF ARGUED THAT SINCE THIS WAS A DIFFERENT PROCEEDING (IE, COMMITTEE) THAT THEY NOW NOT ONLY HAD THE "AUTHORITY", BUT PLAINTIFF NOW HAD THE RIGHT TO BE RELEASED OR AT MINIMAL THE RIGHT TO HAVE THE ITEM SENT BACK TO IGI FOR REINVESTIGATION, AND REJECTION - GIVEN THAT THE WARDEN AND CCII FOUND THE ITEM QUESTIONABLE AND UNCORROBORATED CCR .3341.5(C) (1)(A)(1): 3341.5(C)(3): 3321 ET SEQ... 3378(C)(7): 3378(d).

31. PLAINTIFF ALSO INFORMED DEFENDANTS THAT HE HAD THE RIGHT TO BE RECOMMED FOR INVESTIGATION AND INACTIVE STATUS RELEASE, GIVEN THAT NEW EVIDENCE ESTABLISHES THAT THE ITEM USED IS OVER SIX YEARS OLD CCR 3341.5(C)(5).3378(C) ³

32. DEFENDANTS CASTELLAW, AND NEALY STATED THAT THEY ARE NOT AWARE OF ANY SUCH AUTHORITY AND STATED THEY DO NOT HAVE THE AUTHORITY, NEITHER TO RELEASE PLAINTIFF NOR TO SEND THE INFORMATION BACK TO IGI ONCE IGI HAS MADE THEIR INITIAL DETERMINATION, AND ONCE THE DIRECTOR HAS MADE ITS FINAL DECISION - THUS ESTABLISHING THAT ICC'S ARE HELD IN ROTE FASHION AND PRETEXT FOR INDEFINATE SHU CONFINEMENT

33. DEFENDANTS, CASTELLAW, NEALY AND SILVA REFUSED TO CONSIDER PLAINTIFF FOR RELEASE, INACTIVE STATUS OR TO REFERANCE PLAINTIFFS CASE BACK TO IGI FOR FURTHER INVESTIGATION AND ITEM REJECTION IN COMPLIANCE WITH PLAINTIFFS LIBERTY INTEREST CCR 3341.5(C)(1)(A)(1)3341.5 (C)(3)(5): 3378(C)(7).3378(C)(d). DISPITE PLAINTIFFS ARGUMENT THAT THE WHOLE PURPOSE FOR AN "ANNUAL REVIEW" IS TO REVIEW PLAINTIFFS PLACEMENT, SEGREGATION, EVIDENCE USED TO RETAIN PLAINTIFF AND TO CONSIDER PLAINTIFF FOR RELEASE.

34. PLAINTIFF GAVE DEFENDANTS REFERENCE TO CCR .3341.5(C)(1)(A)(1): 3341.5(C)(3)(5): 3378(C)(7): 3378(C)(d), AND REMINDED THEM THAT THEY HAD AUTHORITY AND PLAINTIFF HAD A RIGHT TO BE CONSIDERED FOR RELEASE, AND RELEASED, TO BE CONSIDERED FOR INACTIVE STATUS, AND TO HAVE THE ITEM PREVIOUSLY FOUND QUESTIONABLE REFERED BACK TO IGI FOR INVESTIGATION AND REJECTION. DEFENDANTS AGAIN STATED THAT THEY HAD NO SUCH AUTHORITY, THAT THEIR JOB IS SOLELY TO

3. PLAINTIFF PRESENTED NEW EVIDENCE PREVIOUSLY UNCONSIDERED, NAMELY THAT THE ADDRESSES FOUND WERE OVER SIX YEARS OLD, ICC COULD'VE VERIFIED THAT LWCA WAS PLAINTIFFS CELL MATE OVER SIX YEARS AGO THUS THIS WARRENTS REFERENCE BACK TO IGI PURSUANT TO CCR .3378(C)(3) BECAUSE HAD IGI AND OCS KNEW THIS, THEY COULD NOT HAVE USED SUCH AN OLD ITEM CCR 3341.5(C)(5) 33 78(C)(1)(2) - ADDITIONALLY, IT WOULD MEAN PLAINTIFF IS ELIGIBLE FOR PRESENT INACTIVE STATUS IBID: ALSO 3378(C).

VERIFY IF PLAINTIFFS PAPER WORK (USED TO RETAIN HIM) IS IN "ORDER" AND NOT TO ADDRESS ITS VALIDITY—, STATING; "ONCE THE DIRECTOR MADE ITS DECISION, ITS FINAL...TAKE IT TO COURT". HENCE ESTABLISHING THAT DEFENDANTS HOREL, BRADBURY AND TILTON HAVE FAILED TO TRAIN AND SUPERVISE THEM IN THE RULES, POLICIES AND THE ADMINISTRATION OF LAW.

35. DEFENDANTS DID NOT DESIGNATE PLAINTIFF AS CURRENTLY ACTIVE NOR DID THEY FIND HE WOULD POSE A SECURITY THREAT IF RELEASED (SEE EX'8" PG 37) YET THEY REFUSED TO RELEASE HIM, MUCH LESS CONSIDER PLAINTIFFS RELEASE AS WAS REQUIRED. DEFENDANT, J. ISOLA THERE AFTER APPROVED PLAINTIFFS INDEFINATE SHU TERM.

FACTS PERTAINING TO DEFENDANTS CODE OF SILENCE AND REFUSAL TO PROCESS APPEALS.

36. PLAINTIFF INCORPORATES AND RE-ALLEGES ALL PREVIOUS PARAGRAPHS.

37. AFTER DEFENDANTS DEMONSTRATED THEIR COMMITTEES ARE HELD IN A ROTE AND PERFUNCTORY FASHION THAT THEY ARE SOLELY A PRETEXT FOR INDEFINATE CONFINEMENT—WHICH REFUSE TO ADHERE TO THE RULE OF LAW (SEE PREVIOUS PARA'S) PLAINTIFF FILED AN ADMINISTRATIVE APPEAL CHALLENGING COMMITTEES REFUSAL TO GRANT MEANINGFUL COMMITTEES · THEIR REFUSAL TO RELEASE PLAINTIFF GIVEN THERE WAS NO EVIDENCE NOR FINDING BY THEM THAT HE IS A PRESENT SECURITY THREAT —NOR PRESENTLY ACTIVE, AND ICC'S REFUSAL TO REFER THE SEGREGATING ITEM BACK TO IGI FOR INVESTIGATION / REJECTION, AND OR IN ACTIVE STATUS REVIEW (SEE EX.B PG 36-37) PLAINTIFF ALLEGED THAT ICC'S ACTIONS WERE UNLAWFUL, UNCONSTITU-TIONAL AND VIOLATED HIS LIBERTY INTERESTS ET SEQ... (IBID)

38. ON JAN 9,08, DEFENDANT C. WILBER ACKNOWLEDGED PLAINTIFF WAS CHALLENGING THE ICC'S ACTIONS / IN ACTIONS, AND MADE SUCH A NOTATION ON THE ADMINISTRATIVE APPEAL — HOWEVER HE RETURNED PLAINTIFFS APPEAL, ALLOWING PLAINTIFF THE OPPORTUNITY TO OBTAIN A COPY OF HIS 128-G CHRONO REFLECTING ICC'S DECISION AND AGREED TO SUSPEND THE TIME FOR FILING THE APPEAL UNTIL THE ADMINISTRATION PROVIDES HIM A COPY OF THE CHRONO (128-G) (EMPHASIS ADDED)

39. AFTER PLAINTIFF RECEIVED HIS CHRONO OF THE ICC'S DECISION—HE RESUBMITTED HIS APPEAL TO DEFENDANT WILBER—NOTING THAT THE CHRONO WAS ATTACHED AS EXHIBIT A-2 PLAINTIFF IS INFORMED, AND BASED ON INFORMATION, BELIEVES THAT C. WILBER CAREFULLY READ PLAINTIFFS APPEAL, REALIZED THAT THE ICC VIOLATED PLAINTIFFS RIGHTS · THUS ATTEMPTED TO COVER IT UP BY REFUSING TO PROCESS PLAINTIFFS APPEAL UNDER THE GUISE THAT PLAINTIFF EXCEEDED THE STATUTE OF LIMITS FOR CHALLENGING THE OSC DECISION.

40. ON JAN, 30·08 · PLAINTIFF INFORMED THE APPEALS COORDINATOR THAT HIS APPEAL WAS TIMELY BECAUSE HE WAS NOT PRESENTLY CHALLENGING THE OCS DECISION—BUT RATHER ICC'S DECISION AND ICC'S ACTIONS. (SEE EX "B" PG 47) WHICH IS INCORPORATED AS FULLY SET FORTH HERE IN) PLAINTIFF INFORMED WILBER THAT THE ICC FAILED TO CONSIDER AND DOCUMENT HIS VIEWS, THAT ICC REFUSED TO ADHERE TO THE RULE OF LAW BY NOT REFERING ITEMS BACK TO IGI WHICH THEY FOUND QUESTIONABLE PURSUANT TO CCR 3378(C)(7) AND THAT HE HAD A RIGHT TO APPEAL ICC'S ADVERSE DECISION.

41. DEFENDANT WILBER AGAIN ·COVERED UP ICC'S ACTIONS BY REFUSING TO PROCESS PLAINTIFFS APPEAL· STATING IT'S TOO LATE TO PROCESS THE VALIDATION. (SEE EXH. 'E' PG 48) YET

WILBER PREVIOUSLY ACKNOWLEDGED AND NOTED THIS APPEAL PERTAINED TO ICC'S ACTIONS (SEE EX B, P.36 )

42. ON 2-3-08 PLAINTIFF AGAIN EXPLAINED TO DEFENDANT WILBER THAT HE WAS NOT PRESENTLY CHALLENGING THE CCS DECISION BUT RATHER THE ICC'S ACTIONS. (SEE EX B, P.48) DEFENDENT WILBER AGAIN REFUSED TO PROCESS PLAINTIFFS APPEAL - INDICATING THAT HE IS REJECTING THE APPEAL "BASED ON CLEAR DIRECTION FROM THE INMATE APPEALS BRANCH BASED ON PRIOR ATTEMPTS BY OTHER INMATES IN THE SAME SITUATION" (SEE EX B, P.48)

43. PLAINTIFF IS INFORMED AND BASED ON INFORMATION BELIEVES - THAT C. WILBER HAS AN UNWRITTEN AND UNDERGROUND POLICY OF REFUSING TO PROCESS INMATES APPEALS CHALLENGING COMMITTEE DECISIONS AND UNLAWFUL ACTIONS - IN AN EFFORT TO COVER UP CONSTITUTIONAL VIOLATIONS IN FURTHERANCE OF THE CODE OF SILENCE, ADDITIONALLY - THIS POLICY IS FURTHER ENFORCED TO SHEILD THEM AND THEIR SUBORDINATES FROM LIABILITY BASED ON RIGOROUS EXHAUSTION POLICIES - SEE 42 .U S C. 1997 ET.SEQ..

44. DEFENDANTS HAVE A CUSTOM AND POLICY OF MAINTAINING A CODE OF SILENCE, AN UNWRITTEN BUT WIDELY UNDERSTOOD CODE DESIGNED TO ENCOURAGE PRISON EMPLOYEES TO REMAIN SILENT OR COVER UP ACTIONS REGARDING THE IMPROPER BEHAVOR OR THEIR FELLOW EMPLOYEES. AS A RESULT OF THEIR FAILURE TO TRAIN SUBORDINATES AND THEIR ACTIVE OPPOSITION TO INVESTIGATIONS OF WRONG-DOINGS BY OFFICERS, APPEALS COORDINATORS, SUPERVISORY, AND DEFENDANTS HAVE RATIFIED AND PERPETUATED THIS PRACTICE AND POLICY.

45. BY REFUSING TO PROCESS INMATES APPEAL - DEFENDANTS KNOW THAT THEY CAN COVER UP UNLAWFUL ACTIONS, GIVEN THAT THEIR ILLEGAL ACTIONS OR ACTS OF MISCONDUCT, GO UNINVES-TIGATED AND THUS UNHEARD. THIS POLICY HAS NOT BEEN ADOPTED IN COMPLIANCE WITH THE A.P.A - THUS IT'S NOT ENFORCEABLE AND ILLEGAL, SEE PEN. CODE .5058(a). GOV. CODE 11340.5, 11342.(9) - IT VIOLATES PLAINTIFFS FIRST AMENDMENT RIGHTS TO PETITION FOR GRIEVANCES, AND HIS RIGHTS TO APPEAL ADVERSE ACTIONS OR DECISIONS .CCR 3084.1(a) AND THIS COURTS MADRID V GOMEZ (TILTON 889 F.SUPP.1146 (N.D.CAL 1995) INJUNCTION AGAINST THE CODE OF SILENCE.

46. PLAINTIFF IS SERVING A TERM OF 30-TO-LIFE, HIS RETENTION IN THE SHU AFFECTS THE DURATION OF HIS CONFINEMENT GIVEN THAT HE IS IN ELIGIBLE FOR GOOD TIME WORK TIME CREDITS AND IT IS THE BOARD OF PRISON TERMS POLICY NOT TO PAROLE ANY ONE WHO IS IN THE SHU.

### 47. SHU'S PHYSICAL DESCRIPTION

(A) PLAINTIFF IS HOUSED IN THE SECURITY HOUSING UNIT (SHU) IN PELICAN BAY STATE PRISON, HE REMAINS CONFINED TO A SHU POD, THERE ARE EIGHT CELLS PER POD, EACH CELL IS 80 SQUAR FEET, THE CELL DOORS ARE MADE OF HEAVY GAUGE PERFORATED METAL, WHICH SIGNIFICANTLY BLOCKS VISION, AND LIGHTS IN EACH CELL ARE PRIMARILY LIT WITH A FLUORESCENT LIGHT THAT CAN BE OPERATED BY THE INMATE . THE SHU INTERIOR IS DESIGNED TO REDUCE VISUAL STIMULATION, THE CELL BLOCKS ARE MARKED THROUGHOUT BY DULL SAMENESS IN DESIGN AND COLOR, THE CELLS ARE WINDOWLESS, THE WALLS ARE WHITE AND CONCRETE, WHEN INSIDE THE CELL, ALL ONE CAN SEE THROUGH THE PERFORATED METAL DOOR IS ANOTHER WHITE WALL. A SMALL EXERCISE PEN WITH CEMENT FLOOR AND WALLS IS ATTACHED TO THE END OF EACH POD. BECAUSE OF THE WALLS BEING 20-FEET HIGH, THEY PRECLUDE ANY VISION OF THE OUT SIDE WORLD, THE TOP OF THE PEN IS COVERED BY A MESH SCREEN AND PARTLY BY A PLASTIC RAIN COVER . GIVEN THERE CELL LIKE

DESIGN AND PHYSICAL ATTACHMENT TO THE POD ITSELF, THE PEN'S ARE MORE SUGGESTIVE OF SATELLITE CELLS THAN FOR EXERCISE. THE OVERALL EFFECT OF THE SHU IS ONE OF STARK STERILITY AND UNREMITTING MONOTONY, PLAINTIFF HAS SPENT OVER 14-YEARS WITHOUT EVER SEEING ANY ASPECT OF THE OUTSIDE WORLD EXCEPT FOR A SMALL PATCH OF SKY.

B. SOCIAL AND RECREATIONAL ISOLATION

PLAINTIFF HAS SPENT YEARS WITH LITTLE TO NO OPPORTUNITY FOR NORMAL CONTACT WITH OTHER PEOPLE, HE REMAINS CONFINED TO HIS CELL 22½ HOURS A DAY. FOOD TRAYS ARE PASSED THROUGH A NARROW FOOD PORT IN THE CELL DOOR. PLAINTIFF EATS ALL HIS MEALS ALONE IN HIS CELL. HE IS PRECLUDED FROM ANY SOCIAL INTERACTION WITH OTHER PRISONERS OR STAFF, HE IS NOT ALLOWED TO PARTICIPATE IN ANY JOB OPPORTUNITIES OR ANY OTHER PRISON VOCATIONAL, RECREATIONAL OR EDUCATIONAL PROGRAMS. GROUP EXERCISE IS NOT ALLOWED, HE IS PROVIDED NO RECREATIONAL EQUIPMENT. JUST ALLOWED TO SIMPLY SPEND HIS YARD TIME PACING AROUND THE EDGES OF THE PEN.

PLAINTIFF CAN NOT SEE THE INMATES IN THE ADJOINTING CELLS. INTERACTION WITH CORRECTIONAL STAFF IS KEPT TO AN ABSOLUTE MINIMUM, WHEN PLAINTIFF LEAVES HIS CELL TO GO TO THE EXERCISE PEN, THE DOOR IS OPENED AUTOMATICALLY BY A CONTROL OFFICER, THE DOOR TO THE PEN IS ALSO CONTROLLED ELECTRONICALLY—THE MINIMAL CONTACT PLAINTIFF HAS WITH STAFF OCCURES IN A ROUTINE SETTING AFTER PLAINTIFF IS SUBJECTED TO A HUMILIATING AND DEGRADING UNCLOTHED CAVITY SEARCH, SIMPLY TO PLACE PLAINTIFF IN HANDCUFFS AND WAIST CHAINS AND ESCORT HIM TO ANOTHER PART OF THE PRISON, ALL VISITS ARE CONDUCTED BY TELEPHONE THROUGH A THICK GLASS WINDOW - PREVENTING AN OPPORTUNITY FOR HUMAN TOUCH—PLAINTIFF HAS SPENT OVER 16-YEARS WITHOUT HUGGING HIS PARENTS, SIBLINGS, RELATIVES AND FRIENDS, GIVEN THE DISTANCE AND REMOTENESS OF THE PRISON. PLAINTIFFS VISITS ARE INFREQUENT, NO PHONE CALLS ARE PERMITTED—PLAINTIFF HAS BEEN SEVERELY DEPRIVED OF ANY HUMAN CONTACT, PLAINTIFF IS INFORMED AND BELIEVES THAT THE RESTRICTIONS, AT PELICAN BAY STATE PRISON SHU ARE MORE HARSH THAN ANY OTHER SUPER MAX HOUSING UNIT IN THE NATION.

C. IMPACT ON MENTAL HEALTH

BASED ON PSYCHOLOGICAL TESTIMONY "THIS COURT HAS FOUND THAT SEVERE REDUCTION IN ENVIRON—MENTAL STIMULATION AND SOCIAL ISOLATION CAN HAVE SERIOUS PSYCHIATRIC CONSEQUENCES ... AND THESE CONSEQUENCES ARE TYPICALLY MANIFESTED IN THE DEPRIVATIONS [CITED ABOVE] STUDIES TAKEN IN THE MADRID CASE ("THE COURT FINDS THAT MANY IF NOT MOST, IF THE INMATES IN THE SHU EXPERIENCE SOME DEGREE OF PSYCOLOGICAL TRAUMA IN REACTION TO THEIR EXTREME SOCIAL ISOLATION AND SEVERITY OF THE RESTRICTED ENVIRONMENTAL STIMULATION IN THE SHU"(Id AT 1230-32)) BASE ON PERSONAL EXPERIENCES AND AN INDEPENDENT STUDY CONDUCTED BY THE LOS ANGELES TIMES, PLAINTIFF BELIEVES, THAT THE CONDITIONS IN SHU CAN TURN HIM INTO A MENTAL HEALTH CASE (SEE EX "C" P'S 51-THRU-57)

LEGAL CLAIMS

FIRST CAUSE OF ACTION

(LIBERTY INTEREST --- 14TH AMENDMENT)

48. PLAINTIFF REALLEGES AND INCORPORATES ALL PREVIOUS PARAGRAPHS OF THIS COMPLAINT.

49. DEFENDANTS D. MOUNT, K. OSBORN HAVE VIOLATED PLAINTIFFS LIBERTY INTEREST BY ENFORCING A POLICY AND RELYING ON A CATCH-ALL CLAUSE TO DESIGNATE THE ITEM USED TO RETAIN HIM "CONFIDEN-TIAL". CAL.PEN.CODE 5058(a) PERMITS THE DIRETOR TO AMEND OR PRESCRIBE RULES AND REGULATIONS,

11.

HOWEVER" THE RULES AND REGULATIONS SHALL BE PROMULGATED AND FILED PURSUANT TO THE (APA)(Ibid)—
GOVERNMENT CODE DEFINES" REGULATION AS . . EVERY RULE , RESULATION ,ORDER ,OR STANDARD OF
GENERAL APPLICATION OR THE AMENDMENT , SUPPLEMENT OR REVISION OF ANY RULE ,REGULATION,
ORDER OR STANDARD ADOPTED BY ANY STATE AGENCY TO IMPLEMENT, INTERPRET, OR MAKE SPECIFIC —
THE LAW ENFORCED OR ADMINISTERED BY IT, OR TO GOVERN ITS PROCEDURE," GOV CODE 11340.5(a)
PROVIDES" NO STATE AGENCY SHALL ISSUE ,UTILIZE ,ENFORCE ,OR ATTEMPT TO ENFORCE ANY GUIDELINE
CRITERION ,BULLETIN ,MANUAL ,INSTRUCTION ,ORDER ,STANDARD OR GENERAL APPLICATION OR RULE WHICH
IS A REGULATION AS DEFINED IN SUB(G )OF SECTION 11342 UNLESS THE GUIDELINE ,CRITERION ,
BULLETIN ,MANUAL INSTRUCTION ,ORDER ,STANDARD OF GENERAL APPLICATION OR OTHER RULE HAS
BEEN ADOPTED AS A REGULATION AND FILED WITH THE SECRETARY OF STATE PURSUANT TO [APA]"—
THE CATCHALL CLAUSE USED BY DEFENDANTS TO DESIGNATE THE ITEM CONFIDENTIAL IS A POLICY
GUIDELINE OR CRITERION , WHICH WAS NOT LEGALLY PROMULGATED IN COMPLIANCE WITH PLAINTIFFS
LIBERTY INTERESTS WITH IN THE APA PRIOR TO DEFENDANTS ENFOREMENT /UTILIZATION OF IT ON
PLAINTIFF — TO DEPRIVE HIM DISCLOSURE OF VITAL INFORMATION , THUS THEY VIOLATED HIS RIGHTS
AS ALLEGED HERE TO .

### SECOND CAUSE OF ACTION
( 14 TH AMENDMENT—LIBERTY INTEREST TO SUFFICIENT NOTICE )

50. PLAINTIFF REALLEGES AND INCORPORATES ALL PREVIOUS PARAGRAPHS OF THIS COMPLAINT
51. DEFENDANTS D. MOUNT AND K. OSBORN VIOLATED PLAINTIFFS RIGHTS TO DUE PROCESS AND LIBERTY
INTEREST UNDER CCR .3321 (b)(3)(B) ;3378(C )(6)(B)(C) ; 3378(C )(8)(G) ' AND WOLFF .V. MC DONNELL
418 U.S. 539, 564 (1974 )BECAUSE THEY FAILED TO DISCLOSE AS MUCH INFORMATION POSSIBLE AND
PROVIDE ADIQUATE NOTICE OF ALL SOURCE ITEMS USED TO RE VALIDATE AND RETAIN PLAINTIFF IN THE
SHU—24 HOURS IN ADVANCE , SO THAT PLAINTIFF CAN PREPARE A DEFENSE . THERE IS NO EVIDENCE
THAT INFORMS PLAINTIFF , WHICH ADDRESS WERE MAIL DROPS — IN DOING SO WOULD NOT HAVE
THREATENED SECURITY , IT WAS ONLY DESIGNATED CONFIDENTIAL TO DEPRIVE PLAINTIFF A
DEFENSE . THE INFORMATION PROVIDED TO PLAINTIFF WAS VAGUE AND MADE IT IMPOSSIBLE
FOR HIM TO PRESENT A DEFENSE .

### 3 RD CAUSE OF ACTION
( 14 TH AMENDMENT—LIBERTY INTEREST )

52 . PLAINTIFF REALLEGES AND INCORPORATES ALL PREVIOUS PARAGRAPHS OF THIS COMPLAINT
53. DEFENDANTS D. MOUNT AND K. OSBORNE VIOLATED MY LIBERTY INTEREST UNDER CCR .3378(C)
(1)(2) ; 3378(C )(6)(B )(C) ; 3378(C)(8)(L) BECAUSE THEY FAILED TO "VERIFY" ENSURE AND ARTICULATE
HOW THE TWO ADDRESSES IN PLAINTIFF PHONE BOOK ESTABLISHES PLAINTIFF IS A "CURRENTLY ACTIVE
ASSOCIATE AS DEFINED IN SEC .3000 · IE. COMMITING ILLEGAL ACT OF MISCONDUCT OR BEHALF OF
GANG CURRENT ACTIVE IS DEFINED AS ANY DOCUMENTED GANG ACTIVITY WITHIN THE PAST SIX YEARS
CONSISTENT WITH 3341.5(c)(5)" Id AT 3378(C)(1)(2) — BEFORE SUBMITTING IT TO THE OCS FOR
VALIDATION AND SEGREGATION — NO SUCH VERIFICATION , ARTICULATION WAS MADE TO PLAINTIFF
OR THE OCS —AS TO HOW HAVING TWO ADDRESSES IN A PHONE BOOK IS EVIDENCE THAT PLAINTIFF
HAS COMMITTED ILLEGAL ACTS OF MISCONDUCT ON BEHALF OF THE PRISON GANG CLASSIFIED AS
SERIOUS WITH IN A SIX YEAR PERIOD — SO THAT PLAINT CAN REFUTE IT .

12

## 4TH CAUSE OF ACTION

( 14TH AMENDMENT, LIBERTY INTEREST, INSUFFICIENT EVIDENCE OF GANG ACTIVITY )

54. PLAINTIFF REALLEGES AN INCORPORATES BY REFERANCE ALL PREVIOUS PARAGRAPHS OF THIS COMPLAINT

55. ALL DEFENDANTS VIOLATED PLAINTIFFS RIGHTS TO DUE PROCESS AND LIBERTY INTEREST BECAUSE THEY REVALIDATED AND ORDERED PLAINTIFFS SEGREGATION FOR SIX MORE YEARS BASED ON INSUFFICIENT EVIDENCE OF GANG ACTIVITY CCR. 3000, 3023, DEFINES GANG ACTIVITY AS; INMATES AND PAROLEES SHALL NOT KNOWINGLY PROMOTE, FURTHER ASSIST ANY GANG...WITH THE PLANING, ORGANIZING, THREATENING, FINANCING, SOLICITING OR COMMITTING UNLAWFUL ACTS OR ACTS OF MISCONDUCT CLASSIFIED AS SERIOUS PURSUANT TO SECTION 3315 Ibid [4]. THE FACT THAT D. HAWKES AND DEFENDANT HOREL ADMITTED THAT EVIDENCE OF SUCH ACTIVITY IS NON-EXISTANT AND THAT PLAINTIFF WAS NOT PROVIDED A RULES VIOLATION REPORT FOR ENGAGING IN GANG ACTIVITY AS IS MANDATED BY CCR. 3315 ET. SEC - ESTABLISHES THAT HAVING TWO ADDRESSES IN A PHONE BOOK IS NOT GANG ACTIVITY.

## 5TH CAUSE OF ACTION

( 14TH AMENDMENT - LIBERTY INTEREST - INSUFFICIENT EVIDENCE OF ASSOCIATION / COMMUNICATION )

56. PLAINTIFF REALLEGES AND INCORPORATES BY REFERENCE ALL PREVIOUS PARAGRAPHS OF THIS COMPLAINT.

57. ALL DEFENDANTS VIOLATED PLAINTIFFS RIGHTS TO DUE PROCESS AND LIBERTY INTERESTS BY REVALIDATING AND SEGREGATING PLAINTIFF BASED ON INSUFFICIENT EVIDENCE OF ASSOCIATION / COMMUNICATION - BOTH CCR 3378(c)(8)(G) AND 3378(c)(8)(L) REQUIRE, AN ACTION OR INTENT - WHICH THE REVIEWER CAN ARTICULATE, IE., THAT PLAINTIFF IS ASSOCIATING AND COMMUNICATING WITH A GANG MEMBER OR ASSOCIATE [5] - IN THIS CASE D. MOUNT AND K. OSBORNE - STATE ONLY THAT THE TWO ADDRESSES MERELY SHOW PLAINTIFF "COULD" COMMUNICATE WITH ALLEGED ASSOCIATES OR MEMBERS - (SEE EX"B" P. 46 ) NOT THAT HE WOULD NOR DID, INFACT HE CITES NO EVIDENCE THAT PLAINTIFF DID OR MADE AN ATTEMPT TO COMMUNICATE OR ASSOCIATE WITH THE MEMBERS OR ASSOCIATES. BY CONTRAST D. MOUNT ADMITTED THERE WAS NO EVIDENCE THAT PLAINTIFF ACTUALLY HAS ASSOCIATED OR COMMUNICATED WITH THE ALLEGED MEMBER / ASSOCIATES (SEE EX"B" P. 48) D. HAWKES AND DEFENDANT HOREL ALSO ADMIT THERE IS NO EVIDENCE OF PLAINTIFF ACTUAL COMMUNICATION / ASSOCIATION WITH THESE MEMBER OR ASSOCIATES AND THAT SUCH EVIDENCE IS LACKING (EX"B" P. 45 ) AND YET DESPITE THE LACK OF SUFFICIENT EVIDENCE OR ACTUAL ASSO-CIATION OR COMMUNICATIONS - DEFENDANTS STILL OPTED TO REVALIDATE AND SEGREGATE PLAINTIFF.

## 6TH CAUSE OF ACTION

( 14TH AMENDMENT - LIBERTY INTEREST - EVIDENCE NOT RELIABLE )

58. PLAINTIFF REALLEGES AND INCORPORATES BY REFERENCE ALL PREVIOUS PARAGRAPHS IN THIS COMPLAINT.

59. D. MOUNT, K. OSBORN, M. RUFF, E. FISHER, AND D. SPEER VIOLATED PLAINTIFFS RIGHTS TO

---

4. DEFENDANTS STIPULATED IN PREVIOUS LITIGATION THAT THIS IS THE PRECISE DEFINITION OF GANG ACTIVITY SEE. CASTILLO V. ALAMEIDA ET. AL ... (N.D. CAL)

5. THAT EVIDENCE MUST BE WITH IN A SIX YEAR PERIOD CCR. 3341.5(c)(5): 3378(c)(1)(Q) .

DUE PROCESS - WHICH REQUIRES THAT CONFIDENTIAL INFORMATION BE RELIABLE BEFORE IT IS USED ADVERSELY. CATO. V. RUSHEN, 824 F.2d 703, _____ (9TH CIR. 1987), CCR. 3321(b)(1) - CCR.3321(C)(1)-(5), PROVIDES GUIDELINES TO WHERE A SOURCES RELIABILITY MAY BE ESTABLISHED. IN THIS CASE PLAINTIFF WAS VALIDATED AND ORDERED SEGREGATED BY DEFENDANTS BASED ON EVIDENCE NOT FOUND NOR DOCUMENTED UNDER CCR.3321(C)(i)-(5) GUIDELINES.

## 7TH CAUSE OF ACTION

( 14TH AMENDMENT - LIBERTY INTEREST - UNDERGROUND RULES )

· 60. PLAINTIFF RE-ALLEGES AND INCORPORATES BY REFERENCE ALL PREVIOUS PARAGRAPH IN THIS COMPLAINT.
61. DEFENDANTS D. MOUNT, K. OSBORN, M. RUFF, E. FISHER, D. SPEER, HOREL, BRADBURY, CASTELLAW, SILVA AND NEALY VIOLATED PLAINTIFFS LIBERTY INTEREST BY VALIDATING AND OR ORDERING FURTHER SEGREGATION BASED ON UNDERGROUND CRITERIA, GUIDELINES NOT LEGALLY PROMULGATED IN COMPLIANCE WITH THE APA, - AS INDICATED IN PARA 58 ANTE, ANY CONFIDENTIAL EVIDENCE USED ADVERSELY MUST BE FOUND RELIABLE UNDER CCR.3321(C)(1)-(5) GUIDELINES (Ibid), IN THIS CASE DEFENDANTS VALIDATED AND SEGREGATED PLAINTIFF BASED ON A CATCH ALL GUIDELINE "OTHER" (SEE EX "B"-P. 4B) WHICH IS NOT A GUIDELINE/CRITERION LEGALLY PROMULGATED IN COMPLIANCE WITH THE APA WHICH IS MANDATED SEE CAL. PEN. CODE 5058: GOV. CODES 11340.5; 11342(9) AND HENCE [HE VIOLATED] PLAINTIFF LIBERTY INTERESTS BY ENFORCING SUCH GUIDELINES ON HIM.

## 8TH CAUSE OF ACTION

( 14TH AMENDMENT - LIBERTY INTEREST - EVIDENCE UNCORROBORATED )

62. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS OF THIS COMPLAINT.
63. DEFENDANTS M. RUFF, D. SPEER, E. FISHER, D. MOUNT, AND K. OSBORN VIOLATED PLAINTIFFS LIBERTY INTEREST WHICH PROHIBITS ANY DECISION [TO BE] BASED UPON CONFIDENTIAL INFORMATION UNLESS OTHER DOCUMENTATION CORROBORATES THE INFORMATION - CCR.3321(b)(1), IN THIS CASE D. MOUNT HAS ADMITTED THAT DURING THE SEARCH HE FOUND NO CORROBORATING EVIDENCE THAT PLAINTIFF HAD ASSOCIATED WITH ANYONE CONNECTED TO THESE TWO ADDRESSES (SEE EX "B"-P. 45 ) DEFENDANTS CCII HAWKES AND HOREL HAVE STATED THE EVIDENCE OF MURPHYS ACTUAL PARTICIPATION IN COMMUNICATING WITH THE AFFILIATES OR RESIDENTS LINKED TO THE ADDRESS IS LACKING, YET DISPITE THE LACK OF MANDATORY CORROBORATION, DEFENDANTS HAVE VALIDATED AND SEGREGATED PLAINTIFF BASED ON THIS ITEM.

## 9TH CAUSE OF ACTION

( 14TH AMENDMENT - DUE PROCESS )

· 64. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS IN THIS COMPLAINT
65. DEFENDANTS HOREL, A.A READ AND GRANIS - VIOLATED PLAINTIFFS RIGHTS TO DUE PROCESS BY FAILING TO CORRECT THE CONSTITUTIONAL VIOLATIONS FOR WHICH PLAINTIFF PROVIDED THEM NOTICE THEY KNEW PLAINTIFFS RIGHTS WERE BEING VIOLATED AND HAD THE AUTHORITY TO STOP AND CORRECT THESE CONSTITUTIONAL VIOLATIONS - THEIR FAILURE TO ACT, CONTRIBUTED TO THE CONSTITUTIONAL VIOLATIONS ALLEGED HERE TO, AS THEY DID NOTHING TO STOP THEM.

## 10 TH CAUSE OF ACTION

( 14TH AMENDMENT - DUE PROCESS, ICC IS PRETEXT FOR INDEFINATE CONFINEMENT )

66. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS OF THIS COMPLAINT.

14

. 67. DEFENDANTS HOREL, BRADBURY, CASTELLAW, V. SILVA, K. NEALY AND J. ISOLA VIOLATED
PLAINTIFFS RIGHTS TO DUE PROCESS WHICH ENTITLE HIM TO MEANINGFUL COMMITTEE REVIEWS WHICH
ARE NOT PRETEXT FOR INDEFINATE CONFINEMENT HEWIT V. HELMS 459 U.S. 460 (1983) THE FACT THAT
DEFENDANTS ADMITTED AT COMMITTEE THAT THEY HAVE NO AUTHORITY TO RELEASE PLAINTIFF FROM THE
SHU NOR CONSIDER SUCH A RELEASE, NOR TO REFER PLAINTIFFS CASE BACK TO IGI, BUT THE COMMITTEE
IS ONLY HELD TO VERIFY THAT PLAINTIFFS DOCUMENTS ARE IN ORDER--ESTABLISHES THAT THIS AND
ALL COMMITTEES PLAINTIFF WILL ATTEND IN P.B.S.P SHU ARE UNCONSTITUTIONALLY HELD IN
ROTE FASHION AND ARE SOLELY A PRETEXT FOR INDEFINATE CONFINEMENT. DEFENDANTS ALSO
RENDERED PLAINTIFFS DUE PROCESS RIGHTS TO BE PRESENT AND PRESENT HIS VIEWS/DOCUMENTARY
EVIDENCE UNDER WOLFF V. MCDONNELL 418 U.S. 539, 563-70 (1974) MEANGLESS, WHICH IS
ESTABLISHED BY THE FACT THAT THE VIEWS/EVIDENCE PRESENTED BY PLAINTIFF (SEE EX.B P.s. 41-THRU-46)
WERE NEVER NOTED IN THE 128-G (SEE EX B P. 39) DEFENDANTS SIMPLY NOTED PLAINTIFF DISAGREED
(IBID)--ADDITIONALLY DEFENDANT ADMISSION SEE EX B - P. 39 THAT REGARDLESS OF ANY EVIDENCE
OR VIEWS SUBMITTED THAT THEY WILL NEVER CONSIDER RELEASING PLAINTIFF UNLESS HE SERVES
SIX-YEARS MINIMAL OR DEBRIEFS, THIS ESTABLISHES THAT THIS COMMITTEE AND ALL FUTURE
. COMMITTEES ARE HELD IN ROTE FASHION AND ARE INDEED A PRETEXT FOR INDEFINATE CONFINEMENT.

## 11 TH CAUSE OF ACTION

(14TH AMENDMENT-LIBERTY INTEREST-REFUSAL TO CONSIDER RELEASE)

. 68. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS IN THIS COMPLAINT.
69. DEFENDANTS HOREL, BRADBARRY, J. ISOLA, CASTELLAW, V. SILVA, AND K. NEALY's REFUSAL TO
CONSIDER PLAINTIFFS RELEASE AND OR RELEASE HIM VIOLATE PLAINTIFFS LIBERTY INTEREST WHICH
PROVIDES PLAINTIFFS LIBERTY INTEREST, WHICH PROVIDES THAT PLAINTIFF BE CONSIDERED FOR
RELEASE EVERY 180 DAYS, SEE CCR.3341.5(C)(1)(A)(1)--CCR-3341.5(C)(3) MANDATES THAT DEFENDANTS
RELEASE PLAINTIFF WITHIN 11-MONTHS UNLESS HE IS FOUND TO BE A PRESENT SECURITY THREAT, HERE
DEFENDANTS BASES FOR DENYING CONSIDERATION FOR RELEASE AND RELEASE TO PLAINTIFF, WAS NOT
BECAUSE THEY DEEMED HIM A SECURITY THREAT--NO SUCH FINDING WAS MADE (SEE EX B P.39)
BUT RATHER THEY REFUSED TO RELEASE HIM BECAUSE THEY BELIEVED THEY HAD NO AUTHORITY TO
CONSIDER, MUCHLESS GRANT THE RELEASE.

## 12 TH CAUSE OF ACTION

(14TH AMENDMENT-LIBERTY INTEREST-REFUSAL TO REFER INFORMATION BACK TO IGI)

70. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS IN THIS COMPLAINT.
71. DEFENDANTS HOREL, BRADBURY, J. ISOLA, CASTELLAW, SILVA, AND NEALY REFUSAL TO REVIEW
AND REFER EVIDENCE PREVIOUSLY FOUND QUESTIONABLE BACK TO IGI FOR INVESTIGATION AND
REJECTION VIOLATES PLAINTIFFS LIBERTY INTEREST IN CCR-3378(C)(7) WHICH PROVIDES THAT " THE CDC
812-A AND 812-B SHALL BE REVIEWED BY A CLASSIFICATION COMMITTEE AT EACH ANNUAL HEARING
AND UPON ANY REVIEW OR TRANSFER CONSIDERATION. . QUESTIONABLE GANG IDENTIFICATION, NOTATION...
SHALL BE REFERED TO IGI FOR INVESTIGATION"- HERE PLAINTIFF PRESENTED DEFENDANTS WITH
EVIDENCE AND STATEMENTS FROM D. HAWKES AND DEFENDANT HOREL WHICH NOT ONLY QUESTIONED
THE EVIDENCE, BUT FOUND IT UNCORROBORATED AND LACKING (SEE EX B P. 44-45) THE ONLY REASON
DEFENDANT HOREL DID NOT VACATE THE VALIDATION, WAS BECAUSE HE LACKED AUTHORITY(IBID)-

HOWEVER GIVEN THAT THIS WAS A DIFFERENT PROCEEDING (I.E. COMMITTEE) ONCE PLAINTIFF ALERTED THEM OF THEIR PREVIOUS FINDINGS HE WAS ENTITLED TO HAVE DEFENDANTS REFER THE EVIDENCE, WHICH THEY FOUND QUESTIONABLE, BACK TO IGI FOR INVESTIGATION AND REJECTION CCR.3378(c)(7) THEIR REFUSAL TO DO SO DISPITE THEIR PRESENT AUTHORITY AND PLAINTIFFS ENTITLEMENT WAS A DELIBERATE VIOLATION OF LAW.

## 13 TH CAUSE OF ACTION

( 14TH AMENDMENT LIBERTY INTREST REFUSAL TO REFER CASE BACK FOR INACTIVE STATUS )

72. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS IN THIS COMPLAINT.

73. DEFENDANTS, HOREL, BRADBURY, J. ISOLA, CASTELLAW, SILVA, AND NEALY's REFUSAL TO REFER NEW EVIDENCE AND PLAINTIFFS CASE BACK TO IGI, OCS, AND DRB FOR INVESTIGATION AND INACTIVE STATUS REVIEW VIOLATED PLAINTIFFS LIBERTY INTEREST IN CCR.3378(c)(7) WHICH MANDATES THAT NEW EVIDENCE REGARDING THE INITIAL VALIDATION BE REFERRED TO IGI FOR INVESTIGATION, CCR.3341.5(c)(5), 3378(e) MANDATES THAT INMATES WITH NO GANG ACTIVITY IN "SIX YEARS" BE DESIGNATED INACTIVE AND BE REFERED TO THE IGI, OCS, AND DRB FOR INACTIVE STATUS REVIEW AND RELEASE. HERE PLAINTIFF OFFERED DEFENDANTS NEW VERIFIABLE EVIDENCE, NAMELY THEY CAN CLEARLY VERIFY LUCA WAS PLAINTIFFS CELL MATE OVER SIX YEARS AGO - AND ANY ADDRESS IN PLAINTIFFS PHONE BOOK WAS PLACED IN THERE OVER SIX YEARS AGO - THUS NEW EVIDENCE PROVES THE ITEM CANNOT BE USED AS IT WAS OVER SIX YEARS OLD CCR.3378(c)(1)(2) - ADDITIONALLY, BECAUSE THERE IS NO OTHER EVIDENCE FORMING THE BASES OF PLAINTIFFS RETENTION (SEE EX'B' $p^5$ 44-45) HIS LIBERTY INTEREST WAS VIOLATED BECAUSE NOT ONLY DOES CCR.3378(c)(7) REQUIRE THAT THE NEW EVIDENCE BE REFERED BACK TO IGI FOR INVESTIGATION (REJECTION, BUT ADDITIONALLY PLAINTIFF IS ENTITLED OF HAVING IT BE REFERRED TO THE APPROPRIATE AUTHORITIES FOR INACTIVE STATUS DESIGNATION / REVIEW IN COMPLIANCE WITH CCR.3341.5(c)(5)(INMATES WITH NO GANG ACTIVITY IN SIX YEARS SHALL BE DESIGNATED INACTIVE) SEE ALSO CCR.3378(e) - ESPECIALLY GIVEN THAT THERE IS NO ITEM CURRENT OF GANG ACTIVITY WITH IN PLAINTIFFS C-FILE (SEE PARA. 2 ANTE) DEFENDANTS FAILURE TO DO ACCORDINGLY VIOLATED PLAINTIFFS RIGHTS.

## 14 TH CAUSE OF ACTION

(14 TH AMENDMENT DUE PROCESS - LIBERTY INTEREST, SEGREGATION BASED ON UNCORROBORATED EVIDENCE)

74. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS IN THIS COMPLAINT.

75. DEFENDANTS HOREL, BRADBURY, J. ISOLA, CASTELLAW, SILVA, AND NEALY's DECISION TO FURTHER SEGREGATE PLAINTIFF BASED ON THE ID30 (SEE EX'B' P.46 ) VIOLATES PLAINTIFFS RIGHTS TO DUE PROCESS AND LIBERTY INTEREST IN CCR.3321(b)(1) WHICH PROVIDES THAT "NO DECISION SHALL BE BASED UPON INFORMATION FROM A CONFIDENTIAL SOURCE, UNLESS OTHER DOCUMENTATION CORRBEORATES, INFORMATION FROM THE SOURCE, OR UNLESS THE CIRCUMSTANCES SURROUNDING THE EVENT AND DOCUMENTED RELIABILITY OF THE SOURCE SATISFIES THE DECISION MAKER THAT THE INFORMATION IS TRUE". HERE DEFENDANTS DESIGNATED AND RELIED ON CONFIDENTIAL MATERIAL TO CONTINUE THE SEGREG-ATION, YET THERE IS NO FINDING EVIDENCE THAT THE INFORMATION WAS TRUE OR RELIABLE - NOR WAS IT "CORROBORATED BY DOCUMENTATION" AS IS REQUIRED CCR.3321(b)(1) BY CONTRAST DEFENDANTS KNEW THAT DEFENDANT HOREL FOUND" THERE IS NO INFORMATION AVAILABLE TO INDICATE THAT [PLAINTIFF] HAS COMMUNICATED WITH EME AFFILIATES THROUGH THESE ADDRESSES (SEE EX'B' P. 45)

"THE EVIDENCE OF MURPHYS ACTUAL PARTICIPATION IN COMMUNICATION WITH THE AFFILIATES OR RESIDENTS LINKED TO THE ADDRESSES IS LACKING (IBID) DEFENDANTS KNEW THAT EVEN DEFENDANT D.MOUNT WHO AUTHORED THE ITEM ADMITTED THERE WAS NO CORROBORATION TO IT" [D. MOUNT] DID NOT FIND CORRESPONDENCE BETWEEN MURPHY AND PERSONS ASSOCIATED WITH THESE ADDRESSES." IBID. GIVEN DEFENDANTS ADMISSION THAT THEY LACK CORROBORATION THEN THEIR DECISION TO CONTINUE SEGREGATION VIOLATED PLAINTIFFS LIBERTY INTEREST CCR 3321(b)(1)

### 15TH CAUSE OF ACTION
( 14 TH AMENDMENT- DUE PROCESS - LIBERTY INTEREST )

76. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS IN THIS COMPLAINT.

77. DEFENDANTS HOREL, BRADBURY, J. ISOLA, CASELLAN, SILVA, AND NEALY'S DECISION TO CONTINUE PLAINTIFFS SEGREGATION VIOLATES PLAINTIFFS LIBERTY INTEREST AND DUE PROCESS, WHICH PROHIBIT RETENTION BASED ON UNRELIABLE INFORMATION CCR 3321 et seq... CATO.V. RUSHEN 824 F.2d 703 (9TH CIR. 1987) RELIABILITY IS ASSESS BY THE FIVE PRONG TEST WITH IN CCR 3321(C)(1)-(5). HERE DEFENDANTS RELIED ON AN ITEM TO RETAIN PLAINTIFF WHICH DID NOT FALL WITHIN THAT RELIABILITY CRITERIA -THUS THEIR DECISION TO SEGREGATE PLAINTIFF WAS UNLAWFUL.

### 16TH CAUSE OF ACTION
( 1ST AMENDMENT, AND 14 TH AMENDMENT LIBERTY INTEREST )

78. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS IN THIS COMPLAINT.

79. DEFENDANT WILBER, GRANNIS AND READ VIOLATED PLAINTIFFS 1ST AMENDMENT RIGHT TO PETITION FOR REDRESS AND LIBERTY INTEREST UNDER CCR 3084.1(a) AND 3084.5(a)(3)(A) BY REFUSING TO PROCESS PLAINTIFFS ADMINISTRATIVE APPEALS, BASED ON AN UNWRITTEN POLICY WITHOUT PENALOGICAL JUSTIFICATION. THE FAILURE TO PROCESS THE APPEAL CONTRIBUTES AND COVERS UP THE CONSTITUTIONAL VIOLATIONS ALLEGED HERETO BY FAILING TO TAKE ANY ACTION TO PREVENT OR CORRECT UNLAWFUL ACTIONS.

### 17 TH CAUSE OF ACTION
( 14 TH AMENDMENT- LIBERTY INTEREST - UNDERGROUND CODE OF SILENCE )

80. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS OF THIS COMPLAINT.

81. DEFENDANTS WILBER, GRANNIS AND READ VIOLATED PLAINTIFFS RIGHTS TO DUE PROCESS AND LIBERTY INTEREST BY ENFORCING TWO UNDERGROUND POLICIES ON HIM WHICH HAVE NOT BEEN LEGALLY PROMULGATED IN COMPLIANCE WITH THE MANDATORY REQUIREMENTS OF THE APA. SEE PEN. CODE 5058- GOV. CODE 11340.5(a) - THESE POLICIES INCLUDE THE REFUSAL TO PROCESS TIMELY AND VALID ADMINISTRATIVE APPEALS CHALLENGING THE COMMITTEES UNLAW ACTION (SEE EX-"B" p.48), AND MAINTAINING AN UNWRITTEN CODE OF SILENCE BY COVERING UP THE UNLAWFUL ACTIONS OF ICC, BY REFUSING TO PROCESS PLAINTIFFS VALID AND TIMELY APPEALS-KNOWING THAT WITHOUT PROCESSING THE APPEALS, PLAINTIFFS ALLEGATIONS WILL GO-UNHEARD -NOR CORRECTED - THUS DEFENDANTS ACTIONS CONTRIBUTED TO THE CONSTITUTIONAL VIOLATION AS ALLEGED HERE - TO.

## 18TH CAUSE OF ACTION
### (MADRID INJUNCTION, BARRING CODE OF SILENCE)

82. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS OF THIS COMPLAINT.

83. DEFENDANT WILBER, GRANNIS, AND READ HAVE VIOLATED THE MADRID.V.GOMEZ/TILTON 889 F.SUPP 1146(N.D.CAL 1995) INJUNCTION BY PROMOTING AND ENFORCING A SYSTEMATIC CODE OF SILENCE—TO COVER UP UNLAWFUL ACTIONS OF THEIR FELLOW EMPLOYEES (AT COMMITTEE), BY REFUSING TO PROCESS PLAINTIFFS AND INMATES APPEALS CHALLENGING AND EXPOSING THEIR UNLAWFUL CONDUCT, SUCH ACTIONS ARE UNJUSTIFIED.

## 19TH CAUSE OF ACTION
### (VIOLATION OF MANDATORY DUTIES STATE LAW)

84. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS OF THIS COMPLAINT.

85. CAL.PEN.CODE 5058(a), GOV.CODES 11340.5(a): AND 11342(g) IMPOSES A MANDATORY DUTY UPON DEFENDANTS AND EACH OF THEM TO REFRAIN FROM ENFORCING ANY POLICY, REGULATION, CRITERION, GUIDELINE, STANDARD OF APPLICATION ET.SEQ.., ON PLAINTIFF WITHOUT FIRST LEGALLY PROMULGATING IT IN STRICT COMPLIANCE WITH THE APA.

86. CCR 3321(b)(3)(B) 3378(C)(6)(B)(c): AND 3378(c)(8)(G) IMPOSES A MANDATORY DUTY ON DEFEN-DANTS AND EACH OF THEM TO DISCLOSE ALL EVIDENCE TO PLAINTIFF, NOT JEOPARDIZING INSTITUTIONAL SECURITY AND TO PROVIDE PLAINTIFF SUFFICIENT NOTICE OF ALL EVIDENCE BEING USED TO RE-VALIDATE HIM 24-HOURS PRIOR TO THE VALIDATION INTERVIEW SO THAT PLAINTIFF CAN PRESENT A DEFENCE.

87. CCR.3378(c)(i)(2): 3378(c)(6)(B)(c); 3378(c)(8)(L) IMPOSES A MANDATORY DUTY ON DEFENDANTS AND EACH OF THEM TO "VERIFY" AND ESTABLISH AND ARTICULATE HOW ADDRESSES IN PLAINTIFFS PHONE BOOK ESTABLISHES HE HAS.. "KNOWINGLY PROMOTED, FACILITATED, FINANCED ET SEQ... ILLEGAL ACTS OF MISCONDUCT CLASSIFIED AS SERIOUS ON BEHALF OF THE GANG WITHIN A SIX YEAR PERIOD", PRIOR TO SUBMITTING VALIDATION AND SEGREGATION EVIDENCE/INFORMATION ON PLAINTIFF.

88. CCR 3378(c)(8)(L)(G) IMPOSE A MANDATORY DUTY ON DEFENDANTS AND EACH OF THEM TO FIRST ESTABLISH PLAINTIFF ACTUALLY USED THE ALLEGED ADDRESS TO COMMUNICATE WITH THE GANG AFFILIATES PRIOR TO USING IT AS A VALIDATION ITEM.

89. CCR.3321(b)(i) IMPOSES A MANDATORY DUTY ON DEFENDANTS AND EACH OF THEM TO REFRAIN FROM UTILIZING CONFIDENTIAL EVIDENCE WHICH IS NOT CORREBORATED.

90. CCR 3321(C)(1)-(5) IMPOSES A MANDATORY DUTY ON DEFENDANTS AND EACH OF THEM TO REFRAIN FROM UTILIZING CONFIDENTIAL EVIDENCE—NOT FALLING WITHIN ITS RELIABILITY CRITERIA.

91. CCR.3341.5(c)(i)(A)(i) AND 3341.5(c)(3) IMPOSSES A MANDATORY DUTY ON DEFENDANT'S AND EACH OF THEM TO CONSIDER PLAINTIFF FOR SHU RELEASE AT EVERY COMMITTEE AND TO RELEASE HIM—UNLESS HE IS FOUND TO BE A CURRENT SECURITY THREAT.

92. CCR 3341.5(c)(5): AND 3378(c) IMPOSSES A MANDATORY DUTY ON DEFENDANTS AND EACH OF THEM TO DESIGNATE PLAINTIFF INACTIVE (ELIGIBLE FOR RELEASE) WHEN HE HAS NOT BEEN INVOLVED IN "GANG-ACTIVITY" I.E.-COMMITTED/ENGAGED IN ILLEGAL ACTS OF MISCONDUCT ON BEHALF OF THE GANG WITHIN SIX YEARS.

93. CCR.3378(c)(7) IMPOSSES A MANDATORY DUTY ON DEFENDANTS AND EACH OF THEM, TO ANNUALLY REVIEW THE ITEMS USED TO VALIDATE PLAINTIFF AND REFER ANY NEW EVIDENCE—OR ITEMS FOUND

18

TO BE QUESTIONABLE, BACK TO IGI FOR INVESTIGATION AND REJECTION.

94. CCR.3378(c)(1)(2) IMPOSES A MANDATORY DUTY ON DEFENDANTS AND EACH OF THEM TO REFRAIN FROM USING AS VALIDATION ITEMS -EVIDENCE THAT IS OVER SIX YEARS OLD -AND DOES NOT ESTABLISH THAT PLAINTIFF KNOWINGLY COMMITTED, PROMOTED ET SEQ ... ILLEGAL ACTS OF MISCONDUCT CLASS- IFIED AS SERIOUS ON BEHALF OF THE GANG.

95. CCR.3084.1(a): AND 3084.5(a)(3)(A) IMPOSES A MANDATORY DUTY ON DEFENDANTS AND EACH OF THEM TO PROCESS ANY APPEALS CHALLENGING ADVERSE COMMITTEE ACTIONS, AND DECISIONS.

<u>20 TH CAUSE OF ACTION</u>
(FAILURE TO LAWFULLY ADMINISTER, TRAIN AND SUPERVISE)

96. PLAINTIFF INCORPORATES AND REALLEGES ALL PREVIOUS PARAGRAPHS OF THIS COMPLAINT.

97. DEFENDANTS HOREL, BRADBURY, WOODFORD, TILTON, PULER, RIANDA, SPEER, RUFF, FISHER, CASTRO, GRANNIS AND READ ARE SUPERVISORY OFFICIALS.

98. THESE SUPERVISORY DEFENDANTS HAVE A DUTY TO TRAIN AND SUPERVISE THEIR SUBORDINACE IN THE ADMINISTRATION OF LAW, SUPERVISORY EMPLOYEES HAVE A DUTY TO ENSURE THAT THEIR SUBORDINATES ARE AWARE OF ALL REGULATIONS AND POLICIES RELEVANT TO PRISONERS AND ENSURE THAT THEIR SUBORDINATES EXECUTE THEIR DUTIES IN A MANNER CONSISTENT WITH STATE AND FEDERAL LAW.

99. SUPERVISORY OFFICIALS ALSO HAVE A DUTY TO DESIGNATE APPEALS COORDINATORS WHO WILL SCREEN AND PROCESS APPEALS IN "COMPLIANCE WITH [PRISON] REGULATIONS" CCR 3084.3(a).

100. SUPERVISORY OFFICIALS BREACHED THEIR DUTY TO LEGALLY ADMINISTER THE PRISON AND TO TRAIN AND SUPERVISE SUBORDINATES, WERE PLAINTIFFS RIGHTS WERE VIOLATED AS OF PRISON OFFICALS LACK OF TRAINING AND SUPERVISION -INDEED ALL COMMITTEE MEMBERS ESTABLISHED THEY WERE NOT ADIQUATELY TRAINED AND DID NOT KNOW RELEVANT RULES AND LAW -BECAUSE THEY INDICATED THAT ALL COMMITTEES ARE TO BE HELD IN ROTE FASHION, AND ARE MEANINGLESS, THEY DID NOT EVEN REALIZE THAT THEY HAD THE AUTHORITY TO CONSIDER PLAINTIFFS RELEASE OR REFER EVIDENCE BACK TO IGI FOR INVESTIGATION -IN ACTIVE STATUS DISPITE THE FACT THAT IT IS WRITTEN IN THE TITLE IS -CCR 3341.5 (C)(1)(A)(1): 3341.5(C)(5): 3378(C)(7): 3378(d), AND DUE PROCESS HAS LONG RECOGNIZED THE RIGHT TO MEANINGFUL COMMITTEE REVIEWS WHICH ARE MORE THAN PRETEXTS FOR INDEFINATE CONFINEMENT. HEWIT .V. HELMS .459 U.S. 460 ___ , (1983).

101. SUPERVISORY OFFICIALS ALSO BREACHED THEIR DUTY TO LEGALLY ADMINISTER, TRAIN AND SUPERVISE DEFENDANT WILBER, BECAUSE RATHER THAN PROCESSING APPEALS IN COMPLIANCE WITH PRISON REGULATIONS CCR.3084.3(a), HE'S REFUSING TO PROCESS TIMELY/VALID APPEALS BASED ON WHAT THE "APPEALS BRANCH" TOLD HIM.

102. AS A RESULT OF SUPERVISORY DEFENDANTS BREACH OF DUTIES TO LEGALLY ADMINISTER THE PRISON AND TRAIN AND SUPERVISE SUBORDINATES, PLAINTIFFS RIGHTS WERE VIOLATED AS ALLEGED IN THIS COMPLAINT, AS THE DEFENDANTS LACK OF KNOWLEDGE AND ACTIONS DERIVED FROM THEIR SUPERVISORS WHO FAILED TO ADIQUATELY TRAIN AND SUPERVISE THEM -THUS SUPERVISORY DEFENDANTS CONTRIBUTED TO THE CONSTITUTIONAL VIOLATION ALLEGED HERE TO.

CAUSATION

AS A DIRECT AND PROXIMATE RESULT OF THE AFOREMENTIONED ACTS AND ADMISSIONS ON THE PART OF DEFENDANTS, PLAINTIFF HAS SUFFERED AND CONTINUES TO SUFFER GENERAL AND SPECIAL DAMAGES IN AN AMOUNT TO BE PROVEN AT TRIAL. PLAINTIFF HAS NO PLAIN, ADEQUATE OR COMPLETE REMEDY AT LAW TO REDRESS THE WRONGS DESCRIBED HERE IN. PLAINTIFF HAS BEEN AND WILL CONTINUE TO BE IRREPARABLE INJURED BY THE CONDUCT OF DEFENDANTS UNLESS THE COURT GRANTS THE DECLARATORY AND INJUNCTIVE RELIEF WHICH PLAINTIFF SEEKS.

PRAYER FOR RELIEF

WHEREFORE PLAINTIFF RESPECTFULLY PRAYS FOR THE FOLLOWING RELIEF:

1. A DECLARATORY JUDGEMENT THAT DEFENDANTS ACTS AND PRACTICES DESCRIBED HEREIN VIOLATE PLAINTIFFS RIGHTS AS STATED HEREIN,

2. AN ORDER VACATING PLAINTIFFS VALIDATION AND SEGREGATION-DESIGNATE PLAINTIFF INACTIVE.

3. A PRELIMINARY AND PERMANENT INJUNCTION/ORDER WHICH PROHIBITS AND REQUIRES THAT DEFENDANTS THEIR AGENTS EMPLOYEES AND SUCCESSORS: (i) CEASE PRACTICE OF UTILIZING THE UNDERGROUND CATCH ALL CLAUSE ("OTHER") TO DESIGNATE ITEMS CONFIDENTIAL OR RELIABLE, AND TO USE AS A VALIDATION ITEM. (ii) CEASE ENFORCEMENT OF ALL UNDERGROUND REGULATIONS-POLICIES WITHOUT FIRST PROMULGATING THEM IN COMPLIANCE WITH THE APA. (iii) VACATE THE VALIDATION HEARING AND RESULT-AND PROVIDE PLAINTIFF A NEW FAIR HEARING WHICH DISCLOSES AS MUCH INFORMATION POSSIBLE 24-HOURS IN ADVANCE SO THAT HE CAN PREPARE A DEFENSE AS IS REQUIRED UNDER CCR.3321(b)(3)(B), 3378( )(6)(8)(C), 3378(c)(8)(G). (iv) DISCLOSE ADDRESS BOOK TO PLAINTIFF AND PROVIDE HIM NOTICE AS TO WHICH TWO ADDRESSES WERE DEEMED MAIL DROPS (v) CEASE SCHEME OF SUBMITTING VALIDATION PACKAGES TO THE OCS, WITHOUT FIRST VERIFYING AND ARTICULATING HOW ITEMS OR AN ADDRESS ESTABLISHES CURRENT GANG ACTIVITY AS STIPULATED IN CASTILLO SUPRA AND DEFINED IN CCR.3000, 3023 (vi) CEASE THE PRACTICE OF VALIDATING PLAINTIFF AS A PRISON GANG AFFILIATE, AND IMPOSSING AN INDETERMINATE SHU TERM BASED ON ITEMS WHICH DO NOT ESTABLISH KNOWINGLY COMMITTING GANG ACTIVITY AS DEFINED IN CCR.3000, 3023, 3378(c)(1)(2)(vii) CEASE SCHEME OF VALIDATING PLAINTIFF AS AN ASSOCIATE, FOR HAVING A SIMPLE ADDRESS -WHICH SOMEONE ELSE MAY POSSESS, WITHOUT CURRENT EVIDENCE THAT PLAINTIFF IS CURRENTLY AND ACTIVELY TRYING TO COMMUNICATE WITH AFFILIATES OR RESIDENCE FOR GANG ACTIVITY PURPOSES. (viii) CEASE SCHEME OF SUBMITTING AND USING UNRELIABLE UNTRUE, INSUFFICIENT AND UNCORROBORATED INFORMATION IN IMPOSING GANG VALIDATIONS AND INDETERMINATE SHU TERMS. (ix) IMPLEMENT A CLEAR AND FAIR PRISON GANG MANAGEMENT POLICY THAT (a) PROVIDES INMATES ADEQUATE NOTICE OF WHAT CONDUCT IS PRESCRIBED AND WHAT CONDUCT IS PERMITTED (b) DEFINES KEY TERMS I.E, GANG ACTIVITY, THREAT, INACTIVE AND ACTIVE GANG AFFILIATES, ASSOCIATE —INVOLVEMENT IN GANG ACTIVITY, ASSOCIATION (c) PROVIDES CLARITY FOR ENFORCEMENT AND DOES NOT REACH A BROAD RANGE OF INNOCENT UNKNOWN CONDUCT OR PROVIDE UNBRIDLED DISCRETION TO DEFENDANTS (d) PROVIDE REASONABLE MINIMAL STANDARDS TO GUIDE DEFENDANTS WHEN JUDGING WHETHER OR NOT AN INMATE IS A PRISON GANG AFFILIATE OR A THREAT TO THE SAFETY OF OTHERS OR INSTITUTIONAL SECURITY. (E) THAT CEASE THE PRACTICE OF DENYING INACTIVE STATUS, OR SEGREGATING INMATES BASED ON MERE INNOCENT ASSOCIATION—

VERSUS ACTUAL ACTIVITY AND POSSING A PRESENT SECURITY THREAT.(X) VACATE ADVERSE COMMITTEE DECISION, AND ORDER A NEW A FAIR ONE.(XI) CEASE PRACTICE OF HOLDING MEANINGLESS ROTE, RUBBERSTAMP CLASSIFICATION COMMITTEES.(XII) GRANT ICC AND PRISON WARDENS THE AUTHORITY TO RELEASE ALLEGED ASSOCIATES/MEMBERS TO THE GENERAL POPULATION BEFORE SIX (6) YEARS (XIII) ORDER ICC TO REFER QUESTIONABLE AND UNRELIABLE INFORMATION BACK TO IGI / OC S FOR REINVESTIGATION AND REJECTION IN COMPLIANCE WITH CCR 3378(C)(1)(IXX) ORDER THAT NEW EVIDENCE BE SENT BACK TO IGI FOR INVESTIGATION AND INACTIVE STATUS REVIEW PERSUANT TO CCR 3378(C)(7) (XX) THAT ALL ICC MEMBERS BE ADIQUATELY SUPERVISED AND TRAINED AS TO PRISON POLICIES AND ADMINISTRATION OF LAW.(XXI) CEASE ILLEGAL UNDERGROUND POLICY WHICH PROHIBITS VALIDATED ASSOCIATES/MEMBERS FROM CHALLENGING ADVERSE CLASSIFICATION DECISIONS.(XXII) CEASE UNDERGROUND CODE OF SILENCE POLICY BY APPEALS COORDIN-ATORS WHO COVER UP THE CLASSIFICATION COMMITTEES ILLEGAL ACTIONS BY REFUSING TO PROCESS APPEALS AND IMPEDING INVESTIGATIONS.

4. COMPENSATORY DAMAGES OF $100.00 A DAY TO PLAINTIFF FOR PLAINTIFFS SEGREGATION FROM JULY 5, 2006 TO THE PRESENT FROM ALL DEFENDANTS JOINTLY AND SEVERALLY, COMPENSATORY DAMAGES TO COVER PLAINTIFFS MENTAL EMOTIONAL ANGUISH AND STRESS AS A RESULT OF CONTINUED SEGREGATION.

5. PUNITIVE DAMAGES OF $60,000.00 FROM ANY DEFENDANT FOUND TO HAVE INTENTIONALLY DENIED PLAINTIFFS RIGHTS.

6. JUDICIAL SANCTIONS TO DEFENDANTS WILBER, READ, AND GRANNIS IN THE AMOUNT OF $5,000.00 EACH FOR MAINTAINING AND ENFORCING A CODE OF SILENCE IN VIOLATION OF THE MADRID INJUNCTION.

7. THAT DEFENDANTS PAY AND REIMBURST ALL COST OF THIS SUIT.

8. THAT DEFENDANTS PAY FOR ALL COSTS AND REASONABLE ATTORNEY FEES PURSUANT TO 42 U.S.C. 1983 AND ANY OTHER GROUNDS AUTHORIZED BY LAW.

9. TRIAL BY JURY INCLUDING, TO THE EXTENT THAT LEGITIMATE SECURITY CONCERNS DICTATE IN JUDICIAL PROCEEDINGS REGARDING THE SPECIFIC FACTUAL GROUNDS THAT PURPORTEDLY JUSTIFY PLAINTIFFS INDETERMINATE TERM IN THE SHU.

10. ANY FURTHER RELIEF THIS COURT DEEMS JUST.

I DECLAIR UNDER THE PENALTY OF PERJURY THAT THE ABOVE IS TRUE AND TO THE BEST OF MY KNOWLEDGE.

DATED 4/15/08

RESPECTFULLY SUBMITTED,

WILLIAM MURPHY
IN PRO - SE.

1 _____

2 _____

3 _____

4 _____

5    I declare under penalty of perjury that the foregoing is true and correct.

6

7    Signed this __15__ day of __APRIL_____, 20 08

8

9    _____

10                          (Plaintiff's signature)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                    - 1 -
                              22

**INMATE/PAROLEE**
**APPEAL FORM**
CDC 602 (12/87)

Location: Institution/Parole Region | Log No. | Category

1. _____  _____
2. _____  _____

ADMIN INACTIVE 128 B

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|------|--------|------------|------------------|
| MURPHY William | H-76407 | S.H.U. | C2-120 |

A. Describe Problem: CN 7-28-06, A CDC 128-B WAS ISSUED TO ME DUE TO AN INVESTIGATION INITIATED BY I.G.T. IN REFERENCE TO UPDATING MY GANG STATUS (KK CCR 3378(C) FOR AN INACTIVE REVIEW ATTRIBUTABLE MY LAST SOURCE OF INFORMATION BEING WELL OVER 6 YRS OLD. (SEE ATTACHED CDC 128-B). A REVIEW OF MY CENTRAL FILE WAS CONDUCTED WITH NO NEW DOCUMENTS OF CURRENT GANG ACTIVITY BEING DISCOVERED I.G.I ALSO CONTACTED SSU/LEIU SEEKING INFORMATION BUT NO GANG ACTIVITY NOR NEW INFO WAS AVAILABLE SHOWING ANY CURRENT GANG ACTIVITY. A SEARCH OF MY PERSONAL PROPERTY WAS ALSO CONDUCTED AND MY PERSONAL ADDRESS BOOK WAS REMOVED FROM MY PROPERTY BY I.G.T FOR FURTHER REVIEW. IN CONCLUSION OF SAID REVIEW, (% MOUNT (I.G.) INDICATED HE DISCOVERED

If you need more space, attach one additional sheet.

(SEE ATTACHED SHEET CONTINUATION "A")

B. Action Requested: ABSENT FACTUAL AND TANGIBLE "ACTIVE" EVIDENCE OF ACTUAL GANG ACTIVITIES, I REQUEST TO BE RE-VALIDATED AND PLACED ON IN-ACTIVE STATUS FOR POSSIBLE RELEASE FROM S.H.U

Inmate/Parolee Signature _____ H-76407    Date Submitted 9/4/06

C. INFORMAL LEVEL (Date Received _____)

Staff Response _____

*BYPASS*

Staff Signature _____ Date Returned to Inmate _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

*BYPASS*

BRANCH NOV 30 2006

Signature _____ Date Submitted _____

Note: Property/Funds appeals must be accompanied by a complete Board of Control form BC-1E, Inmate Claim

CDC Appeal Number

2nd LVL SEP 18 2006

RCVD Oct 5 2006

EXHIBIT
"A" 23

TO ADDRESS 3 ALLEGED MEXICAN GANG AFFILIATES BY THE NAMES OF ESTRADA, MENDOZA AND LUCA. AS A RESULT, HE RESUMES THIS CONJECTURAL DISCOVERY PROVIDES A DIRECT LINK OF ASSOCIATION PER CCR 3378(c)(6)(ASSOCIATION), AND A CONFIDENTIAL DISCLOSURE FORM WAS THEN ISSUED TO ME WITH VERY CURT AND INADEQUATE INFORMATION.

BASED ON THE ABOVE INFORMATION IGI BELIEVES GANG ACTIVITY IS BEING CONTINUED, AND RECOMMENDS THAT I BE RETAINED AS AN "ACTIVE" ASSOCIATE OF THE MEXICAN MAFIA PRISON GANG PURSUANT TO THE CCR 3378(c).

ON 8/31/06, I WAS ISSUED A CDC 128 B-2 FORM FROM I.E.J.J. ICON APPROVING IGI'S RECOMMENDATION TO RETAIN ME IN SHU AS AN "ACTIVE" ASSOCIATE, WITH BEING ELIGIBLE FOR ANOTHER INACTIVE REVIEW ON JUN. 27, 2012. (SEE ATTACHED 128 B-2)

I VIGOROUSLY DISAGREE WITH THE RECOMMENDATION OF IGI AND THE ACTIONS TAKEN BY ICON TO CONTINUE MY RETENTION IN SHU AS A VALIDATED "ACTIVE" ASSOCIATE BASED ON IGI'S RECOMMENDATION. IN REFERENCE TO TWO OF THE THREE MENTIONED NAMES, ESTRADA AND MENDOZA, I HAVE NOT THE SLIGHTEST IDEA TO WHOM EITHER INDIVIDUAL IN QUESTION ARE, NOR DO I HAVE ANY INKLING TO WHAT SUBJECTS I'M BEING REFERRED TO, FOR I WASN'T PROVIDED SUFFICIENT INFORMATION TO CHALLENGE SUCH CLAIMS BY IGI. NO WHERE LOCATED IN MY ADDRESS BOOK WILL YOU FIND THE NAMES OF A PERSONAL DIRECT "MAIL DROP ADDRESS" TO EITHER INDIVIDUAL FOR THE PURPOSE OF THIRD PARTY UNAUTHORIZED CORRESPONDENCES AS DESCRIBED BY IGI. SUCH INFORMATION IS FALLACIOUS AND UNFOUNDED, AND SOLELY BASED ON THEORY AND HYPOTHESIS. THESE ALLEGATIONS OF A DIRECT LINK ARE CONJECTURED AND SPECULATIVE AND WITHOUT MERIT.

WITH RELATION TO LUCA HIM AND I WERE BUDDIES FOR A GOOD PERIOD OF TIME AND CONTAINED A GENUINE FRIENDSHIP THAT GOES BEYOND THESE WALLS. WE IN EFFECT GREW UP WITH ONE ANOTHER AND ARE ACQUAINTED WITH EACH OTHERS FAMILIES WHICH IS THE SOLE REASON IN ME POSSESSING HIS FAMILY ADDRESSES, WHICH ARE THE ONLY TWO ADDRESSES I CONTAINED IN MY ADDRESS BOOK OF ANOTHER FAMILY THATS INCARCERATED. SINCE LUCA AND I SEPARATED WAYS OVER A DECADE EVER ONCE HAVE I WRITTEN UP ENGAGED IN ANY SORT OF UNAUTHORIZED THIRD PARTY CORRESPONDENCE WITH HIM THROUGH THE ADDRESSES I HAD TO THAT OF HIS FAMILY MEMBERS AT ANY TIME.

IN REGARDS TO THE CASTILLO SETTLEMENT, MERE POSSESSION OF ADDRESSES DO NOT CONSTITUTE AN OVERT ACTS OF MISCONDUCT OR "ACTIVE" GANG ASSOCIATION. IGI MUST HAVE AN ARTICULATED BASIS OF DETERMINING THAT GANG CONTENT OR CONDUCT AT ISSUE IS GANG RELATED AS DEFINED IN THE CCR 3323(a) 3000 "GANG." IN THE CASE OF ACTIVE ASSOCIATION THE CONDUCT MUST BE "CURRENT TIVE", AND GANG ACTIVITY DEFINED AS TO KNOWINGLY PROMOTE, ASSIST OR FURTHER ANY GANG OR UNLAWFUL ACTS OR ACTS OF SERIOUS MISCONDUCT. THEREBY MAKING AN INMATE CULPABLE WHICH HAS NOT BEEN FOUNDED OR SUBSTANTIATED IN MY CASE.

IF SAID ADDRESSES ARE IN POINT OF FACT AND UNDENIABLY DISTINGUISHED AS KNOWN MAIL DROPS CONFIRMING AND OUT GOING MAIL TO OR FROM SAID ADDRESSES, I'M BEING CLOSELY SCRUTINIZED AND THERE SHALL BE DOCUMENTED ON A CDC FORM WITH ESTABLISHED EXPLANATION EVIDENCING ACTS TO WHY SUCH MATERIALS GANG RELATED AS REQUIRED PER 3378 (CRITICAL CASE INFORMATION TO BE PLACED IN THE CENTRAL FILE. DOCUMENTATION OF TELEPHONE CONVERSATION, MAIL NOTES OR OTHER COMMUNICATION, INCLUDING COURT MINUTES EVIDENCING GANG AFFILIATION PER CCR 3378 I. (COMMUNICATION)

NO CLEAR DOCUMENTATION EXIST EVIDENCING ANY OVERT ACTS OF MISCONDUCT ON MY PART IN

NECTION TO KEEPING OR RECEIVING ANY SORT OF UNAUTHORIZED COMMUNICATION TO OR FROM TRADA, MENDOZA OR LUCA. IGI'S OWN REVIEW OF MY CENTRAL FILE CLEARLY SHOWS NO NEW MENTS CONTAINING ANY RECENT ACTIVITY WITH THE EME PRISON GANG WAS DISCOVERED, NOR BE THERE ANY NEW INFORMATION AVAILABLE THROUGH CCI/IGI SHOWING CURRENT "ACTIVE" ATION EITHER. (SEE ATTACHED 128 B. PARAGRAPH'S 1 & 3).

"ACTION 15 [ILLEGIBLE] (SETTLEMENT)" STAFF SHALL HAVE AN ARTICULABLE BASIS FOR WHY THE ITENTS OF THE ADDRESS BOOK ARE EVIDENCE OF GANG ASSOCIATION".

THERE SHALL BE AN ARTICULABLE BASIS FOR WHY THE ADDRESSES ARE EVIDENCE OF "CURRENT ACTIVE 1G ASSOCIATION (MEANING SOMETHING THAT INCLUDES REASONABLE FACTS) AS TO WHY MERE SESSION OF ADDRESSES IS INDICATIVE OF "ACTIVE" GANG ACTIVITY WHEN THERE EXIST NO TUAL EVIDENCE OF "ACTUAL CORRESPONDENCE" TO EITHER ADDRESSES IN QUESTION IN SUPPORT SUCH OPINION/THERORY BY A MOUNT (I.G.I).

CALIFORNIA REGULATIONS PRECLUDES RELIANCE ON NOT-CLEAR INFORMATION IF IT IS NOT ROBORATED BY OTHER INFORMATION ON THE RECORD. SUCH INFORMATION BEING USED TO TAIN ME IN S.H.U AS AN "ACTIVE" ASSOCIATE IS UNFAIR, ARBITRARY, AND A DENIAL OF FAIR ACTICE IN NATURE IN THIS SITUATION!

I'VE DONE EVERYTHING THATS REQUIRED OF ME IN TERMS OF MEETING THE CRITERA FOR AN ACTIVE STATUS. I KEPT MYSELF FREE OF ANY SORT OF INFRACTIONS FOR MANY YEARS NOW, PECIALLY THAT OF ANY UNAUTHORIZED COMMUNICATION.

ABSENT FACTUAL AND TANGIBLE "ACTIVE" EVIDENCE OF "ACTUAL" GANG ACTIVITIES, I QUEST TO BE RE-VALIDATED AND PLACED ON AN INACTIVE STATUS FOR POSSIBLE RELEASE OM S.H.U PER CCR. 3378 (e) (INACTIVE STATUS).

*[signature]* 11/04/07

WILLIAM MURPHY 164457
C2-120
9-4-06

STATE OF CALIFORNIA                                                                    C2-120 RLP

DEPARTMENT OF CORRECTIONS

NAME: MURPHY, WILLIAM                CDC #H-76407                          CDC 128-B
(REV. 4/74)

On Wednesday, June 27, 2006, an investigation was initiated, by the Institution Gang Investigation (IGI)Unit, in reference to inmate MURPHY, WILLIAM, H-76407 AKA'S" "SCRAPPY", "YOUNGSTER" per California Code of Regulations, Section 3378 (e), in order to update his gang status. MURPHY was validated as an associate of the Mexican Mafia (EME) on September 23, 1993, as listed on his CDC 128B-2 dated 09-23-1993. Gang status was updated on a CDC 128B-2 dated 06-25-2002, that noted the most recent gang activity as being that of 06-18-2000. The source items used to validate MURPHY are all over six (6) years old. Therefore, per the California Code of Regulations, 3378 (e), MURPHY meets the criteria for an Inactive Status Review.

1. (Central File) of MURPHY was reviewed and no new documents containing any recent activity with the EME prison gang were discovered.

2. (Property Search), The IGI unit conducted a search of the personal property of MURPHY. A Confidential CDC 128B dated June 27, 2006, Association, documented the fact that amid the property of MURPHY was: One personal address book containing the addresses for 1 documented mail drop for 1 validated Mexican Mafia (EME) Member ESTRADA, V-26050 and 1 documented mail drop for 2 validated Mexican mafia associate's MENDOZA, J-38667, LUCA, H-12604. Third party mail is a form of circumventing mail procedures and is a violation of Rules and Regulations Per the Title 15 section 3139(b). MURPHY'S possession of these contact addresses for Inmate's ESTRADA, MENDOZA, and LUCA provides a direct link to 1 Validated Mexican Mafia (EME) Member and 2 validated Mexican mafia associates. This document meets the criteria set forth in CCR 3378 (c), (8), (G), Association.

3. (SSU/LEIU) The IGI unit contacted SSU/LEIU regarding MURPHY with no new information being available.

4. (Outside Law Enforcement) Outside Law Enforcement was not contacted as MURPHY has been in custody during the last six years.

A cell search was conducted on June, 27, 2006 at that time photographs were taken as part of the review process. MURPHY was cooperative with the taking of identification photographs.

On July 03, 2006, MURPHY was issued a CDC 1030, confidential Disclosure Form for the confidential report used in this update. MURPHY was informed that the IGI unit would interview him after 24 hours regarding the information used in this update. MURPHY was informed that during the interview he would have the opportunity to present his response regarding the information used. MURPHY has a TABE score of 9.9 and does not require nor did he request a staff assistant. MURPHY is not a participant in the Mental Heath Delivery System.

On July 05, 2006, MURPHY was interviewed relative to the document used in the review. MURPHY submitted a one page double sided hand written response challenging the amount of information that was provided to MURPHY for his response. Based on the above information and documentation, it is reasonable to believe that MURPHY is active with the Mexican Mafia prison gang. The confidential documents reviewed comply with the Department Operations Manual (DOM). Section 61020.7 and requirements established in the CCR regarding prison gangs

EXH - A - 26

Pursuant to the CCR, Section 3378 (c), the IGI Unit recommends that the gang status of William, MURPHY, H-76407, be retained as an active associate of the Mexican Mafia (EME) prison gang. At MURPHY'S request, he will be eligible for an Inactive Gang Status Review after June of 2012. This date is based upon information contained in MURPHY'S central file, specifically a Confidential 128B dated 06-27-06, documenting gang activity in June of 2006. This information will be forwarded to the Law Enforcement Investigations Unit (LEIU) to update MURPHY'S gang status.

D. MOUNT

Correctional Officer
Institution Gang Investigations
Pelican Bay State Prison

K.OSBORNE

Correctional Lieutenant
Institution Gang Investigator
Pelican Bay State Prison

*DATE: July 05, 2006*        *IGI GANG STATUS UPDATE*        *CDC 128B*

EXH - A 27

STATE OF CALIFORNIA
CDC 128-B-2 (5/95)

DEPARTMENT OF CORRECTIONS

---

INMATE'S NAME: William MURPHY

CDC NUMBER: H76407

---

On June 25, 2002, a CDC 128B2 regarding subject was issued identifying subject as an Active EME associate based upon a gang validation package submitted by Institution Gang Investigator Nordell at CCI. A subsequent CDC 128B2 dated June 10, 2003, was issued reaffirming subject's status as an Active EME associate. On July 26, 2006, an Active/Inactive Review was received from IGI Osborne at PBSP. The following documents were submitted to UPDATE subject's validation status:

### TOTAL NUMBER OF ITEMS SUBMITTED FOR REVIEW: (1)

Item (1) Confidential CDC 128B dated 6/27/06 (Association)

### TOTAL NUMBER OF ITEMS WHICH MEET VALIDATION REQUIREMENTS: (1)

The following items **do not meet** the validation requirements and were/shall not be used as a basis for validation:

### TOTAL NUMBER OF ITEMS WHICH DO NOT MEET VALIDATION REQUIREMENTS: (0)

---

### ACTION OF REVIEWER

Pursuant to the validation requirements established in 15 CCR Section 3378, William MURPHY is:

☒ **VALIDATED**        ☐ **REJECTED**

as an "Active" **associate** of the **Mexican Mafia** prison gang.

| | | |
|---|---|---|
| SIGNATURE | SIGNATURE | SIGNATURE |
| CHAIRPERSON | MEMBER | MEMBER |
| Printed name | Everett W. Fischer | D L Peeu |
| | Printed name | Printed name |

DATE: 8/25/06

GANG VALIDATION/REJECTION REVIEW
GENERAL CHRONO
LEIU/SSU

DISTRIBUTION:
Original - Central File
Copy - Classification & Parole Representative/Parole Administrator I
Copy - Institutional Gang Investigator/Region Gang Coordinator
Copy - Law Enforcement Liaison Unit
Copy - Inmate/Parolee  RF 8/31/06

ACTIVE/INACTIVE REVIEW

JUN 27 2012

ELIGIBILITY DATE

EXH "A"-28

## PELICAN BAY STATE PRISON
## SECOND LEVEL REVIEW

DATE:    NOV - 1 2006

Inmate William MURPHY, H-76407
Pelican Bay State Prison
Security Housing Unit
Facility C, Unit 2

RE:    WARDEN'S LEVEL DECISION            APPEAL:  DENIED
       APPEAL LOG NO.  PBSP-C-06-02319    ISSUE:   CASE INFORMATION

This matter was reviewed by Robert A. Horel, Warden, at Pelican Bay State Prison (PBSP). D. Hawkes, Correctional Counselor II, conducted the Appeal interview at the Second Level of Appeal Review on October 30, 2006.

All submitted documentation and supporting arguments have been considered, including the interview conducted at the Second Level of Review. Additionally, a thorough investigation has been conducted into the claim presented by the inmate and the documentation evaluated in accordance with PBSP's institutional procedures and the California Department of Corrections and Rehabilitation policies.

### ISSUES

MURPHY reported that the most recent review of his gang status inappropriately retains him as an active gang member. He challenged the material that was used, claiming that there is no evidence of gang activity. MURPHY claims that he was not provided with sufficient information to challenge the identifications of Estrada and Mendoza as associates. Released from SHU MURPHY claims he has known Luca and his family prior to incarceration, and was the cellmate of Luca during their period of incarceration. Murphy claims that the acceptance of the document for continued active status is not compliant with the *Castillo* agreement. He requests that he be granted inactive status.

### FINDINGS

I

MURPHY is a validated associate of the Mexican Mafia (EME) prison gang. MURPHY is also known as "Scrappy" of Lennox. The inactive review was initiated in June 2006 and completed in July 2006. It was updated by the Law Enforcement and Investigations Unit (LEIU) in August 2006, and MURPHY's status as an active EME associate was reaffirmed.

II

Confidential CDC 128B dated June 27, 2006, documents two address entries discovered in Subject's property/cell during a search on that same date. The investigator noted that these two addresses are connected to three EME affiliates (one member, two associates). MURPHY's possession of this information was viewed by both the investigator and LEIU representatives as evidence of active association with validated EME affiliates.

III

A review of MURPHY's Central File reflects that there is no information available to indicate that he has communicated with EME affiliates through either of these addresses. There are reports indicating that MURPHY has communicated with EME affiliates through notes passed directly to the intended recipient.

EXH-"A"·29

Second Level Reviewer's Response
Appeal Log #: PBSP-C-06-02319
Inmate MURPHY H-76407
Page 2

IV

Officer D. Mount was interviewed for this Appeal response. He indicated that during the search, he did not find any correspondence between MURPHY and persons associated with the two addresses.

V

The California Code of Regulations, Title 15, Section 3378(c)(6), cites the authority for determining the accepted documents and gang status of an inmate / parolee. It states in part, "*The verification of an inmate/parolee's gang identification shall be validated or rejected by the assistant director, law enforcement and investigations unit (LEIU), or a designee. The validation and / or rejection of evidence relied upon shall be documented on a CDC Form 128-B2.*"

VI

The CCR, Title 15, Section 3378(e), states "*An inmate housed in a security housing unit (SHU) as a gang member or associate may be considered for review of inactive status by the Departmental Review Board when the inmate has not been identified as having been involved in gang activity for a minimum of six (6) years.*" Furthermore, the section identifies the authority to determine inactive status. It states, "*Verification of an inmate's inactive status shall be approved or rejected by the assistant director, LEIU, or a designee.*"

## DETERMINATION OF ISSUE

Only one document accepted for validation must contain reported gang activity within the last six years to maintain an active gang status. One document was submitted and accepted by the LEIU.

It is the responsibility of the investigator to articulate the basis for a document's connection to the gang or its activity. The confidential CDC 128B dated June 27, 2006, documents MURPHY's possession of the information linked to other prison gang affiliates. The evidence of MURPHY's actual participation in communicating with the affiliates or residents linked to the address is lacking.

The LEIU is the designated authority for determining gang status and what documents are accepted or rejected for validation. The institution staff does not have the authority to change a gang status or determine which documents are acceptable. The institution staff can make recommendations only. The due process requirements for gang validation have been satisfied. MURPHY submitted the same argument for LEIU to consider during the review, and approved of the "active" status.

Based on the above, MURPHY's Appeal is DENIED.

## MODIFICATION ORDER

No modification of this decision or action is required.

ROBERT A. HOREL
Warden

EXH-A 30

First Level   ☐ Granted   ☐ P. Granted   ☐ Denied   ☐ Other _____

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: _____ Due Date: _____

Interviewed by: _____

_____

_____

_____

*BYPASS*

Staff Signature: _____ Title: _____ Date Completed: _____
Division Head Approved:                              Returned
Signature: _____ Title: _____ Date to Inmate: _____

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

*BYPASS*

Signature: _____ Date Submitted: _____

Second Level   ☐ Granted   ☐ P. Granted   ☒ Denied   ☐ Other
G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: 9/18/06   Due Date: 10/31/06
☐ See Attached Letter

Signature: _____ Date Completed: 10/30/06
Warden/Superintendent Signature: _____ Date Returned to Inmate: 11-14-06

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

Dissatisfied for all reasons stated above (problem discribed) and as following On 11-14-06, I received the second level reviewer's investigated report administered CCII D. Hankes into my appeal challenging the erroneous evidence being used to inappropriately retain in S.H.U as an alleged "Active Associate". — A thoroa investigation and evaluation of all case factors has been conducted by CCII D. Ha in accordance with P.B.S.P's institutionals procedures and the C.D.C.R policie (SEE ATTACHED SHEET-CONTINUATION

Signature: _____ H76407   Date Submitted: 11-26-06

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted   ☐ P. Granted   ☒ Denied   ☐ Other
☐ See Attached Letter

Date: FEB 2 1 2007

CDC 602 (12/87)

EXH-"A"-31

conclusion reached by IGI in the 128B dated 6/27/06, which was used as evidence by I.G.I. to reaffirm my erroneous and alleged "active association". In fact, it was demonstrated that the evidence of my actual participation in communication with affiliates or residents linked to the addresses is LACKING !!!

It is highly unlikely that the I.G.I. would have designated me as an "active associate", if the Mount (IGI) would have conducted more of a thorough investigation initially, as required, and presented all case factors accordingly to that of the Cal. code or regulations.

In conclusion of CCII D. Hawkes formal investigation, and all case factors now currently presented, no substantiating evidence exist validating actual "active association" on my part in connection to the alleged affiliates in question, actual tangible evidence is LACKING! Thus making my revalidation as an alleged "active associate", erroneous, baseless and conjectured in nature.

Pursuant to CCR.3378(e)(inactive review), I meet all criteria and eligibility assigned for an inactive status. Therefore I respectfully request that my "actions requested" (absent factual and tangible "active" evidence of "actual" gang activities, I request to be re-validated and placed in inactive status for possible release (from SHU), be granted based on all mitigated factors.

The second level reviewer does not possess the authority to grant my appeal any recommendations. ████ His professional judgment as the investigator found that the evidence in this matter is LACKING!

Date: 11/26/06

Respectfully Submitted

William Murphy T6110

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P.O. BOX 942883
SACRAMENTO, CA 94283-0001

## DIRECTOR'S LEVEL APPEAL DECISION

FEB 2 1 2007

Date:

In re:   Murphy, H-76407
Pelican Bay State Prison
P.O. Box 7000
Crescent City, CA 95531-7000

IAB Case No.: 0606467          Local Log No.: PBSP 06-02319

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner A. A. Read. All submitted documentation and supporting arguments of the parties have been considered.

**I   APPELLANT'S ARGUMENT:** It is the appellant's position that on July 28, 2006, the appellant was issued a Pelican Bay State Prison (PBSP) CDC Form 128-B, General Chrono, dated July 5, 2006, regarding an investigation initiated by Correctional Officer (CO) D. Mount, Institution Gang Investigator (IGI), in reference to updating the appellant's gang status pursuant to California Code of Regulations, Title 15, Section (CCR) 3378(e) for an inactive review due to the appellant's last source of information is well over six (6) years ago. The appellant contends that a review of his central file was conducted with no new documents indicating current gang activity being discovered. It is also contended that the IGI contacted the Law Enforcement Investigation Unit (LEIU) seeking information into the appellant's gang activity but no new information was available. A search of the appellant's personal property was conducted and his address book was removed for a further review. The appellant challenges the information that was found in his address book, which CO Mount believes are three (3) mail drop addresses and evidence of gang activity. The appellant also states that he was not provided with sufficient information to challenge the identification of Estrada, Mendoza and Luca. The appellant requests to be re-validated and placed on in-active status for possible release from Security Housing Unit (SHU).

**II   SECOND LEVEL'S DECISION:** The reviewer found that the appellant's concerns have been properly addressed by involved and/or assigned PBSP staff. The reviewer states that the appellant is an associate of the Mexican Mafia prison gang (EME), which was validated in June 2002. The CCR 3378(e) states, "An inmate housed in a SHU as a gang member or associate may be considered for review of inactive status by the Departmental Review Board when the inmate has not been identified as having been involved in gang activity for a minimum of six (6) years. Verification of an inmate's inactive status shall be approved or rejected by the assistant director, LEIU, or a designee." The eligibility date for the review is based upon the evidence of the last activity contained in the documents in the most current CDC Form 128-B2, Gang Validation/Rejection Review Chrono. The confidential CDC Form 128-B, dated June 27, 2006, documents two (2) address entries discovered in the appellant's property/cell during a search on that same date. The investigator noted that the two (2) addresses are connected to three (3) EME affiliates (one member, two associates). The appellant's possession of this information was viewed by both the investigator and LEIU representatives as evidence of active association with validated EME affiliates. The Second Level of Review (SLR) states that only one document accepted for validation must contain reported gang activity within the last six (6) years to maintain an active gang status. One document was submitted and accepted by the LEIU. The decision was made by the LEIU to continue the appellant's status as an EME associate and the acceptance of the newer documentation was identified on a CDC Form 128-B2, dated August 23, 2006. The appellant is not eligible for another review of his gang status until the year 2012. Based upon the aforementioned information, the Second Level of Review denied the appeal.

**III   DIRECTOR'S LEVEL DECISION:** Appeal is denied.

**A.   FINDINGS:** The documentation and presented arguments are persuasive that the appellant has failed to support his appeal issue with sufficient evidence or facts to warrant a modification of the SLR. The examiner reviewed CCR 3023, Gang Activity, and CCR 3378, Documentation of Critical Case

EXH·A·34

Information, and concurs with the assessment of the institution that the appellant's appeal issues have been appropriately and properly addressed. The examiner noted the attached CDC Form 128-B, IGI Gang Status Update, dated July 05, 2006, a CDC Form 1030, Confidential Information Disclosure Form, dated July 3, 2006, and a CDC Form 128-B2, dated August 23, 2006. The examiner noted the explanation given in the CDC Form 128-B regarding the three (3) EME affiliates and their association with the mail drop addresses found in the appellant's address book. The institution is correct in its decision that the document meets the criteria in CCR 3378 (c) (8) (G), Association. The LEIU also upheld the institution's decision to submit the CDC Form 128-B for consideration of maintaining the appellant as an active associate of the EME. The SLR response detailed the information that upheld the appellant's status as being an active associate of the EME. The appellant has not shown any documentation or other verified evidence that would lend credence to his appeal issues and requests. The appellant has the option to request that the IGI arrange a debriefing process to show that the appellant desires to drop out of a gang pursuant to CCR 3378.1, Debriefing Process. The appellant has been duly informed regarding his appeal issues and responding institutional staff has addressed all pertinent areas of his complaint. The examiner finds that the appellant has failed to present any new documentation and/or evidence that would substantiate his claim; therefore, justification for intervention at the Director's Level of Review is not warranted.

**B. BASIS FOR THE DECISION:**
California Penal Code Section: 5058
CCR: 3000, 3001, 3023, 3270, 3271, 3287, 3321, 3370, 3378
CDC Operations Manual Section: 52070.6.1, 52070.6.2, 52070.18.2, 52070.18.2.3, 52070.19.4, 52070.21, 52070.21.1

**C. ORDER:** No changes or modifications are required by the institution.

This decision exhausts the administrative remedy available to the appellant within CDCR.

N. GRANNIS, Chief
Inmate Appeals Branch

cc:   Warden, PBSP
      Appeals Coordinator, PBSP

EXH-A-35

APPEALING ICC DECISION (ACTION)

EX-D 30    DISPUTE ICC 1-9-08
REFERR
FOR INACTIVE REVIEW.

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS

DELICAN BAY STATE PRISON

INMATE/PAROLEE    Location Institution/Parole Region    Log No.    Category 2/9
APPEAL FORM       HOUSING UNIT  **PBSP**
CDC 602 (12/87)   UNIT C-2                1. _____    1. _____
                                          2. _____    2. _____

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|------|--------|-----------|------------------|
| WILLIAM MURPHY | H.76407 | | C2-120 |

A. Describe Problem: ICC's (ICSR's) DECISION TO CONTINUE SEGREGATION & REFUSAL TO REFER MY CASE BACK TO IGI FOR INVESTIGATION & OR IN ACTIVE STATUS REVIEW VIOLATES MY LIBERTY INTERESTS PROTECTED BY THE 14TH AMENDMENT * ADDITIONALLY THIS ICC AND ALL FUTURE ICC VIOLATE DUE PROCESS AS THEY ARE MEANINGLESS SHAMS & PRETEXT FOR INDEFINATE CONFINEMENT, FINALLY ICC's BELIEF THAT THEY LACK AUTHORITY TO RELEASE ME, REFLECTS THEIR LACK OF TRAINING AND SUPERVISION BY THE DIRECTORS WARDEN & DRB - THUS RENDERING THEM LIABLE. FACTS: ON 1/4/08 CCI-PUGET PROVIDED ME A 114 ORDER INDICATING I WOULD BE GOING TO COMMITTEE (EXHIBIT "A") AT WHICH TIME I EXERCISED MY RIGHTS UNDER WOLFF. V. MCDONNELL Et. seq. TO PRESENT MY VIEWS - AND DOCUMENTARY EVIDENCE, TO BE CONSIDERED & PLACED IN MY C-FILE PRIOR TO ANY ICC DECISION (EXHIBIT"B-1-5") ON 1/9/08, I APPEARED BEFORE ICC & REITERATED MY VIEWS, ICC INTURN READ MY VIEWS & ATTACHED EXHIBITS. I EXPLAINED TO THE (CONT. PG 3 - INFRA) ...

If you need more space, attach one additional sheet.

B. Action Requested: (1) VACATE THE COMMITTEES DECISION - ORDER A NEW & FAIR ONE (2.) CEASE PRACTICE OF HOLDING ROTE RUBBER STAMP COMMITTEES (3) THAT ICC ORDER MY RELEASE (4) THAT IT REFER THE QUESTIONABLE ITEM BACK TO IGI FOR INVESTIGATION/REJECTION (5) THAT NEW EVIDENCE BE SENT TO IGI - & I BE DESIGNATED INACTIVE (6) THAT ICC ET AL ·· BE ADIQUATELY TRAINED & SUPERVISED (7) THAT EACH MEMBER OF ICC THE WARDEN, DIRECTOR & DRB - SEPARATELY PAY ME $100.00 IN COMPENSATORY DAMAGES PER DAY THAT I'M RETAINED (FOR MENTAL EMOTIONAL DISTRESS) AND AN ADDITIONAL $100.00 PER DAY IN PUNITIVE DAMAGES FOR VIOLATING MY RIGHTS.

Inmate/Parolee Signature: _William Murphy_ H.76407    Date Submitted: 1/14/08

C. INFORMAL LEVEL (Date Received: _____)

Staff Response: _____

_____

_____

_____

_____

Staff Signature: _____    Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

_____

_____

_____

_____

Signature: _____    Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed    CDC Appeal Number:
Board of Control form BC-1E, Inmate Claim

* ALL REGULATIONS CITED HERETO CONSTITUTE A VIOLATION OF A LIBERTY INTEREST UNDER THE 14TH AMEDS. SEE SANDIN V. CONNER 515 U.S.-472 AS THEY LENGTHEN MY PAROLE ELIGIBILITY (Ibid) AND THE HOUSING CONDITIONS IMPOSE A ATYPICAL AND SIGNIFICANT HARDSHIP ON ME IN RELATION TO THE ORDINARY INCIDENTS OF PRISON LIFE Ibid SEE MADRID V. GOMEZ 889 F. Supp.1146 (FOR CONDITIONS).
• EXHIBIT "B" IS INCORPORATED AS FULLY SET FORTH HERETO.

EXHIBIT *B-36

ICC—THAT IGI & SSU HAVE FOUND THERES NO EVIDENCE OF CURRENT GANG ACTIVITY, THAT AS FOR THE ITEM USED TO RETAIN ME, IGI ADMITTED IT WAS NOT CORROBORATED (EX"B 5") THAT THE WARDEN AND CCII HAVE QUESTIONED THE ITEM USED TO RETAIN ME AND FOUND THERE IS NO INFORMATION THAT I'VE ACTUALLY AFFILIATED WITH EME AFFILIATES—OR THE ADDRESSEES (Ibid) THEY FURTHER QUESTION THE ITEM USED TO RE-VALIDATE ME BY FINDING "THE EVIDENCE OF MURPHY'S ACTUAL PARTICIPATION IN COMMUNICATING WITH AFFILIT OR RESIDENTS LINKED TO THE ADDRESS IS LACKING"(Ibid) I POINTED OUT THAT THE ONLY REASON THEY DID NOT GRANT MY 602 CHALLENG IN THE "VALIDATION" WAS BECAUSE THEY HAD NO AUTHORITY (ibid), HOWEVER I ARGUED THAT SINCE THIS IS A DIFFERENT PROCEEDING (IE, COMMITTEE), THAT THEY NOW, NOT ONLY HAVE THE "AUTHORITY" TO RELEASE ME CCR 3341.5C(X)(A)(1), 3341.5C(3) 3378(d) BUT GIVEN THAT D. HAWKES & THE WARDEN FOUND THE ITEM QUESTIONABLE, AND UNCORROBORATED THEY NOW HAD THE AUTHORITY & I HAD THE RIGHT T THEIR SENDING IT BACK TO IGI FOR RE-INVESTIGATION/REJECTION. CCR 3321 ET SEQ. 3378C(X), AND TO RECOMMEND ME FOR INACTIVE STATUS RELEASE—GIVEN THAT NEW EVIDENCE ESTABLISHES THAT THE ITEM IS ALSO OVER SIX YEARS OLD (Ibid) CCR 3341.5C(6), CCR. 3378(C). ICC, IN PARTICULAR THE AW, AND CCII NEALY STATED THEY ARE NOT AWARE OF ANY SUCH AUTHORITY, AND STATED THEY DO NOT HAVE THE AUTHORITY—NEITHER TO RELEASE ME NOR TO SEND THE INFORMATION BACK TO IGI ONCE IGI MADE ITS INITIAL DETERMINATION A ONCE THE DIRECTOR MADE ITS FINAL DECISION. I EXPLAINED TO THE ICC THAT THE WHOLE PURPOSE FOR AN ANNUAL IS TO REVIEW PLACEMENT, SEGREGATION, EVIDENCE USED TO RETAIN ME, & TO CONSIDER ME FOR RELEASE—AND THAT THE ICC DOES HAVE THE AUTHORITY TO REFER THE EVIDENCE BACK TO IGI IF THE EVIDENCE IS "QUESTIONABLE" I REFERED THEM TO THE CCII & WARDENS FINDIN THAT THE EVIDENCE WAS NOT ONLY QUESTIONABLE BUT UNSUBSTANTIATED, THE ICC AGAIN STATED THEY HAD NO SUCH AUTHORITY THAT THE JOB IS TO VERIFY THAT THE PAPERWORK USED TO RETAIN ME IS IN "ORDER"-NOT TO ADDRESS ITS VALIDITY—THAT ONCE THE DIRECTOR M ITS DECISION ITS FINAL—THEY THEN TOLD ME TO TAKE IT TO COURT.

1ST CAUSE OF ACTION: ICC VIOLATED MY RIGHTS TO DUE PROCESS—WHICH ENTITLES ME THE RIGHT TO MEANINGFUL REVIEWS AND TO A COMMITTEE WHICH IS NOT A PRETEXT FOR INDEFINATE CONFINEMENT, HEWIT V. HELMS 459 U.S 460 (1983). HERE THE FACT THAT ICC ADMI THAT THEY HAVE NO AUTHORITY TO RELEASE, NOR TO CONSIDER MY RELEASE, NOR REFER MY CASE BACK TO IGI, BUT ARE SOLELY THERE TO VERIFY THAT MY DOCUMENTS ARE IN ORDER, ESTABLISHES THAT THIS AND ALL FUTURE ICC's ARE UNCONSTITUTIONAL AS THEY ARE HELD IN ROTE FASHIO AND ARE NOTHING MORE THAN A "PRETEXT FOR INDEFINATE CONFINEMENT"—INDEED IT ALSO RENDERS MY RIGHTS TO BE PRESENT & TO PRESEN MY VIEWS/DOCUMENTARY EVIDENCE [3] MEANINGLESS. THIS IS ESTABLISHED BY THE FACT THAT ICC NEVER NOTED IN THE 128-G ANY OF THE ARGUMENTS I PRESENTED, BUT SIMPLY STATED I DISAGREED WITH THE DECISION—ADDITIONALLY ICC ADMITS (IN THE 128-G) THAT REGARDLESS OF ANY EVIDENCE I PRESENTED OR VIEWS SUBMITTED (OR CCR 3341.5C(3)) THEY WILL NEVER RELEASE ME OR CONSIDER MY RELEASE UNTIL I COMPLETE ANOTHER 6 YEARS INACTIVE STATUS OR DEBRIEF—THIS HIGHTENTS MY CONTENTION THAT THIS AND ALL ICC's A HELD IN ROTE FASHION AND ARE PRETEXT FOR INDEFINATE CONFINEMENT. (SEE EX-"A 2" 128-G)

2ND CAUSE OF ACTION: ICC's REFUSAL TO CONSIDER MY RELEASE & REFERENCE THE QUESTIONABLE ITEM BACK TO IGI FOR RE-INVESTIGAT VIOLATES MY LIBERTY INTEREST FOUND IN CCR 3341.5C(X)(A)(1) WHICH PROVIDES THAT THE COMMITTEES SHALL CONSIDER MY RELEASE EVERY 180 DAYS; IN THIS CASE ICC's REFUSAL STEMS FROM ITS ERRONEOUS BELIEF THAT IT CAN NOT CONSIDER MY RELEASE. IT ALSO VIOL MY LIBERTY INTEREST UNDER CCR 3378(C)(7) WHICH PROVIDES "THE CDC 812-A & 812-B SHALL BE REVIEWED BY A CLASSIFICATION COMMITT AT EACH ANNUAL HEARING & UPON ANY REVIEW OR TRANSFER CONSIDERATION... QUESTIONABLE GANG IDENTIFICATIONS, NOTATIONS ( NEW INFORMATION SHALL BE REFERED TO IGI FOR INVESTIGATION". HERE I PRESENTED THE ICC WITH EVIDENCE, STATEMENTS MA BY THE WARDEN & CCII WHICH NOT ONLY QUESTIONED THE EVIDENCE, BUT FOUND IT UNCORROBORATED AND LACKING (EX'B 4+5) IN LIGHT THIS FINDING I HAD A RIGHT TO EXPECT THAT THE ICC WOULD SEND THIS ITEM BACK TO IGI FOR REINVESTIGATION/REJECTION CCR 3378 C THEIR REFUSAL TO DO SO VIOLATED MY LIBERTY INTEREST—ALTHOUGH IT IS TRUE THAT NO ONE HAD THE AUTHORITY TO VACATE THE VALIDATION "INITIALLY"[1] IT IS ALSO TRUE THAT I ALERTED THE ICC OF THE WARDEN & D. HAWKES FINDINGS AND THE ICC'S PRESENT

2. THE NEW EVIDENCE I GAVE TO THE ICC WAS THAT NO ONE CONSIDERED THAT THE ADDRESSES FOUND WERE OVER SIX YEARS OLD, ICC COULD VERI LUCA WAS MY CELLMATE OVER SIX YEARS AGO, THUS THE EVIDENCE COULD NOT BE USED CCR 3341.5C(X)(3) 3378 ET SEQ—OR AT MIN, MAI—IM ELIGIBLE F IN ACTIVE STATUS Ibid

3. UNDER WOLFF V. MCDONELL 418 U.S 539, 563-70 (1974), 14TH AMENDS.

AUTHORITY TO EITHER RELEASE VALIDATED CCR3341.5(C)(5), 3378(e) (AUTHORIZING THE PLACEMENT OF VALIDATED INMATES) OR AT MINIMAL ID SEND IT BACK TO IGI FOR FURTHER INVESTIGATION CCR3378.(C)(7) (SEE EX"B.1-5") THEIR REFUSAL TO DO SO DISPITE EVIDENCE THEY DID HAVE THE AUTHORITY-IS A DELIBERATE VIOLATION OF LAW.

3RD CAUSE OF ACTION: ICC'S REFUSAL TO REFER MY CASE BACK TO IGI FOR INVESTIGATION & INACTIVE STATUS REVIEW VIOLATED MY LIBERTY INTERESTS. CCR3378(C)(7) MANDATES THAT AT EACH ANNUAL NEW INFORMATION REGARDING THE INITIAL VALIDATION BE REFERED TO IGI FOR INVESTIGATION, CCR3341.5(C)(5), 3378(e) PROVIDES THAT INMATES WITH NO GANG ACTIVITY IN "SIX YEARS" BE DESIGNATED INACTIVE AND REFERED TO THE IGI, DCS AND DRB. HERE I OFFERED NEW VERIFIABLE EVIDENCE THAT ALL ADDRESSES WERE PLACED IN MY ADDRESS BOOK OVER SIX YEARS AGO (LUCA WAS MY CELLMATE WELL OVER SIX YEARS AGO) THE WARDEN et AL... ADMIT THERES NO EVIDENCE THAT IVE HAD CONTACT WITH HIM OR ANYONE SINCE (EX"B-5") THUS I HAD A RIGHT & ICC HAD A DUTY TO REFER THIS NEW EVIDENCE BACK TO IGI FOR RE-INVESTIGATION-ESPECIALLY SINCE IT WAS OVER SIX YEARS OLD (AND NOT "ACTIVITY") THUS IT SHOULDN'T HAVE BEEN USED CCR3000,3023,3341.5(C)(5),3378(C)(1)(2), ALTERNATIVELY SINCE IT WAS OVER SIX YEARS OLD THE ICC HAD A DUTY AND I HAD A RIGHT- IN THEM REFERING MY CASE TO IGI et al... FOR INACTIVE STATUS REVIEW CCR3378(C). (ALSO SEE 128-B DATED JUNE 27-06 FOR OTHER AGENCY'S FINDINGS OF MY BEING NOT ACTIVE)

4TH CAUSE OF ACTION: ICC'S DECISION TO FURTHER SEGREGATE VIOLATES MY LIBERTY INTEREST IN CCR3321(D)(1) WHICH PROVIDES THAT "NO DECISION SHALL BE BASED UPON INFORMATION FROM A CONFIDENTIAL SOURCE, UNLESS OTHER DOCUMENTATION CORROBERATES INFORMATION FROM THE SOURCE OR UNLESS THE CIRCUMSTANCES SURROUNDING THE EVENT & THE DOCUMENTED RELIABILITY OF THE SOURCE SATISFIES THE DECISION MAKER THAT THE INFORMATION IS TRUE". HERE THE ITEM WAS DESIGNATED CONFIDENTIAL (EX-C) YET THERE IS NO FINDING THAT THE INFORMATION IS TRUE - NOR WAS IT "CORROBORATED BY DOCUMENTATION" AS WAS REQUIRED CCR3321(D)(1) BY CONTRAST THE WARDEN & CCII FOUND THERE IS "NO INFORMATION AVAILABLE TO INDICATE THAT I HAVE COMMUNICATED WITH EME AFFILIATES THROUGH THESE ADDRESSES" (EX"B-5") "THE EVIDENCE OF MURPHYS ACTUAL PARTICIPATION IN COMMUNICATION WITH THE AFFILIATES OR RESIDENTS LINKED TO THE ADDRESS IS LACKING" Ibid EVEN THE IGI WHO AUTHORED THIS ITEM ADMITTED IT WAS NOT CORROBORATED "[D.MOUNT] DID NOT FIND CORRESPONDENCE BETWEEN MURPHY & PERSONS ASSOCIATED WITH THESE ADDRESSES" (Ibid) GIVEN THEY ADMITTED LACK OF CORROBORATION, ICC's RETENTION IS THUS ILLEGAL.

5TH CAUSE OF ACTION: THE ICC's RETENTION VIOLATES LIBERTY INTERESTS AND DUE PROCESS; CCR3321 et.SEQ. & CATO V. RUSHEN 824 F.2d 703 (9TH CIR 1987) PROHIBIT RETENTION BASED ON UNRELIABLE EVIDENCE, UNLESS IT FALLS WITHIN CCR3321(D)(3) CRITERIA. HERE ICC KNOWS THAT "MOUNT" RELIED ON CRITERIA NOT FOUND IN CCR3321-NAMELY-"OTHER" (EX-C) AND DOM 60020.7 (SEE RE, DATED 6-27-06) THUS ICC VIOLATES MY LIBERTY INTEREST BY RETAINING ME BASED ON INFORMATION THAT IS NOT RELIABLE UNDER CCR3321 ET. SEQ... CATO SUPRA. BUT BY RELYING ON AN UNDER GROUND STANDARD NOT LEGALLY PROMULGATED IN COMPLIANCE WITH THE APA. SEE PEN. CODE 5058, GOV.CODE 11340.5(C) (PROHIBITING THE USE OF UNDERGROUND RULES).

6TH CAUSE OF ACTION: ICC VIOLATED MY LIBERTY INTEREST IN NOT RELEASING ME PURSUANT TO CCR3341.5(C)(3) WHICH MANDATES MY RELEASE UNLESS IM FOUND A SECURITY THREAT- HERE I WAS NOT DENIED RELEASE BECAUSE ICC BELIEVED I WAS A SECURITY THREAT (ANY SUCH FINDING IS CONTRADICTED BY THE WARDEN & CCII'S FINDS THAT SUCH EVIDENCE IS UNSUBSTANTIATED & LACKING EX"B-5") BUT RATHER ICC REFUSED TO RELEASE ME BECAUSE IT BELIEVED IT HAD NO AUTHORITY.

7TH CAUSE OF ACTION: THE DIRECTOR, WARDEN, AND DRB -IS ALSO LIABLE FOR FAILING TO TRAIN AND SUPERVISE THE ICC IN THE ADMINISTRATION OF LAW-WHERE THE ONLY REASON THEY REFUSED TO RELEASE ME MUCH LESS CONSIDER IT-NOR REFER THE EVIDENCE TO IGI FOR RE-INVESTIGATION-INACTIVE STATUS REVIEW, WAS BECAUSE THEY BELIEVED THEY LACKED AUTHORITY.- AS SHOWN ABOVE THEY CLEARLY HAD AUTHORITY - THEIR LACK OF KNOWLEAGE REST ON THEIR SUPERVISORS WHO FAIL TO ADIQUATELY TRAIN AND SUPERVISE THEM!

PELICAN BAY STATE PRISON
SECURITY HOUSING UNIT
UNIT C-2

4.

ADMINISTRATIVE SEGREGATION UNIT PLACEMENT NOTICE

CDC 114-D (Rev 10/98)

HOUSING UNIT

UNIT C-2

| DISTRIBUTION: | |
|---|---|
| WHITE - CENTRAL FILE | CANARY - WARDEN |
| BLUE - INMATE (2ND COPY) | PINK - HEALTH CARE MGR |
| GREEN - ASU | GOLDENROD - INMATE (1ST COPY) |

| INMATE'S NAME | CDC NUMBER |
|---|---|
| MURPHY, WILLIAM | H76407 |

## REASON(S) FOR PLACEMENT (PART A)

☐ PRESENTS AN IMMEDIATE THREAT TO THE SAFETY OF SELF OR OTHERS

☐ JEOPARDIZES INTEGRITY OF AN INVESTIGATION OF ALLEGED SERIOUS MISCONDUCT OR CRIMINAL ACTIVITY

☐ ENDANGERS INSTITUTION SECURITY   ☐ UPON RELEASE FROM SEGREGATION, NO BED AVAILABLE IN GENERAL POPULATION

DESCRIPTION OF CIRCUMSTANCES WHICH SUPPORT THE REASON(S) FOR PLACEMENT:

You Are currently housed At PBSP-SHU Serving An indeterminate SHU Term based on you being VALIDATED AS AN Associate of The MEXICAN MAFIA PRISON gang. The gang VALIDATION is Documented ON CDCR 12882 dated 8-23-06 and AN CDC 812A updated by PBSP.IGI ON 1-3-08. Due To gang VALIDATION you Are deemed To be A Threat To The Safety And Security of the Institution. You Are scheduled To Appear before The Institution Classification Committee for ANNUAL/114B Review.

☐ CONTINUED ON ATTACHED PAGE (CHECK IF ADDITIONAL)   ☐ IF CONFIDENTIAL INFORMATION USED, DATE OF DISCLOSURE: /  /

| DATE OF ASU PLACEMENT | SEGREGATION AUTHORITY'S PRINTED NAME | SIGNATURE | TITLE |
|---|---|---|---|
| | | | Lieutenant |

| DATE NOTICE SERVED | TIME SERVED | PRINTED NAME OF STAFF SERVING ASU PLACEMENT NOTICE | SIGNATURE | STAFF'S TITLE |
|---|---|---|---|---|
| 1-4-08 | 1400 | T. Puget | | CCI |

☐ INMATE REFUSED TO SIGN   INMATE SIGNATURE   CDC NUMBER H76407

## ADMINISTRATIVE REVIEW (PART B)

*The following to be completed during the initial administrative review by Captain or higher by the first working day following placement*

| STAFF ASSISTANT (SA) | | INVESTIGATIVE EMPLOYEE (IE) | |
|---|---|---|---|
| STAFF ASSISTANT NAME | TITLE | INVESTIGATIVE EMPLOYEE'S NAME | TITLE |

### IS THIS INMATE:

| | | | |
|---|---|---|---|
| LITERATE? | ☐ YES ☐ NO | EVIDENCE COLLECTION BY IE UNNECESSARY | ☐ YES ☐ NO |
| FLUENT IN ENGLISH? | ☐ YES ☐ NO | DECLINED ANY INVESTIGATIVE EMPLOYEE | ☐ YES ☐ NO |
| ABLE TO COMPREHEND ISSUES? | ☐ YES ☐ NO | ASU PLACEMENT IS FOR DISCIPLINARY REASONS | ☐ YES ☐ NO |
| FREE OF MENTAL HEALTH SERVICES DELIVERY SYSTEM NEEDS? | ☐ YES ☐ NO | DECLINED 1ST INVESTIGATIVE EMPLOYEE ASSIGNED | ☐ YES |
| DECLINING FIRST STAFF ASSISTANT ASSIGNED? | ☐ YES | | |

Any "NO" requires SA assignment

☐ NOT ASSIGNED

☐ NOT ASSIGNED

Any "NO" may require IE assignment

### INMATE WAIVERS

☐ INMATE WAIVES OR DECLINES INTERVIEW WITH ADMINISTRATIVE REVIEWER   ☐ INMATE WAIVES RIGHT TO 72 HOURS PREPARATION TIME

| ☐ NO WITNESSES REQUESTED BY INMATE | INMATE SIGNATURE | DATE |
|---|---|---|

### WITNESSES REQUESTED FOR HEARING

| WITNESS' NAME | TITLE/CDC NUMBER | WITNESS' NAME | TITLE/CDC NUMBER |
|---|---|---|---|
| WITNESS' NAME | TITLE/CDC NUMBER | WITNESS' NAME | TITLE/CDC NUMBER |

**DECISION:** ☐ RELEASE TO UNIT/FACILITY_____   ☐ RETAIN PENDING ICC REVIEW   ☐ DOUBLE CELL   ☐ SINGLE CELL PENDING ICC

REASON FOR DECISION:

| ADMINISTRATIVE REVIEWER'S PRINTED NAME | TITLE | DATE OF REVIEW | TIME | ADMINISTRATIVE REVIEWER'S SIGNATURE |
|---|---|---|---|---|
| CORRECTIONAL ADMINISTRATOR'S PRINTED NAME (if necessary) | | CORRECTIONAL ADMINISTRATOR'S CO-SIGNATURE (if necessary) | | DATE OF REVIEW |

See chronological Classification Review document (CDC 128 - G) for specific hearing information

EXHIBIT

EXH "B" 98

STATE OF CALIFORNIA                                                                    DEPARTMENT OF CORRECTIONS AND REHABILITATION
                                                                                       CDCR 128G (Rev. 11/07)

**NO:** H-76407          **NAME:** MURPHY, William                          **HSG:**    C2-120L
Custody:   MAX S         CS:   129 (IV)      D1/D EFF 11/27/97    Assignment:  SHU/INDET
RelDate:   MEPD 3/12/2017   Reclass:   7/2008              **Action:**   **RETAIN SHU/INDET STATUS: REFER CSR FOR**
BPH:       INITIAL 2/2016                                                 **ANNUAL RE-ENDORSEMENT RX PBSP SHU**

Inmate Murphy appeared before PBSP FAC-C SHU ICC on this date for Annual/114D Review. No staff assistant was assigned as S is not illiterate, speaks English, can comprehend the issues, and is free of mental health services needs. An investigative employee was not required. Committee notes TABE score of 9.9. Prior to Committee, S was issued an updated copy of his CDCR 114D dated 1/4/08, and the CDCR 812A, Notice of Critical Case Information - Prison Gang Identification, updated by IGI on 1/3/08. Committee notes a CDCR 128-B2 dated 8/23/06, citing 1 new document that updates S's prison gang validation requirements. S is validated as an associate of the Mexican Mafia (EME) prison gang, which is known to be involved in criminal activities that threaten the safety of others and institutional security, and this requires continued segregation from the GP. S was informed that the departmentally-recognized avenues for release from SHU are through the debriefing process or through being determined to be an inactive prison gang member or associate as delineated in CCR, Title 15, Sections 3378(e) and 3341.5(c)(4)(5). Last source document used in the validation process is dated 6/27/06. S will be eligible for Inactive Review after 6/27/12. Committee acts to retain SHU on INDET status, and refer to CSR with recommendation for PBSP SHU based on his validation as an active associate of the EME prison gang. The prior CSR action dated 2/28/07, noted no concerns. Committee notes CDCR 128C Mental Health Screening Chrono dated 1/24/07, denoting no level of care. S does not meet PBSP SHU exclusionary criteria. LCSW E. Douglass was present during this Committee action. When S was questioned regarding his current mental health status, he advised Committee he did not have Psych concerns at this time. DDP Review: CDCR 128C-2 is in C-file. S has no cellmate, and Committee notes the "S" custody suffix has previously been applied. S participated in Committee, acknowledged understanding, and disagreed with Committee action, stating, "I do not agree with the validation process." Committee informed S the validation appears appropriate. S was advised of Committee's decision and his right to appeal, and that any appeal of this Committee action must be submitted within 15 working days of this date, whether he has received the CDCR Form 128G Classification chrono or not. BPH Initial Hearing scheduled in 2/2016. Next scheduled Committee will be in 7/2008, for 180-Day Review.

CHAIRPERSON: M. CASTELLAW/AW          U. SILVA/FC          E. DOUGLASS/LCSW          RECORDER: K. NEALY/CCII(A)

CC: ☐OBIS  ☒CSR  ☐IGI  ☐PSYCH  ☐MED  ☐C&PR  ☐OTHER _____
Committee Date: 1/9/08          (PUGET/jw)          Classification          FAC-C  ICC/REVIEW          Inst: PBSP

STATE PRISON
SECURITY HOUSING UNIT
UNIT C-2

EXH. B-39

State of California

Department of Corrections
CDC 128-G

No. H-76407                    NAME: MURPHY

*Comment*:      **PBSP-SHU retention endorsed.  CS: 129**

SHU Indeterminate retention endorsed per ICC action of 1/9/08.  Inmate remains a threat to the security of the institution by his continuing association with a prison gang engaged in a criminal conspiracy against the safety of others.  CDC 128-B-2 of 8/23/06 is noted.  All referenced documents are present in the file, properly annotated and properly disclosed.

J. Isola, CSR

Date: 2/5/2008              **Classification - CSR ACTION**              **PBSP**

EXH·B·40

TO : ICC's / UCC's

FROM :
WILLIAM MURPHY H 76407 .

IN ACCORDANCE WITH THE STATE & FEDERAL DUE PROCESS CLAUSE UNDER WOLFF V. McDONNEL 418 U.S. 539 563 TO (1974) ; TOUSSAINT V. McCARTHY 801 F. 2d. 1080 (9TH CIR 1986) CERT. DENIED 481 US 1069 (1987), I HEREBY SUBMIT THIS DOCUMENTARY EVIDENCE TO BE CONSIDERED BY THE ICC/UCC PRIOR TO ANY DECISION TO RETAIN ME, THIS SHALL CONSTITUTE MY "VIEWS" TO THE COMMITTEE & I REQUEST THAT IT BE PLACED IN MY C-FILE FOR ANY & ALL FUTURE REVIEWS

FACTS: ON JUNE 27, 06 IGI INITIATED AN INVESTIGATION RELITIVE TO THE INACTIVE STATUS POLICY. AN INVESTIGATION, A REVIEW OF MY C-FILE & CONTACT WITH THE SSU/LEIU ESTABLISHED THERE WAS NO EVIDENCE THAT I WAS "CURRENTLY ACTIVE" (SEE 128-B DATED JULY 5, 06) HOWEVER DURING A CELL SEARCH IGI FOUND TWO ADDRESSES IN MY PROPERTY WHICH THEY INDICATED WERE "MAIL DROPS" IN WHICH I COULD "CONTACT VALIDATED INDIVIDUALS (EXHIBIT "A") THERE WAS NO EVIDENCE/FINDING THAT I'VE EVER COMMUNICATED WITH THESE INDIVIDUALS, (INMATE LUCA WAS MY CELL MATE OVER SIX YEARS AGO) BY CONTRAST AN INVESTIGATION CONDUCTED BY WARDEN "HOREL" & CC II "D. HAWKES" DETERMINED :

"A REVIEW OF MURPHYS CENTRAL FILE REFLECTS THAT THERE IS NO INFORMATION AVAILABLE TO INDICATE THAT HE HAS COMMUNICATED WITH EME AFFILIATES THROUGH EITHER OF THESE ADDRESSES (EXHIBIT "B-1") (EMPHASIS ADDED) OFFICER D. MOUNT WAS INTERVIEWED FOR THIS APPEAL RESPONSE. HE INDICATED THAT DURING THE SEARCH HE DID NOT FIND ANY CORRESPONDENCE BETWEEN MURPHY AND PERSONS ASSOCIATED WITH THE TWO ADDRESSES (EXHIBIT B) EMPHASIS ADDED).

DESPITE THESE FACTS I WAS DENIED INACTIVE STATUS & REVALIDATED. AND ALTHOUGH THE WARDEN & CC II. DISAGREED WITH THE VALIDATION AND FOUND THE ITEM USED QUESTIONABLE [THE EVIDENCE OF MURPHY'S ACTIVE PARTICIPATION IN COMMUNICATING WITH AFFILIATES OR RESIDENTS LINKED TO THE ADDRESS IS LACKING" (EXHIBIT B-2 EMPHASIS ADDED)] THEY NEVER THE LESS DENIED MY APPEAL BECAUSE THE DRB HAD ALREADY MADE ITS DECISION TO REVALIDATE ME, THUS AT THAT POINT THEY HAD "NO AUTHORITY" TO OVER TURN IT (Ibid).

I

THE ICC/UCC NOW HAS AUTHORITY AND I HAVE A RIGHT IN THEIR SENDING THIS ITEM BACK TO IGI FOR INVESTIGATION/REJECTION, TO RELEASE ME & OR TO PLACE ME ON INACTIVE STATUS.

1. CCR 3341. 5 (c)(X)(A)(1) PROVIDES THAT THE COMMITTEE SHALL CONSIDER RELEASING ME EVERY 180 DAYS: CCR-3341. 5 (c)(X)(A)(1) : CCR 3378 (c)(1) ALSO PROVIDES :

" THE CDC 812 A & 812 B SHALL BE REVIEWED BY A CLASSIFICATION COMMITTEE AT EACH ANNUAL HEARING & UPON ANY REVIEW FOR TRANSFER CONSIDERTION . . QUESTIONABLE GANG IDENTIFICATIONS, NOTATIONS OR NEW INFORMATION SHALL BE REFERED TO A [IGI] FOR INVESTIGATION" (EMPHASIS ADDED)

ALTHOUGH PREVIOUSLY THE WARDEN AND CC II LACKED THE AUTHORITY TO OVERTURN THE VALIDATION. UNDER THESE REGULATION THE ICC/UCC POSSESS THE PRESENT AUTHORITY AND HAS A DUTY TO EITHER RELEASE ME OR REFER THE RETAINING SOURCE ITEM BACK TO IGI FOR "INVESTIGATION". ESPECIALLY SINCE THE WARDEN AND CC II HAS ALERTED THEM THAT THE ITEM IS UNSUBSTANTIATED AND

1. ALL REGULATIONS STATUTES CITED HERETO CONSTITUTE A VIOLATION OF A LIBERTY INTEREST PROTECTED BY THE 14TH AMENDS. SHOULD MY REQUEST BE DENIED

EXH "B" 41

QUESTIONABLE[12] — ANOTHER FACTOR SUPPORTING REMAND TO IGI FOR INVESTIGATION IS NEW EVIDENCE, SEE CCR 3378(c)(7) (PROVIDING THAT ICC REMAND ITEMS BASED ON NEW EVIDENCE). HERE THE NEW INFORMATION OVER LOOKED BY IGI AND THE DCS-WHICH THE ICC MUST CONSIDER NOW —, IS THAT ANY AND AL ADDRESS IN MY PHONE BOOK WERE PLACED IN MY ADDRESS BOOK WELL OVER SIX YEARS AGO! A REVIEW OF MY C-FILE ESTABLISHES 'LUCA' (WHOSE ADDRESS IGI SAID I HAD) WAS MY CELLMATE OVER SIX YEARS AGO. THIS NEW DEVELOPEMENT WARRENTS A REMAND TO IGI BY ICC/UCC-BECAUSE HAD THE IGI/DCS KNOWN THAT THOSE ADDRESSES WERE WRITTEN OVER SIX YEARS AGO THEY COULD NOT OF USED THIS SEE CCR3378(c)(i)(2), AND IT RENDERS ME ELIGABLE FOR AN INACTIVE STATUS RECOMMENDATION-REGARDLESS OF WHEN THE ITEM WAS FOUND AND USED[3]

# II.

OTHER FACTORS WHICH SUPPORT MY RELEASE BY ICC/UCC OR A REMAND TO IGI FOR INVESTIGATION CCR3378(c)(6).

  A CCR3321(b)(1) PROHIBITS THE ICC/UCC FROM RETAINING ME, BECAUSE IT PROVIDES ;
  "NO DECISION SHALL BE BASED UPON INFORMATION FROM A CONFIDENTIAL SOURCE, UNLESS OTHER DOCUMENTATION CORROBORATES INFORMATION FROM THE SOURCE, OR UNLESS THE CIRCUMSTANCES SURROUNDING THE EVENT AND THE DOCUMENTED RELIABILITY OF THE SOURCE SATISFIES THE DECISION MAKER THAT THE INFORMATION IS TRUE."

HERE THERE WAS NO FINDING THAT THE INFORMATION (WHICH IGI DESIGNATED CONFIDENTIAL) WAS TRUE-MUCH LESS WAS IT "CORROBORATED" VIA "DOCUMENTATION". BY CONTRAST THE WARDEN & CCII FOUND THERE WAS "NO INFORMATION AVAILABLE TO INDICATE THAT [I] HAVE COMMUNICATED WITH EME AFFILIATES THROUGH THESE ADDRESSES" (EXHIBIT B-1-2) "THE EVIDENCE OF MURPHY'S ACTUAL PARTICIPATION IN COMMUNICATION WITH THE AFFILIATES OR RESIDENTS LINKED TO THE ADDRESS IS LACKING." (ibid) EVEN THE IGI ADMITTED TO THE CCII THAT HE HAD NO CORROBORATION "[D. MOUNT] DID NOT FIND ANY CORRESPONDENCE BETWEEN MURPHY AND PERSONS ASSOCIATED WITH THESE ADDRESSES" (EMPHASIS ADDED). BECAUSE PRISON OFFICIALS ADMIT THERE IS NO CORROBORATION FOR THIS ITEM-A DECISION TO RETAIN ME CANNOT BE MADE. 3321.

  B. CCR3321 et SEG... AND CATO V. RUSHEN 824 F.2d.703 (9TH CIR 1987) PROHIBIT RETENTION BASED ON UNRELIABLE EVIDENCE. TO ASSESS RELIABILITY THE ITEM MUST FALL WITHIN CCR3321(c)(6)(6)' CRITERIA.

2. AGAIN THE ONLY REASON MY APPEAL WAS NOT GRANTED WAS BECAUSE THE WARDEN et al. HAD NO AUTHORITY TO VACATE THE VALIDATION THEN HOWEVER GIVEN THAT THIS IS NOW AN ICC PROCEEDING HE DOES HAVE AUTHORITY NOW TO RELEASE ME, CCR33.41.5(c)(6)(A)(X), 3341.5(c)(6). OR AT LEAST SEND THE CASE BACK TO IGI FOR INVESTIGATION CCR3378 B(7).

3. THE WARDEN (CCII CONCEDED THEY CAN MAKE RECCOMMENDATIONS (EXHIBIT B-2). CCR3341.5(c)(5) 3378(c) PROVIDE THAT INMATES WITH NO GANG ACTIVITY IN SIX YEARS BE DESIGNATED "IN ACTIVE"-THUS I QUALIFY AS NEW EVIDENCE SHOWS THE ITEM IS 6 YEARS OLD-ALL AGENCIES HAVE ADMITTED THERE IS NO EVIDENCE OF GANG ACTIVITY OR ASSOCIATION (SEE EXHIBIT B-1-2) AND (128-B DATED JUNE 27, 06). ADDITIONALLY GANG ACTIVITY IS DEFINED AS KNOWINGLY COMMITTING ILLEGAL ACTS OF MISCONDUCT ON BEHALF OF THE GANG. CCR 3000, 3023 THIS ITEM DOES NOT FALL WITHIN THAT CRITERIA.

EXH·B·42

HERE "MOUNT" FOUND IT FELL UNDER "OTHER" (EXHIBIT "A") AND <u>D.O.M 61020 7</u> (SEE 128 B DATED JUNE 27,06).
HOWEVER THAT IS NOT ONE OF <u>CCR 3321(C)(1)(G)</u>' GUIDELINES, THUS TO RETAIN ME ON IT IS ILLEGAL AS SUCH PROVISION
HAVE NOT BEEN LEGALLY PROMULGATED IN COMPLIANCE WITH THE APA. <u>SEE PEN. CODE 5058: GOV. CODE 11340.5(a)</u>:

> "NO STATE AGENCY SHALL ISSUE, UTILIZE, ENFORCE OR ATTEMPT TO ENFORCE ANY GUIDELINE, CRITERION,
> BULLETIN, MANUAL, INSTRUCTION, ORDER, STANDARD OF GENERAL APPLICATION, OR OTHER RULE, WHICH
> IS A REGULATION AS DEFINED IN SUB. SEC. (G) OF SECTION 11342, UNLESS THE GUIDELINE, CRITERION,
> BULLETIN, MANUAL INSTRUCTION, ORDER, STANDARD OF GENERAL APPLICATION, OR OTHER RULE HAS BEEN
> ADOPTED AS A REGULATION AND FILED WITH THE SECRETARY OF STATE PURSUANT TO THE APA" (EMPHASIS ADDED)

C. IGI HAS ILLEGALLY VALIDATED THE ALLEGED RESIDENTS (ADDRESS) AS A MAIL DROP. YET ALL
CITIZENS ESPECIALLY THOSE IN THE FREE WORLD HAVE RIGHTS TO DUE PROCESS PRIOR TO BEING GIVEN SUCH
A DESIGNATION. THIS HAS NOT OCCURED, THUS THE ALLEGED RESIDENT CANNOT BE DEEMED A MAIL DROP, TO DO SO
VIOLATES DUE PROCESS, LIBERTY INTERESTS AND THE APA. PEN. CODE 5058: GOV. CODE 11340.5(a). ESPECIALLY
SINCE NO RULE AUTHORIZES C.D.C. TO VALIDATE ANY FREE PERSONS RESIDENTS AS MAIL DROPS WITHOUT A TRIAL!

D. FINALLY EVEN THOUGH THE WARDEN/CCII LACKED THE AUTHORITY TO OVER TURN MY VALIDATION, BECAUSE
THIS IS A DIFFERENT PROCEEDING (NAMELY ICC/UCC) THEY ET AL., NOW HAVE THE AUTHORITY AND DUTY TO RELEASE
ME REGARDLESS OF THE VALIDATION, THE CONSTITUTION MANDATES COMMITTEES THAT ARE <u>NOT</u> RUBBER STAMP
SHAMS, <u>HEWITT. V. HELMS</u> 459 U.S 460 (1983), <u>CCR 3341.5(C)(5)</u>' MANDATES MY RELEASE BY <u>ICC</u> UNLESS
IT FINDS ME A SECURITY THREAT—THE WARDEN AND CCII WENT ON RECORD AND DISCREDITED/QUESTIONED THE
EVIDENCE USED AGAINST ME, AND IMPLIED THEY WOULD'VE GRANTED A REVERSAL OF THE VALIDATION HAD THEY
HAD AUTHORITY (EXHIBIT B-2) THEY HOWEVER DO HAVE THE AUTHORITY AND DUTY TO RELEASE NOT ONLY
UNDER <u>CCR 3341.5(C)(5)</u> BUT UNDER <u>CCR 3378 (d)</u> WHICH PERMITS VALIDATED ASSOCIATES/MEMBERS TO BE
HOUSED IN THE GENERAL POPULATION.

FOR THE ABOVE SAID REASONS I REQUEST THAT THE ICC/UCC RELEASE ME OR ALTERNATIVELY IN
LIGHT OF THE ABOVE—SEND MY CASE BACK TO IGI FOR INVESTIGATION, AND RECOMMEND ME FOR INACTIVE STATUS.

DATE: 1/4/08

WILLIAM MURPHY H 76467
C-2 / 120

STATE PRISON
SECURITY HOUSING UNIT
UNIT C-2

EXH "B" 43

DATE:   NOV - 1 2006

Inmate William MURPHY, H-76407
Pelican Bay State Prison
Security Housing Unit
Facility C, Unit 2

# PELICAN BAY STATE PRISON
## SECURITY HOUSING UNIT
## UNIT C-2

RE:   WARDEN'S LEVEL DECISION                    APPEAL: DENIED
      APPEAL LOG NO.  PBSP-C-06-02319            ISSUE:   CASE INFORMATION

This matter was reviewed by Robert A. Horel, Warden, at Pelican Bay State Prison (PBSP).  D. Hawkes, Correctional Counselor II, conducted the Appeal interview at the Second Level of Appeal Review on October 30, 2006.

All submitted documentation and supporting arguments have been considered, including the interview conducted at the Second Level of Review.  Additionally, a thorough investigation has been conducted into the claim presented by the inmate and the documentation evaluated in accordance with PBSP's institutional procedures and the California Department of Corrections and Rehabilitation policies.

## ISSUES

MURPHY reported that the most recent review of his gang status inappropriately retains him as an active gang member.  He challenged the material that was used, claiming that there is no evidence of gang activity. MURPHY claims that he was not provided with sufficient information to challenge the identifications of Estrada and Mendoza as associates.  Relevant to Luca, MURPHY claims he has known Luca and his family prior to incarceration, and was the cellmate of Luca during their period of incarceration.  Murphy claims that the acceptance of the document for continued active status is not compliant with the *Castillo* agreement.  He requests that he be granted inactive status.

## FINDINGS

I

MURPHY is a validated associate of the Mexican Mafia (EME) prison gang.  MURPHY is also known as "Scrappy" of Lennox.  The inactive review was initiated in June 2006 and completed in July 2006.  It was updated by the Law Enforcement and Investigations Unit (LEIU) in August 2006, and MURPHY's status as an active EME associate was reaffirmed.

II

Confidential CDC 128B dated June 27, 2006, documents two address entries discovered in Subject's property/cell during a search on that same date.  The investigator noted that these two addresses are connected to three EME affiliates (one member, two associates).  MURPHY's possession of this information was viewed by both the investigator and LEIU representatives as evidence of active association with validated EME affiliates.

III

A review of MURPHY's Central File reflects that there is no information available to indicate that he has communicated with EME affiliates through either of these addresses.  There are reports indicating that MURPHY has communicated with EME affiliates through notes passed directly to the intended recipient.

EXH-B-44

SAN *F.* *INT* PRISON
SECURITY HOUSING UNIT
IV    UNIT C-2

IC-1
Officer D. Mount was interviewed for this Appeal response. He indicated that during the search, he did not find any correspondence between MURPHY and persons associated with the two addresses.

V

The California Code of Regulations, Title 15, Section 3378(c)(6), cites the authority for determining the accepted documents and gang status of an inmate / parolee. It states in part, *"The verification of an inmate/parolee's gang identification shall be validated or rejected by the assistant director, law enforcement and investigations unit (LEIU), or a designee. The validation and / or rejection of evidence relied upon shall be documented on a CDC Form 128-B2."*

VI

The CCR, Title 15, Section 3378(e), states *"An inmate housed in a security housing unit (SHU) as a gang member or associate may be considered for review of inactive status by the Departmental Review Board when the inmate has not been identified as having been involved in gang activity for a minimum of six (6) years."* Furthermore, the section identifies the authority to determine inactive status. It states, *"Verification of an inmate's inactive status shall be approved or rejected by the assistant director, LEIU, or a designee."*

## DETERMINATION OF ISSUE

Only one document accepted for validation must contain reported gang activity within the last six years to maintain an active gang status. One document was submitted and accepted by the LEIU.

It is the responsibility of the investigator to articulate the basis for a document's connection to the gang or its activity. The confidential CDC 128B dated June 27, 2006, documents MURPHY's possession of the information linked to other prison gang affiliates. The evidence of MURPHY's actual participation in communicating with the affiliates or residents linked to the address is lacking.

The LEIU is the designated authority for determining gang status and what documents are accepted or rejected for validation. The institution staff does not have the authority to change a gang status or determine which documents are acceptable. The institution staff can make recommendations only. The due process requirements for gang validation have been satisfied. MURPHY submitted the same argument for LEIU to consider during the review, and approved of the "active" status.

Based on the above, MURPHY's Appeal is DENIED.

## MODIFICATION ORDER

No modification of this decision or action is required.

ROBERT A. HOREL
Warden

EXH-B-45

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS
CDC 1071 (12/86)

## CONFIDENTIAL INFORMATION DISCLOSURE FORM

INMATE NUMBER      H-76407                    INMATE NAME:    MURPHY

1) Use of Confidential Information.

   Information received from a confidential source(s) has been considered in the:

   a)  Active/Inactive Review _____ submitted by

       D.MOUNT, C/O _____
                                        STAFF NAME, TITLE

   b)  CDC-114-D, Order and Hearing for Placement in Segregated Housing dated      N/A

2) Reliability of Source.

   The identity of the source(s) cannot be disclosed without endangering the source(s) or the security of the institution.

   This information is considered reliable because:

   a) ☐  This source has previously provided confidential information which has proven to be true.

   b) ☐  This source participated in and successfully completed a Polygraph examination.

   c) ☐  More than one source independently provided the same information.

   d) ☐  This source incriminated himself/ herself in a criminal activity at the time of providing the information.

   e) ☐  Part of the information provided by the source(s) has already proven to be true.

   f) ☒  Other (Explain) _____

       The following information was confiscated and not solicited by or intended for staff

3) Disclosure of information received.

During the course of a cell search of cell C02-120L, solely occupied by Inmate MURPHY, H-76407, I discovered  third
party  mail drop addresses in MURPHYS personal property.  With these addresses MURPHY could contact a Validated
Mexican Mafia Member ESTRADA, V-26050 or validated  Mexican Mafia Associates MENDOZA, J-38667 and LUCA,
H-12604

> # PELICAN BAY STATE PRISON
> ## SECURITY HOUSING UNIT
> ## UNIT C-2

(If additional space needed, attach another sheet.)

4) Type and current location of documentation, (for example: CDC-128-B of 5-15-86 in the confidential material
folder). _____

   Confidential CDC128B dated 06-27-06 in the confidential material folder of the central file

_____ _I_G_T_ _%_             02-03-06
       STAFF SIGNATURE, TITLE                      DATE DISCLOSED

DISTRIBUTION: WHITE = Central File; GREEN = Inmate; YELLOW = Institution Use



( DOUBLE SIDED PAGE )

STATE OF CALIFORNIA
GA-22 (9/92)

## INMATE REQUEST FOR INTERVIEW

DEPARTMENT OF CORRECTIONS

| DATE | TO: | FROM (LAST NAME) | | CDC NUMBER |
|---|---|---|---|---|
| 1/30/08 | APPEALS COORDINATOR | MURPHY | | H-76407 |

| HOUSING | BED NUMBER | WORK ASSIGNMENT | JOB NUMBER | |
|---|---|---|---|---|
| C2 | 120 | PELICAN BAY | FROM | TO |

| OTHER ASSIGNMENT (SCHOOL, THERAPY, ETC.) | ASSIGNMENT HOURS | |
|---|---|---|
| UNIT C-2 | FROM | TO |

### Clearly state your reason for requesting this interview.

You will be called in for interview in the near future if the matter cannot be handled by correspondence.

ALL APPROPRIATE TIME REQUIREMENTS WERE MET PER 3084.6(C) WITH FILING MY APPEAL IN A TIMELY
FASHION. MY APPEAL ISSUE IS WITH ICC NOT CCS, FOR ITS DECISION/ACTION/PROJECTED ON 1/9/08. ICC FAILED
TO TAKE UNDER CONSIDERATION THE MERITS OF MY FINAL WRITTEN VIEWS I SUBMITTED TO COMMITTEE AND VERBALLY
REITERATED DURING MY ICC REVIEW ON 1/9/08 (SEE DR-C-ICC FAILED TO PLACE ANY OF MY VIEWS ON RECORD) - FURTHERMORE,
ICC HAS THE MORAL OBLIGATION ¿ AUTHORITY TO REVIEW ALL INFORMATION/EVIDENCE BEING UTILIZED TO RETAIN ME
IN WHICH IS FOUND QUESTIONABLE ¿ UNCORROBORATED AND REFER IT BACK TO ICI FOR FURTHER INVESTIGATION. HERE ICC
REFUSAL TO DO SO DIRECTLY VIOLATED MY LIBERTY INTEREST UNDER CCR 3378(F)(7) WHICH PROVIDES "THE CDC 812 ¿ 812-B
WILL BE REVIEWED BY A CLASSIFICATION COMMITTEE AT EACH ANNUAL HEARING ¿ UPON ANY REVIEW OR TRANSFER →

Do NOT write below this line. If more space is required, write on back.

| INTERVIEWED BY | DATE |
|---|---|
| C. WILBER, AC | |

DISPOSITION

THE INMATE APPEALS BRANCH IN SACTO HAS LONG SINCE
ESTABLISHED VALIDATION APPEALS WITHIN 15 DAYS OF
128-B2 ONLY.

EMH-"B"-47   CONTINUANCE OF PG. 47 →

consideration... QUESTIONABLE GANG IDENTIFICATIONS, NOTATIONS OR NEW INFORMATION SHALL
e referred to IGI for investigation which I presented to icc information showing that
the evidence being used is lacking, with icc actions of FAILING TO APPROPRIATELY review my
alidation & all questionable items & sent it back to IGI, which THEY NOW HAVE THE
whoerty to do - not only violates my liberty interest but also my Due PROCESS to a fare and
impartial hearing. Thus I retain the RIGHT to exercise my RIGHTS TO APPEAL ANY AND ALL
committee actions looked in 1/9/06, which AFFECTED ME

In conclusion: this APPEAL is not DIRECTED TOWARDS ICC, BUT DIRECTED TOWARDS COMMITTEES
actions. — read the whole icc ))

     "please APPROPRIATELY PROCESS my APPEAL !! '

( DOUBLE SIDE PAGE )

o

STATE OF CALIFORNIA
GA-22 (9/92)

**INMATE REQUEST FOR INTERVIEW**

DEPARTMENT OF CORRECTIONS

| DATE | TO APPEALS COORDINATOR | FROM (LAST NAME) | CDC NUMBER |
|------|------------------------|------------------|------------|
| 1/3/08 | C WILBER | MURPHY | H-764407 |

| HOUSING | BED NUMBER | WORK ASSIGNMENT | | JOB NUMBER FROM | TO |
|---------|------------|-----------------|--|-----------------|-----|
| C·2 | 120 | | ...SON | | |

| OTHER ASSIGNMENT (SCHOOL, THERAPY, ETC.) | ...G UNIT | ASSIGNMENT HOURS FROM | TO |
|------------------------------------------|-----------|------------------------|-----|

### Clearly state your reason for requesting this interview.

You will be called in for interview in the near future if the matter cannot be handled by correspondence.

I AM IN NO WAY CHALLENGING THE 128, B2 IN THIS APPEAL! I'M SOLELY EXERCISING MY RIGHT TO APPEAL
AND CHALLENGE CLASSIFICATIONS ACTIONS ON 1/9/08 TO RETAIN ME IN SHU ON AN INDETERMINATE STATUS AND REF-
MY CASE TO CSR WITH THE RECOMMENDATION FOR SHU RETENTION BASED ON BEING AN ALLEGE ACTIVE ASSOCIATE
OF THE EME PRISON GANG (SEE CDCR-128-G "ACTION") Such ACTIONS ARE BASED ON UN-SUFFICIENT & QUESTIONABLE
INFORMATION / EVIDENCE . WHICH WAS FOUND BY CCII & THE WARDEN TO BE LACKING IN THEIR INITIAL INVESTIGATED REP
COMMITTEES NONFEASANCE TO ADEQUATELY REVIEW THE QUESTIONABLE INFORMATION & REFER IT BACK TO IGI FOR
FURTHER INVESTIGATION AS MANDATED UNDER CCR 3378 (C)(8) (ONCE THIS WAS BROUGHT TO ICC'S ATTENTION IN WRITING
AND IN PERSON, PRIOR & DURING MY ANNUAL ICC REVIEW BY ME PERSONALLY) FURTHER PROVIDES ME THE RIGHT TO

Do NOT write below this line. If more space is required, write on back.

| INTERVIEWED BY | DATE |
|----------------|------|
| C WILBER, AC | |

DISPOSITION

YOUR APPEAL IS BEING REJECTED BASED ON CLEAR
DIRECTION FROM IAB BASED ON PRIOR ATTEMPTS
BY OTHER INMATES IN SAME SITUATION.

CONTINUANC
OF PAGE 48

EXH "B"-48

HALLENGE COMMITTEES ACTIONS DESCRIBED ON THE 128-G.

IS ADVISED BY COMMITTEE, I HAVE THE RIGHT TO APPEAL ANY COMMITTEE ACTION WHICH I
ISAGREE WITH & DIRECTLY EFFECTS ME — WHICH IM EXERCISING THOSE RIGHTS TO APPEAL AND
HALLENGE COMMITTEES ACTIONS TOOKEN ON 1/9/08 NOT IN THE ATTACH 602.

"ANY INMATE OR PAROLEE UNDER THE DEPARTMENT'S JURISDICTION MAY APPEAL ANY DEPARTMENTAL
ECISION, ACTION, CONDITION OR POLICY WHICH THEY CAN DEMONSTRATE AS HAVING AN ADVERSE EFFECT UPON
IEIR WELFARE" CCR.3084 i (RIGHT TO APPEAL)

AS STATED ABOVE IM NOT IN ANY WAY CHALLENGING THE 128-B2 AS YOU IMPLIED, IM APPEALING
AND CHALLENGING 602'S ACTIONS TOOKEN OF 1/9/08 ONLY.

SO IS MY APPEAL GOING TO BE APPROPRIATELY PROCESS "YES" OR "NO"?

**State of California**
**CDC FORM 695**
**Screening For:**
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

RE: Screening at the FIRST Level

January 15, 2008

~~~~ BAY STATE PRISON
SECURITY HOUSING UNIT
UNIT C-2

*MURPHY, H76407*
*CF02L 000000120L*

Log Number: PBSP-C-
(Note: Log numbers are not assigned to screen out appeals or informal level appeals.)

The enclosed documents are being returned to you for the following reasons:

*You have failed to provide necessary copies of your chrono(s).*

*PLEASE ATTACH 128-G WHEN YOU GET IT. IF YOUR APPEAL IS ACCEPTED*
*BASED ON AN ICC ACTION (OR INACTION), YOUR APPEAL TIME LIMITS ARE*
*SECURE WHILE YOU WAIT FOR 128-G.*

Appeals Coordinator
Pelican Bay State Prison

"ATTENTION"
(128-G ATTACHED AS EHIBIT A-2)

**NOTE:** Failure to follow instruction(s) will be viewed as non-cooperation and your appeal will be
automatically dismissed pursuant to CCR 3084.4(d). This screening decision may not be
appealed. If you believe this screen out is in error, please return this form to the Appeals
Coordinator with an explanation of why you believe it to be in error, and supporting
documents. ~~You have only 15 days to comply with the above directives~~

**PERMANENT APPEAL ATTACHMENT – DO NOT REMOVE**

EXH·B'-49

State of California
CDC FORM 695
Screening For:
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

RE: Screening at the FIRST Level

January 29, 2008

PELICAN BAY S.H.U.
UNIT C-2

*MURPHY, H76407*
*CF02L 000000120L*

Log Number: PBSP-C-
(Note: Log numbers are not assigned to screen out appeals or informal level appeals.)

The enclosed documents are being returned to you for the following reasons:

*There has been too great a TIME LAPSE between when the action or decision occurred and when you filed your appeal with no explanation of why you did not or could not file in a timely fashion. Time limits expired per CCR 3084.6(c). Therefore, if you would like to pursue this matter further, you must submit an explanation and supporting documentation explaining why you did not or could not file your appeal timely.*

*UPON REVIEW OF ATTACHED 128-G, YOUR APPEAL ISSUE IS SOLELY WITH OCS, NOT ICC. YOUR APPEAL TIME FRAMES ARE WITH 15 WORKING DAYS OF RECEIVING A 128-B2. SHOULD YOU RECEIVE A NEW UPDATED 128-B2, YOU CAN FILE AN APPEAL WITHIN 15 WORKING DAYS OF THAT.*

Appeals Coordinator
Pelican Bay State Prison

**NOTE:** Failure to follow instruction(s) will be viewed as non-cooperation and your appeal will be automatically dismissed pursuant to CCR 3084.4(d). This screening decision may not be appealed. If you believe this screen out is in error, please return this form to the Appeals Coordinator with an explanation of why you believe it to be in error, and supporting documents. You have only 15 days to comply with the above directives.

## PERMANENT APPEAL ATTACHMENT – DO NOT REMOVE

EXH·B-50

# A necessary evil?; Pelican Bay State Prison Houses 'the Worst of the Worst' in the Starkest Isolation Imaginable. But These 'Supermax' Units Are Turning Inmates Into Mental Cases, and the Asylum Gate Opens Right Back Onto Our Streets.:[HOME EDITION]

*Vince Beiser.* **Los Angeles Times.** Los Angeles, Calif.: Oct 19, 2003. pg. I.12

**Full Text** (4629 words)

*Copyright (c) 2003 Los Angeles Times*

It's quiet in pod C5, deep inside Pelican Bay State Prison's Security Housing Unit, home to about 1,200 of California's most violent offenders. There are no sounds from outside, because there are no windows—only a skylight high overhead, through which gray daylight seeps into the bare quadrangle facing the pod's eight cells, stacked four on four. All that can be heard are a few subdued voices, and the occasional thunderous sound of a flushing toilet reverberating off the blank concrete walls.

This is not the crowded, clamorous kind of prison you see in the movies. The SHU, as it's known, is a starkly efficient place of electronically controlled doors and featureless concrete and steel. Occasionally, the monotony is punctured by bursts of noise and violence. Sometimes inmates scream at guards, other inmates, or themselves. Sometimes there is the clangorous racket of a recalcitrant prisoner being forcibly extracted from his cell. But most of the time, nothing happens. Almost nothing is permitted to happen. That's the idea of the SHU.

If you're an inmate in a regular prison—even a maximum-security prison, which the other two wings of Pelican Bay are—most days you can play basketball in the yard or cards in the day room, work in the laundry room or dining hall and take meals with the other men on your tier.

In the SHU, there are no jobs, no activities, hardly any educational programs and barely any human contact. You are locked in your 8-by-10-foot cell almost around the clock. You can't see the other prisoners in the cells adjoining yours, nor the guards watching from a central observation booth. Most of the time, all you can see through the fingertip-sized perforations in your cell's solid steel door is the wall of the eight-cell pod, the larger cage containing your cage. Guards deliver your meals. Once a day, the remote-controlled cell door grinds open, and you get 90 minutes to spend alone in a walled-in courtyard—a place more like the bottom of a mine shaft than an exercise yard. It's an environment about as restrictive and monotonous as human minds can design—and, perhaps, as human minds can tolerate.

Pelican Bay, which sprawls over 275 acres just south of the Oregon border, in a Tolkienesque region of misty mountains and ancient redwood forests, was among the first of a wave of new prisons equipped with ultra-restrictive "supermax" lockups that have proliferated nationwide in recent years. There are as many as 20,000 inmates housed in such facilities in at least 30 states.

California has three SHUs for men in its Pelican Bay, Corcoran and Tehachapi lockups, plus one for women in Valley State Prison in Chowchilla. They house about 3,000 convicts in all. But Pelican Bay is the one with the hardest cons and the harshest conditions, the end of the line for the inmates whom correctional officials call "the worst of the worst."

Like their counterparts in other states, California corrections officials say they need SHUs to control incorrigibly violent cons in the state's vast archipelago of prisons, teeming with nearly 160,000 inmates. While no one could argue with that goal, there are significant concerns about the tactic. For starters, it's not clear to what extent SHUs are indeed reducing prison violence.

More disturbingly, there's a growing worry that supermaxes—long decried by prisoner advocates as dangerous to the mental health of inmates—may be breeding danger for the general public.

Psychiatrists, activists and some correctional officials say the intense isolation of supermaxes is producing

EXPANDING

$EXH \cdot C - 51$

prisoners who are uncontrollably furious and sometimes violently deranged. Most of those prisoners will one day be set free. In the past three years, in fact, nearly 1,000 California SHU inmates at the end of their sentences were moved to less-restrictive prisons for just a few weeks, and then released.

And at least 403 inmates were paroled without even that intermediate step: They were taken straight from the solitary cells where they spent years marinating in their rage, handed $200 in gate money and put on a bus to rejoin the rest of us.

"T.C.," a Pelican Bay SHU inmate who, like most of the nearly two dozen current and former SHU prisoners interviewed for this article did not want his name published, wrote: "How does society expect a person to act once he has been released from the SHU, in most cases after spending years back here? There are things that happen here which people out there are never aware of; these things tend to build anger and hate in some persons, and if these persons don't have anyone to talk to, or complain to, that anger and hate continues to grow. If that person paroles, he's now a human time bomb waiting to release all that anger and hate, waiting to explode."

You can hardly blame prison authorities for liking the idea of supermaxes. Prison guards are spit on, screamed at and assaulted daily. Reducing the chances of being stabbed in the neck with a sharpened toothbrush is understandably a higher priority for them than fretting over how solitary confinement might change an inmate's mood.

But America's supermaxes have been denounced as inhumane by organizations from the ACLU to the United Nations. Fistfuls of lawsuits have been filed in recent years challenging conditions in supermaxes from California to Massachusetts. Some have succeeded in forcing changes. The latest, a suit on behalf of a Pelican Bay inmate charging that long-term SHU confinement constitutes cruel and unusual punishment, is slated to go to trial in December. So far, the courts have upheld the constitutionality of supermax-style imprisonment. But just because they're legal doesn't necessarily mean they're good policy. In fact, Democratic state Sen. Gloria Romero of Los Angeles, head of the Senate's Select Committee on the California Correctional System, has launched a campaign to investigate how supermaxes are affecting prisoners—and the public.

No question the Pelican Bay SHU holds a great many extraordinarily malicious men. Most of California's top prison gang leaders are there, including such luminaries as Aryan Brotherhood shot-callers Paul "Comfed" Schneider and Dale Bretches, the original owners of the dogs that mauled a San Francisco woman to death in 2001. The day before my visit there this year, a SHU inmate who was appearing in court stabbed his own lawyer with an ice pick- like shank he apparently had hidden in what a Pelican Bay spokesman referred to as his "keister."

There is considerable debate, however, about whether everyone in the SHU deserves to be there. No one is in the SHU for crimes they committed on the streets; you get sent there for doing something while you're in prison.

This works in two ways. The first is straightforward: If you violate prison rules—say, being caught with drugs or for attacking another inmate—you can be sent to the SHU for a set period of time as punishment.

The second is more ambiguous: Simply being declared a member or associate of a prison gang lands you in the SHU—indefinitely. About half the state's SHU inmates are in for this reason. Aside from getting paroled or going certifiably insane, the only way a "gang- validated" inmate can be released from the SHU is by "debriefing"— confessing everything he knows about other gang members, which entails obvious risks—or by convincing prison officials that he has been free from gang activity for six years.

"Prison gang members and associates are responsible for the largest percentage of violence in our institutions," says Steve Moore, the head of gang-related issues for the California Department of Corrections. "The idea is to extract those people from the general population."

Corrections officials and prisoners agree that California's half- dozen major prison gangs—Nazi Low Riders, Aryan Brotherhood, Black Guerrilla Family and several Latino factions—are behind a hefty chunk, though certainly not all, of the trouble in prisons statewide, from stabbings to drug dealing. And as the number of people cycling through the prison system has swelled in recent years, some of those gangs are believed to have begun

EXH C-52

forging increasingly close links with street gangs on the outside.

Activists and inmates, however, charge that the department's criteria for determining gang membership are overly broad, sending many undeserving inmates to supermax solitary. SHU inmates in Corcoran and Pelican Bay have staged two hunger strikes in the past two years over the issue, and Romero convened a hearing in September to investigate the corrections department's policy of identifying gang members. "I have very serious concerns about the validation process," Romero said at the hearing, held in Los Angeles. "In this time of constrained budgets, it's a good time to look at who is going into SHUs and whether they should really be there."

In response to these criticisms, Moore ordered a review of all gang validations. As of September, his office had looked at several hundred cases and found 17 that didn't pass muster.

Regardless of why prisoners are put in the SHU, perhaps the most pressing concern for the public is the inmates' mental states upon release. Dr. Stuart Grassian, a Boston psychiatrist who lectured at Harvard Medical School, has been studying the effects of solitary confinement for more than two decades, during which time he has examined more than 100 supermax prisoners, including 50 at Pelican Bay. His conclusion: Supermax prisons can literally drive inmates crazy.

"There are many scores of cases of people who never suffered psychiatric illnesses and developed them while incarcerated in supermaxes," he says. Other mental health professionals agree. "I've seen many prisoners with no history of mental illness who after some time in the SHU started cutting themselves," says Dr. Terry Kupers, an Oakland-based psychiatrist with decades of experience in prison work. "I've almost never seen self-mutilation among adult males anywhere else, but it's very common in SHUs." At the landmark Madrid v. Gomez federal trial in 1995 over conditions at Pelican Bay, even the prison's senior staff psychologist acknowledged seeing psychiatric deterioration among some SHU prisoners.

Supermax prisoners often develop similar symptoms, Grassian says. These include hallucinations; hypersensitivity to external stimuli; paranoia; panic attacks; hostile fantasies involving revenge, torture and mutilation; and violent or self-destructive outbursts, to the extent of gouging out one's eyes, smearing oneself with feces or biting chunks of flesh from one's own body.

Take Matthew Lowe, convicted of armed robbery, assault on a peace officer and grand theft auto. During his three years in the Pelican Bay SHU, Lowe never got to the point of biting off pieces of his sizable biceps, but in other ways he fits Grassian's diagnosis of a mentally ill inmate. Lowe is a big guy in baggy jeans and a motorcycle-shop sweatshirt, with a tiny soul patch on his chin and tattoos on his neck and fingers. At 38, he has spent most of his life behind bars, but he says his time in the SHU changed him in a way prison never had before.

"Them years of sitting in that little cell—it did something to me, I don't even know what," says Lowe, sitting on a couch in his girlfriend's tidy bungalow in a blue-collar suburb of San Francisco. "I only had conversations with about five or six people in three years. I'd sit in there and just think about doing crazy [stuff] all the time, like Tim McVeigh-type [stuff]. Your average prison doesn't do that to you." After years of obsessively ruminating about blowing up buildings and shooting cops, Lowe was finally paroled last year. He was taken from his SHU cell, shifted to San Quentin for a few days and then let out onto the streets of Marin County.

So far, he's doing all right, working as a roof-gutter installer and going to AA meetings. But he scares himself with how jumpy and paranoid he has become. "So many times I've come so close to snapping since I got out," he says. "One time in a store, someone cut in front of me in line—a 50-year-old guy, I don't think he even realized it. I had to catch myself, because my first thought was just to smash him."

Penal solitary confinement was essentially invented in the United States. In the late 1700s, whips and stocks were the preferred tools of public punishment. But reformers argued that by isolating criminals, their consciences would naturally lead to repenting their evil ways.

In 1790, Pennsylvania opened the first prison designed for this purpose, dubbed a "penitentiary." Several American states and European nations soon followed suit. But the penitentiaries gradually fell out of favor as evidence began to mount that they were often driving inmates mad. As the Supreme Court observed in an 1690

EXH. C-53

ruling condemning the penitentiary system: "A considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition . . . and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed."

Still, solitary confinement continued to be used as a short-term punishment for inmates. But the idea of keeping large numbers of convicts permanently in such severe conditions didn't return until the 1980s, as America's prison population began mushrooming. Driven largely by tough anti-drug and "three-strikes"-type mandatory minimum sentencing laws, the number of Americans behind bars has quadrupled since 1980 to an all-time high of about 2 million today. In the same get-tough-on-criminals spirit, many states have also cut back educational programs, exercise facilities and other "perks" for prisoners. Violence grew apace. Desperate to restore order to the federal maximum-security lockup at Marion, III., authorities in 1983 put the entire facility on indefinite lockdown. Under the administrations of then-Gov. George Deukmejian and then-Corrections Department head James Rowland, California was among the first states to copy the concept, opening SHUs at Corcoran in 1988, and Pelican Bay in 1989.

Pelican Bay came under fire almost right away, both over alleged abuses by guards and conditions in the SHU. In the Madrid v. Gomez decision, U.S. District Court Judge Thelton Henderson ruled that there was a "pattern of brutality" by the guards. On whether the SHU itself was damaging to inmates' mental health, he ruled that while the SHU "may press the outer bounds of what most humans can psychologically tolerate" and could seriously exacerbate previously existing mental illnesses, there was not enough proof to show that it could drive a sane man mad.

Pelican Bay instituted several reforms as a result of the case, including creating a 127-bed psychiatric unit and beefing up its mental-health staff to a total of 79. As far as the prison was concerned, that took care of the problem. "We moved all of those with mental illnesses into the [psychiatric unit] after the Madrid decision," declares Rawland Swift, who, until recently, was the Pelican Bay spokesman. Certainly, the SHU's conditions aren't as extreme as those that so appalled the 1890 Supreme Court. Pelican Bay SHU inmates can talk to others in neighboring cells, receive letters and see visitors (through security glass) on weekends. Those who can afford them have TVs (though they can only watch during the day and must listen through earphones). Most occasionally leave their cells for brief excursions to court or for medical treatment.

A select number of SHU inmates even have cellmates, but most are housed alone, and the overwhelming bulk of their time is spent in a small concrete and steel box. It seems entirely possible that a good many SHU inmates are losing their grip on reality—whether their keepers acknowledge it or not.

Prisoners are given mental-health attention if their guards— hardly experts in such matters—deem their behavior strange enough to warrant an examination. Swift told me that while seemingly troubled prisoners are often taken to the psychiatric unit for evaluation, the psychiatrists almost always send them back, saying, "He's got a behavioral problem, not a mental health problem." This echoes disturbingly a finding of the judge in the Madrid decision: "It is clear . . . that an overburdened, and sometimes indifferent, mental health staff is far too quick to dismiss an inmate as a 'malingerer' and thus deny him needed treatment."

Almost all of the inmates I interviewed (and at least one correctional officer who did not want to be named) said they had seen other prisoners suffer serious mental deterioration in the SHU--screaming, banging on doors, cutting themselves. "I have seen plenty of people lose their sanity while in the SHU. I used to think that they were faking it . . . but once being around them for a while you could see that it was no act," writes Pelican Bay SHU inmate Otis Booker. "When you hear a guy holding a conversation with himself, or calling out cadences to exercises that he's not even doing or growling out animal sounds all day, you know something's not right."

Grassian estimates that as many as one-third of all supermax inmates are suffering some kind of psychiatric trouble--most of which goes undiagnosed. "A guard may see a prisoner hiding under a blanket, obviously delusional, but as long as he's not screaming or throwing feces, he's OK as far as they're concerned," Grassian says.

All of which could help explain the case of Erik Scott January, convicted of armed robbery. His mother, Long Beach resident Laura Daniher, says that before he was sent to the Corcoran SHU in 1997, January had no history of mental health problems. After a couple of years in the SHU, though, he started raving about the evil spirits he saw dancing on the walls.

EXH - C 54

In a letter to her from mid-2001, January writes relatively lucidly for most of two pages, asking about her house and other chitchat—and then mentions that he has been seeing things and experiencing other "strange occurrences." A few months later, another letter makes it apparent he has left reality far behind: "I am Tutankamen mother. . . . take a time to pray to your hi Hitler power of white skin because I need some hand in time I need hand time handtime . . . god is the sun I am the sun I am Satan I am Lucifer."

Vanessa Filley, a member of California Prison Focus, a San Francisco-based advocacy group, visited January early last year and found him "in a delusional state," suffering "visual hallucinations." In a letter to the warden asking that January be taken out of the SHU, Filley states that she was told by a Corcoran psychiatrist that January "is not dysfunctional to the point of forced intervention, therefore barring any specific behavior we can't do anything." At the time of this writing, January was still in the SHU.

Certainly, SHUs don't drive everyone over the threshold of clinical insanity. But they may have dangerous effects short of that. What happens when you take a man who had antisocial and violent impulses to begin with, lock him in a cell by himself for five or 10 years, and then let him out?

"It's like keeping a dog that has bitten someone in a cage, kicking it and beating it all the time until it gets as crazy and vicious as it can be, and then one day you open the cage and run away," Grassian says. "Taking someone straight from the Pelican Bay SHU and sending them back to San Francisco or Los Angeles is about as dangerous a thing as you can do."

Even some corrections officials agree. "From my experience as a prison administrator, the prolonged confinement of inmates with little or no contact with others will only make people worse," Jerry Enomoto, a former California director of corrections, said when the Madrid lawsuit first hit the courts. (Current Department of Corrections director Ed Alameida did not respond to several requests for an interview.)

Some people, of course, are less affected by the SHU than others. But at best, it seems, coming out of the SHU often leaves prisoners dangerously ill-equipped to cope with the stress of being around other people.

"Tony" is a 30-year-old Latino and former gangbanger with a generous mustache and hair cropped so short you can see the scars on his head. He has done time in both the Corcoran and Pelican Bay SHUs. Since his parole last year, he has been living with his mom in a quiet Bay Area town and working as a diesel mechanic. On the spring afternoon I met him, an ancient little dog was asleep on a pillow in the front yard next to Tony's massive weight set.

Like Matthew Lowe, Tony was sent straight home from the SHU after a few days in San Quentin. "On my first day out, my mom took me to the grocery store," he says. "I blew up on a couple of people. There was some woman who came up about five feet behind me, and I turned and said, 'Don't stand so close to me!' " Months later, he still breaks out in hot sweats when he's out in crowds. The day before, he says he found himself moving warily away from an elderly woman standing behind him in line at the post office. "I'm not the same," he says. "Look at me, I'm paranoid of a 90-year-old lady in the post office. It's from being so isolated. No wonder people who've been in five or six years come out and kill people."

There have been at least a few hair-raisingly brutal crimes committed by convicts fresh out of supermaxes. In 1992, one day after getting out of the Pelican Bay SHU, Robert Lee Davenport, 24, kidnapped, beat and raped a woman in El Cerrito. In 1995, within a week of his release from the same facility, Robert Walter Scully, 36, killed a Sonoma County sheriff's deputy, took hostages and barricaded himself inside a house in a standoff with police before finally surrendering.

Judging from the media coverage and conversations with people who remember these cases, it doesn't seem that anyone made the connection, or pointed to the SHUs as possibly having contributed to crimes committed by former SHU inmates. Grassian says he has served as consultant on more than a dozen similar cases nationwide. There may be more crimes to add to this list, but no one keeps track of what happens to SHU inmates as a group after they are freed to their parole officers. They are just another former con.

The jury is still out on whether isolating troublemakers in supermaxes is actually cutting down prison violence.

According to Department of Corrections statistics, killings in California prisons dropped dramatically in the years immediately after the Corcoran and Pelican Bay SHUs opened. But the total rate of assaults in the state prisons has been rising since. As of 2000, the inmate-on-inmate assault rate was just as high as in the years before the SHUs opened, and the rate of armed assaults on staff was even higher. Despite its oppressive security, there were 221 assaults in the Pelican Bay SHU last year—inmates assaulting guards when they are taken to court, for example, or by ingenious methods such as firing homemade blowguns though the perforations in their cell doors. More ominously, in the past two years federal prosecutors have charged more than a dozen members of two prison gangs with directing—via letters and visitors—scores of murders and attempted murders in prisons around the country from their cells in the Pelican Bay SHU.

Moore is aware of all this. But, he says, the SHUs are better than nothing. "We have much better investigative tools with the gang leaders in the SHUs," he says. "We know where they are. We can monitor them more closely. Will we ever totally stop them? No. But are we hindering them? Yes. And the best way we've found so far to do that is the SHU."

This is a common view among supermax supporters. Still, as a 1999 National Institute of Corrections report on these facilities points out, "There exists little or no hard data comparing such perceived impacts on entire systems versus the fiscal cost to gain such results." That's no small matter, considering how prodigiously expensive supermaxes are. Taxpayers forked over $218 million to build Pelican Bay, and spend $115 million every year to keep it running. It costs California about $28,000 per year to hold an average prisoner, but SHU inmates, with their elaborate security measures, cost substantially more. The Department of Corrections won't provide an exact figure, but most experts estimate the cost is as much as two or three times greater.

"We should definitely be looking at ways to reduce the number of inmates in SHUs," says state Sen. Romero, who visited Pelican Bay in June. "We may not like the fact that someone is a gang member, but is that a reason to throw them in this prison-in-a-prison? I'm not convinced of that, especially given the high costs." She aims to keep up pressure on the corrections department to modify its gang- validation policy, and to have more research done into what happens to SHU inmates after they are released.

It makes more sense, says Charles Carbone, an attorney with California Prison Focus, to deal with chronic violent offenders on a case-by-case basis, rather than shovel everyone who might be involved in violence into SHUs. "The purpose of the SHU can be served in each prison by administrative segregation," he says, referring to a type of solitary confinement that's not as restrictive and long. "But even then, those people should not be cut off from rehabilitative programs. In fact, they should get more. Cutting them off completely from all stimulation does nobody any good."

Psychiatrist Kupers, among others, believes the main cause of the surge in violence in the '80s was overcrowding and the idleness that resulted from programs being cut. "If you take everything away, prisoners become desperate, and therefore uncontrollable," he says. "Crowding, idleness and lack of rehabilitation cause violence. And no amount of supermaxes will stop that."

Even if you believe SHUs are necessary, Grassian says, they can be modified to make them more humane. In particular, Grassian recommends creating a transitional program to slowly reintroduce inmates to interaction with other people, something that happens in several other states. At present, with the exception of prisoners who are debriefed, the only pre-release preparation Pelican Bay SHU inmates are offered is a voluntary program that primarily consists of watching videos.

Making visits easier could also ease the transition, with prisoners housed in SHU facilities closer to home. Most experts agree that prisoners who maintain family ties generally do better after release. But Pelican Bay is a solid 14-hour drive from Los Angeles, its biggest single source of inmates; getting up there is a challenge for many families. "That visiting room is never full, even though there are over 1,000 people in the SHU," says Oakland resident Helen Grimes, who makes the trek almost every month to visit her son.

No such changes seem likely to happen soon, however. While the current state budget boosts corrections spending overall, it cut funds for inmate-related programs. Gov. Gray Davis understood well that most voters are not especially concerned about what happens to prisoners in SHUs or elsewhere. For them, the moral equation seems simple: Prisoners broke the law; let them suffer the consequences.

EXH. C-56

But most of the prisoners locked away in the maddening solitude of the SHUs will one day be freed to return to our midst—some of them angrier, more impulsive and more unbalanced than ever. And we will all have to live with those consequences.

**[Illustration]**
Caption: PHOTO: (no caption); PHOTOGRAPHER: Dan Winters; PHOTO: (no caption); PHOTOGRAPHER: Dan Winters; PHOTO: (no caption); PHOTOGRAPHER: Dan Winters; PHOTO: (no caption); PHOTOGRAPHER: Dan Winters; PHOTO: (no caption); PHOTOGRAPHER: Dan Winters; PHOTO: (no caption); PHOTOGRAPHER: Dan Winters; PHOTO: (no caption); PHOTOGRAPHER: Dan Winters

Credit: Vince Beiser is a California-based freelance writer who writes often on criminal justice issues.

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.
Subjects:
Locations:          California
Companies:          Pelican Bay State Prison-California (NAICS: 922140 )
Article types:      Feature
Section:            *Los Angeles Times Magazine; Part I; Lat Magazine Desk*
ISSN/ISBN:          04583035
Text Word Count 4629

EXH C-57

## PROOF OF SERVICE BY MAIL

(C.C.P. Section 101a #2105.5, 20 U.S.C. 1746)

I, WILLIAM MURPHY_____, am a resident of Pelican Bay State Prison, in the County of Del Norte, State of California. I am over eighteen (18) years of age and am a party to the below named action.

My Address is: P.O. Box 7500, Crescent City, CA 95531.

On the_____ day of _____, in the year of 20___, I served the following documents: (set forth the exact title of documents served)

COMPLAINT BY A PRISONER UNDER THE CIVIL RIGHTS ACT,

42 U.S.C §§ 1983

on the party(s) listed below by placing a true copy(s) of said document(s) closed in a sealed envelope(s) with postage thereon fully paid, in the United States mail, in a deposit box so provided at Pelican Bay State Prison, Crescent City, CA 95531 and addressed as follows:

UNIT C-2

| | |
|---|---|
| U.S. Northern Dist. of Ca. U.S. Courthouse 450 Golden Gate Ave. San Francisco, Ca. 94102-3483 | |
| | |

I declare under penalty of perjury that the foregoing is true and correct.

Dated this __15__ day of _____APRIL_____, 20 08.

Signed: _____
                    (Declarant Signature)

Rev. 12/06

EXH·C-58